UNITED STATES DISTRICT COURT
THE DISTRICT OF COLUMBIA
-----------------------------------------------------------X
GREAT NORTHERN INSURANCE COMPANY, :
                                       :

         Plaintiff and Counter-Defendant,    :
                                         :     Case No: 1:07-cv-01804-EGS

         -against-                              :
                                         :

JOEL HIRSCH and CAROL HIRSCH,
                                         :

         Defendants and Counter-Plaintiffs.   :
-----------------------------------------------------------X

## <u>GREAT NORTHERN'S MOTION TO DISMISS THE COUNTERCLAIM</u>

Plaintiff/Counter-Defendant Great Northern, by their undersigned counsel, hereby move

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for dismissal of the First,

Second, Third, Fourth and Fifth Counterclaims asserted in the Defendants' Answer and

Counterclaim, on the grounds that they fail to set forth a claim for which relief can be granted.

The grounds for this motion are set forth in more detail in the memorandum and exhibits

submitted herewith. A proposed Order is attached.

Dated January 18, 2008

                      Respectfully submitted,

                      KORNSTEIN VEISZ WEXLER & POLLARD, LLP

                      By _William B. Pollard III_____
                            William B. Pollard, III
                            D.C. Bar No. 947275
                    David T. McTaggart (*pro hac vice*)
                    757 Third Avenue
                    New York, NY 10017
                    (212) 418-8600

-- and --

Karen Ventrell
D.C. Bar No. 466150
ROSS, DIXON & BELL, LLP
2001 K Street, NW
Washington, DC 20006
(202) 662-2000

***Attorneys for Plaintiff/Counter-Defendant,
Great Northern Insurance Co.***

UNITED STATES DISTRICT COURT
THE DISTRICT OF COLUMBIA
-------------------------------------------------------------------X
GREAT NORTHERN INSURANCE COMPANY, :
                                                            :
            Plaintiff and Counter-Defendant,     :
                                                            :            Case No: 1:07-cv-01804-EGS
            -against-                                    :
                                                            :
JOEL HIRSCH and CAROL HIRSCH,          :
                                                            :
            Defendants and Counter-Plaintiffs.   :
-------------------------------------------------------------------X

## GREAT NORTHERN'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COUNTERCLAIM

### Preliminary Statement

Great Northern Insurance Company ("Great Northern") has sued the Defendants Joel Hirsch and Carol Hirsch, his spouse, (collectively, the "Hirsches") to recover $280,065.39 that it paid them towards settlement of a claim they made under a homeowner's insurance policy for alleged damage to property that they jointly or separately owned. The reason for the lawsuit is simple. Joel Hirsch made a number of material representations to Great Northern during the adjustment of Defendants' claim. Specifically, he submitted fictitious documents that he created to support the claim, and, through deception, he sought and was paid twice for the same painting work. Under the express terms of their Great Northern insurance policy, that wrongful conduct voided the policy, nullified coverage for the Hirsches' alleged loss, and obligated them to return the money that Great Northern had previously paid towards the settlement of their claim.

Now facing the prospect of having to return almost $300,000 in insurance proceeds, Defendants asserted five frivolous claims in their Counterclaim, principally predicated on Great

Northern's efforts to investigate Joel Hirsch's misrepresentations to it or to recover claim payments Defendants are barred from retaining because of that misconduct. As demonstrated below, all five counterclaims should be dismissed.

In a nutshell, Defendants contend that Great Northern breached a fiduciary duty owed them and breached the implied contractual covenant of good faith and fair dealing by investigating Joel Hirsch's misconduct and bringing this lawsuit. However, no such fiduciary duty exists under District of Columbia law in the context of a first party claim, and, even if it did, the conduct alleged does not make out any such breach. This claim fails because Defendants' allegations do no more than contend that Great Northern sought to exercise its rights under the Policy to recover money to which Defendants are no longer entitled to keep. To the extent that Defendants seek to turn this claim or any other claim into one for alleged unfair claims-handling, the District's law does not recognize such a claim.

In conclusory fashion, the Hirsches further allege that Great Northern's investigation of Joel Hirsch's wrongful conduct, which is required by statute, *see* D.C. Code § 22-3225.09 (2001), amounted to an intentional infliction of emotional distress. However, their pleadings do not allege the sort of outrageous conduct that is required to plead such a claim. Similarly, their pleadings fail to allege cognizable damages resulting from that aleged conduct.

Defendants also contend that Great Northern breached its contract of insurance "by seeking to void the [policy] for reasons that are not set forth under the terms of the contract" and by other unspecified conduct purportedly alleged in the Counterclaim. Such allegations are deficient and do not set forth a breach of contract claim. The allegations also simply ignore the record fact that Great Northern's complaint is based on the Fraud or Concealment provision in the Policy.

2

Defendants next contend that Great Northern's advertising and other promotional material -- which are never specifically identified -- promising "hassle free" claims-handling, along with its alleged failure to explicitly warn them that any material misrepresentation concerning their claim would void the policy, somehow breached some unspecified provision of the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, et seq. This claim fails because (1) Great Northern's alleged promotional materials do not contain any actionable statements under that statute; (2) the claims are not pleaded with the particularity required by Rules 8 and 9(b), Federal Rules of Civil Procedure; and (3) whatever the statute may require, it does not require an insurer defrauded by its insured to refrain from investigating suspected fraud or suing for damages when it finds fraud.

In short, each of the counterclaims fails to allege a claim upon which relief can be granted, and, therefore, each should be dismissed at the pleading stage of this action.

## Summary of the Pleadings

### The Complaint

Great Northern issued a homeowner's insurance policy No. 11833276-02 to Joel Hirsch (the "Policy") providing insurance against all risk of physical loss for the premises known as 3115 Cleveland Avenue NW, Washington, D.C. (the "Residence"), and certain contents therein and certain other insurance as more fully stated by the Policy's terms, conditions and exclusions for the June 21, 2006 to June 21, 2007 period.[*] Under the terms of the Policy, Carol Hirsch was an insured.[**]

---

[*]    The Policy is attached as Exhibit A to the Affidavit of Dan Jaeger, sworn to January 18, 2008. In deciding a motion to dismiss, Courts may consider documents incorporated by reference into the claims alleged. *See, e.g., Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999). Because Defendants allege in their Counterclaim that Great Northern breached the Policy (Counterclaim ¶¶ 80-83) and make other

3

(Complaint ¶¶ 10-11.)

In the event of a claim, the Policy provides in pertinent part:

> If you have a loss this policy may cover, you must perform these duties:
>
>                 *       *       *
>
> Prepare an inventory. You must prepare an inventory of damaged personal property, describing the property in full. It should show in detail the amount insured under this policy and actual amount of the loss. Attach bills, receipts, and other documents to support your inventory.
>
>                 *       *       *
>
> Proof of loss. At our request you must submit to us your signed sworn proof of loss on a form we have sent to you.
>
> Examination under oath. We have the right to examine under oath as often as we may reasonably require you, family members and other members of your household and have them subscribe the same. We may also ask you to give us a signed description of the circumstances surrounding a loss and your interest in it, and to produce all records and documents we request and permit us to make copies.

(Complaint ¶ 12; Policy at Y-4.)

The Policy also provides:

> Concealment or fraud
>
> This policy is void if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss.

(Complaint ¶ 12; Policy at Y-1.)

---

references to it, the Court may consider the Policy in addressing the instant motion to dismiss. *Id.*

   ** Defendants canceled the Policy effective March 1, 2007. (Policy, at 82.)

On or about June 26, 2006, Joel Hirsch notified Great Northern that a storm had damaged the Residence as well as property within it. Subsequently, Joel Hirsch submitted a claim under the Policy on his and Carol Hirsch's behalf for alleged loss to property that he and/or she owned. (Complaint ¶ 13.) Defendants acknowledge that between the June 26 reporting of the claim and October 23, 2006, Great Northern paid them $280,065.39 towards settlement of their claim. (Counterclaim ¶¶ 25, 27-32, 36-40.) They also concede that Great Northern never completed its adjustment of their claim, and that their claim was still open at the time that Great Northern denied it. (Counterclaim ¶¶ 40, 43, 60(l).)

In an effort to induce and to obtain payment for their claim, Joel Hirsch submitted a number of fraudulent and fictitious documents to Great Northern. One document purported to be an estimate and invoice prepared by Stephen Frischling, Inc. for the value and repair of certain decorative doors (the "Frischling invoice"). A second document purported to be a proposal by Wentworth, Inc. to provide project management services, for a $10,000 fee, in connection with the repairs to the house (the "Wentworth proposal"). (Complaint ¶¶ 14-18.)

Steven Frischling, the principal of Steven Frischling, Inc., has stated under oath that the Frischling invoice was neither prepared by him nor by anyone employed by him. He also stated under oath that none of the valuation and cost opinions set forth in the invoice were supplied by his company. Bruce Wentworth, the principal of Wentworth, Inc., has stated under oath that the Wentworth proposal was not prepared by him, or anyone employed by him, and that his company never prepared any proposal for Joel and Carol Hirsch to provide project management services for the repair of their home. In addition, Joel Hirsch has admitted that he fabricated the Frischling invoice. He also has said that he does not know the provenance of the Wentworth proposal.

5

(Complaint ¶¶ 19-22.)  Specifically, during a December 11, 2006 recorded interview with Great

Northern, Joel Hirsch said:[*]

> JH:   And frankly, it didn't dawn on me to do that with the doors.  So [Mr.
>       Frischling] said to me he didn't really want to mess with the doors.  And so
>       I wrote this letter.
>
> DJ:   You wrote this letter?
>
> JH:   I wrote this letter.
>
> DJ:   On Mr. Frischling's letterhead?
>
> JH:   I wrote this letter, yes.
>
> \*       \*       \*       \*
>
> DJ:   Did [Mr. Frischling] give you authorization to write a letter on his letterhead
>       and submit it [to Great Northern] under his name?
>
> JH:   Not exactly.
>
> DJ:   Well, did you do it without his authority in order to get paid for these doors?
>
> JH:   I did it to satisfy the demand that I was getting [from Great Northern] for
>       information that I couldn't otherwise supply.
>
> Tr. 8-9
>
> \*       \*       \*       \*       \*       \*       \*       \*
>
> DJ:   Did you create this letter?  I'm asking you whether or not this letter is from
>       Bruce Wentworth of Wentworth, incorporated, or is this another letter like
>       the Frischling letter that you actually authored and sent to us purportedly from

---

[*] See Jaeger Affidavit, Exhibit B at 8-9, 17.  The Hirsches allege that Joel Hirsch agreed to
"submit to a recorded interview" with Mr. Jaeger, a Great Northern investigator, and alleges that the
behavior of Mr. Jaeger during that interview gives rise to each of the claims in the Counterclaim.
(Counterclaim ¶¶ 45-47, 57, 65, 75, 80, 84.)  As such, the recorded interview transcript is central to
the claims alleged, and is to be treated as part of the allegations in the Counterclaim. *See, e.g., Lipton*
135 F. Supp. 2d at 186; *Vanover*, 77 F. Supp. 2d at 98.

Bruce Wentworth?

JH:    I don't remember creating this letter.

DJ:    Is it possible?

JH:    I don't know.

Tr. 17

Joel Hirsch also submitted fabricated invoices to obtain payment for painting work that was done at the Residence. The only painting work that potentially was covered under the Policy was interior painting. Joel Hirsch hired Juenemann Painting ("Juenemann") to perform the interior <u>and</u> exterior painting. Juenemann sent him five invoices for that work. The total amount billed was $11,701.00, of which $9,846.00 was for interior painting. However, Joel Hirsch altered two of Juenemann's bills and submitted them to Great Northern. Those two bills falsely represented that Juenemann had charged $18,675.00 for the interior painting work it had done. Using those fraudulent invoices, Joel Hirsch sought and was paid $18,675.00 by Great Northern, double the amount that Juenemann had charged for the interior painting actually completed. (Complaint ¶¶ 23-27.)

In addition, Joel Hirsch also double billed Great Northern for interior painting performed at the Residence. He originally used Eight Brothers Company ("Eight Brothers") as his painting contractor. He submitted Eight Brothers' invoices for certain interior painting work that it did, and Great Northern paid its insured the amounts billed. Joel Hirsch, however, was unsatisfied with Eight Brothers' work, and had Juenemann re-do that work. He then submitted Juenemann's invoices that contained charges for the very same work previously done by Eight Brothers, but represented that

7

it was fresh work. Relying upon Hirsch's representation, Great Northern paid Juenemann's bills. During his December 11, 2006 interview, Joel Hirsch admitted that he deceived Great Northern through this improper double billing. (Complaint ¶ 28.) *See also* Jaeger Affidavit, Ex. B at 30-32.

Based upon these and other allegations in the Complaint, Great Northern seeks a declaration that the Policy is void based on the Policy's Fraud or Concealment provisions, and that it is entitled to recover the money previously paid Defendants towards settlement of their claim. Great Northern also seeks to recover its prior claim payments on the ground that the Hirsches breached the contract of insurance by failing to cooperate with Great Northern's adjustment and investigation of their claim. Specifically, Great Northern has alleged that Joel Hirsch and Carol Hirsch breached the Policy (the contract of insurance) by refusing to:

    a.    be examined under oath;

    b.    produce records and documents relevant to Great Northern's investigation of the claim;

    c.    allow Great Northern to inspect and copy documents in the possession of third parties which Hirsch contended had provided services in conjunction with the claim; and/or

    d.    submit signed, sworn proofs of loss for the claim.

Under the terms of the Policy, Joel and Carol Hirsch were required to do each of these things. (Complaint ¶¶ 12, 31-35.) Tellingly, the Counterclaim openly acknowledges the conduct which breached such provisions. (Counterclaim ¶¶ 50-53.) Finally, Great Northern seeks to recover its claim payments on the ground that Defendants were unjustly enriched. (Complaint ¶¶ 42-44.) The Counterclaim was filed in response to the Complaint.

8

**The Counterclaims**

The factual predicate for each of the five claims in the Counterclaim is based on a core set of allegations regarding Great Northern's claim adjustment and, later, its claim investigation concerning the fraudulent and fictitious documents that Joel Hirsch submitted in support of the claim. The Hirsches specifically allege:

1.    Great Northern's claims representative (Larry Babinski) did not respond to Joel Hirsch's correspondence regarding the claim in a sufficiently prompt manner. (Counterclaim ¶¶ 24, 33-34);

2.    Great Northern did not inform the Hirsches that payments made toward settlement of their claim were subject to further investigation of the claim or that the Hirsches remained obligated to provide sworn proofs of loss, sit for examinations under oath or provide other cooperation in any claim investigation. (Counterclaim ¶¶ 25-30, 32, 35-36, 39);

3.    Dan Jaeger, a Great Northern investigator, "demanded to see and photograph certain items" that were subject to the claim, and "requested that Mr. Hirsch submit to a recorded interview [to which] Mr. Hirsch complied." During the interview Mr. Jaeger allegedly "disparaged and humiliated Mr. Hirsch, using a condescending and accusatory tone and implying that Mr. Hirsch was attempting to defraud Great Northern . . . which caused Mr. Hirsch severe emotional distress." Subsequent to the interview, Great Northern referred the Hirsches' claim to a law firm for further inquiry. (Counterclaim ¶¶ 45-49);

4.    That law firm and a subsequent firm "demand[ed] that the Hirschs submit a sworn statement in proof of loss and submit to an examination under oath . . . [and] further demanded that the Hirschs provide . . . [Great Northern] with extensive documentation" concerning their claim.

9

(Counterclaim ¶¶ 50-51);*

5.      Notwithstanding the Hirsches' rejection of Great Northern's demand, by "letters dated December 28, 2007, January 23, 2007, February 8, 2007, February 23, 2007, March 14, 2007, April 7, 2007, and May 16, 2007, Great Northern continued to demand that Mr. and Mrs. Hirsch submit sworn proofs of loss, submit to examinations under oath, and provide voluminous documentation." Great Northern next filed suit on October 9, 2007 seeking to recover payments that it made to the Hirsches towards settlement of their claim.  (Counterclaim ¶¶ 53-54);

6.      The Hirsches then allege:

> As a result of Great Northern's extreme and outrageous conduct in handling their claim so poorly, harassing and haranguing them for additional documentation, and then serving them with a lawsuit to recover monies already spent to repair severe water damages to their home, Mr. and Mrs. Hirsch have suffered severe emotional distress. They have not been able to sleep, have suffered loss of appetite, have been unable to enjoy the company of family at their home, have been unable to enjoy the full use of their home, and have endured severe stress. Mrs. Hirsch has had a series of medical issues of unknown etiology related to or aggravated by stress.

(Counterclaim ¶ 56.)

Counterclaim for Breach of Fiduciary Duty

Defendants contend that Great Northern's actions described above in adjusting and investigating their claim breached a fiduciary duty that Great Northern owed them.  (Counterclaim ¶ 60.) Additionally, they allege that "advertising materials" were provided to them regarding Great Northern's "'hassle free' claims handling" which were untrue because of the claim investigation Great Northern conducted, and that this breached an unspecified law that prohibits such alleged false

---

*   The original firm retained by Great Northern withdrew to avoid a dispute regarding meritless conflict of interest claims made by the Hirsches.  (Counterclaim ¶¶ 51-52.)

statements by insurance carriers. In turn, this also "breached [Great Northern's] fiduciary duty to the Hirschs." (Counterclaim ¶¶ 61-62.) Great Northern's alleged breaches of its purported fiduciary duty owed the Hirsches caused Defendants unspecified damages. (Counterclaim ¶ 63.)

Counterclaim for Breach of the Duty of Good Faith and Fair Dealing

Defendants next contend that "District of Columbia law sets forth standards for an insurance company's duties of good faith and fair dealing," but they cite no statute or other authority which would inform the Court or Great Northern of the basis for this legal contention. (Counterclaim ¶ 68.) They further allege that "Great Northern breached its duty of good faith and fair dealing to the Hirschs" by its investigation of their claim, by not commencing that investigation or denying their claim until after the Hirsches allegedly had spent the money that Great Northern had advanced toward settlement of their claim, by seeking to enforce its rights under the Policy (such as requiring a signed proof of loss and seeking a declaration that Joel Hirsch's misconduct voided the Policy), by the claims adjuster's alleged failure to promptly respond to Joel Hirsch's communications, by failing to promptly and fairly adjust the Hirsches' claim and by "not hav[ing] a reasonable basis for belatedly denying coverage" for their claim. (Counterclaim ¶¶ 69, 72.)

Without benefit of citation, Defendants also allege that "[a]s part of the duty of good faith and fair dealing, District of Columbia law also prohibits an insurer from making statements that misrepresent" policy benefits. Defendants then allege that they were provided Great Northern "advertising materials" promising "'hassle free' claims-handling," and that this alleged promise was broken because Great Northern investigated their claim after suspecting fraud. This alleged conduct, Defendants contend, breached the "duties of good faith and fair dealing" owed them. (Counterclaim ¶¶ 70-71.) Defendants also alleged unspecified damages as a result of this alleged conduct.

11

(Counterclaim ¶ 73.)

Counterclaim for Intentional Infliction of Emotional Distress

The Hirsches describe their claim for intentional infliction of emotional distress as follows:

> Great Northern's conduct in failing to respond promptly to the Hirschs during the investigation of their claim, sending an investigator to the Hirschs' home who humiliated and disparaged Mr. Hirsch, sending the Hirschs threatening letters, repeatedly inquiring about items that are not material to the Hirschs' claim, seeking to void the Hirschs' insurance policy after paying almost the entirety of their claim (and without refunding premiums paid (with interest)), and seeking recovery of moneys it knows have been spent to repair or replace the Hirschs' home and its contents after damage to the home that it acknowledged was "severe" is egregious, extreme, and outrageous.

(Counterclaim ¶ 76.)

In allegedly so acting, Great Northern "intend[ed] to cause the Hirschs severe emotional distress and/or recklessly disregarding that its conduct would in fact cause the Hirschs severe emotional distress." (Counterclaim ¶ 77.)  As a result:

> The Hirschs have not been able to sleep, have suffered loss of appetite, have been unable to enjoy the company of family at their home, have been unable to enjoy the full use of their home, and have endured severe stress. Mrs. Hirsch has had a series of medical issues of unknown etiology related to or aggravated by stress.

(Counterclaim ¶ 78.)  Unspecified damages are sought.

Counterclaim for Breach of Contract

The sum and substance of the Hirsches' fourth counterclaim is as follows: "Great Northern breached this contract by seeking to void the Hirschs' . . . Policy . . . for reasons that are not set forth under the terms of the contract and by its other conduct alleged herein." (Counterclaim ¶ 82.) Unspecified damages are sought.

<u>Counterclaim for Unfair Trade Practices</u>

The fifth and final counterclaim is based upon an alleged breach of an unspecified provision in "the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, et seq." The Hirsches allege that Great Northern violated this statute (1) by falsely representing that it had "hassle-free" claims service, and that the Hirsches "relied on these representations to their detriment"; and (2) by failing to inform the Hirsches that the payments made toward settlement of their claim were subject to recoupment if the Hirsches breached the terms of the Policy. Unspecified actual and treble damages are sought for the unspecified alleged violation of the Act. (Counterclaim ¶¶ 85-88.)

<u>Relief Seeking Punitive Damages</u>

The Hirsches seek punitive damages under the first, second, third and fifth counterclaims on the ground that "Great Northern has been and is guilty of oppression and malice and has otherwise acted in conscious disregard of the Hirschs' rights." (Counterclaim ¶¶ 64, 74, 79, 89.)

## ARGUMENT

I

### THE BREACH OF FIDUCIARY DUTY COUNTERCLAIM SHOULD BE DISMISSED AS A MATTER OF LAW BECAUSE <u>NO FIDUCIARY RELATIONSHIP EXISTS BETWEEN THE PARTIES</u>

The Hirsches' first counterclaim (¶¶ 58-64), based upon Great Northern's alleged breach of a fiduciary duty, fails as a matter of law. District of Columbia law does not recognize a fiduciary relationship between an insurer and its policyholder in the context of a first-party claim. *See, e.g., Fireman's Fund Ins. Co. v. CTIA-The Wireless Ass'n*, 480 F. Supp. 2d 7, 15 (D.D.C. 2007) (concluding that both D.C. and Maryland law, which was the source of the District's law, "treat the relationship between insurer and insured as a matter of contract, not a fiduciary relationship")

13

(quoting *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 119 (1993));

*Wright v. Donegal Ins. Cos.*, No. WDQ-06-827, 2006 WL 4748707, at *2 (D. Md. June 7, 2006)

("In Maryland, an insurer's duty to settle a claim is entirely contractual, therefore, no tort liability

arises. *See Hartz v. Liberty Mut. Ins. Co.*, 269 F.3d 474,476 (4th Cir.2001) (*citing Jones v. Hyatt

Ins. Agency, Inc.*, 356 Md. 639, 1107-08 (1999) (tort duty does not arise from insurer's failure to

settle claim)."); 14 *Couch on Insurance* 198:7 (3d ed. 1995) (discussing general rule that "a fiduciary

relationship is not established by the mere fact of an insurance relationship between the parties").

The only relationship between Great Northern and the Hirsches that is alleged in the first

counterclaim is a purely contractual relationship based upon a policy of insurance, and not "a special

relationship of trust and confidence," which alone is the basis for a fiduciary relationship. *See, e.g.,

Prunté v. Universal Music Group*, 484 F. Supp. 2d 32, 43 (D.D.C. 2007).  Accordingly, Great

Northern does not owe a fiduciary duty to Defendants regarding the handling of their homeowners'

claim.

Even if the Court were to find that a fiduciary relationship existed between Great Northern

and Defendants, none of the facts alleged in the first counterclaim constitute a breach of that duty.

At all times, Great Northern's actions as alleged in the Counterclaim were strictly tied to the

application of its rights under the Policy to investigate, adjust and settle the claim. Nothing that Great

Northern allegedly did in this regard could be viewed as breaching any alleged non-contractual duty

owed the Hirsches.

For these reasons, the Court should dismiss the breach of fiduciary claim.[*]

---

[*] The argument that Great Northern breached a fiduciary duty owed Defendants allegedly because unspecified promotional material provided to them violated a consumer protection statute is facially and patently frivolous.  Nothing more needs to said regarding it.

14

II

## THE GOOD FAITH AND FAIR DEALING
## COUNTERCLAIM SHOULD BE DISMISSED

The Hirsches' second counterclaim is based on an alleged breach of the implied covenant of

good faith and fair dealing.  The District of Columbia Court of Appeals recently

> reiterated [its] holding that "all contracts contain an implied duty of
> good faith and fair dealing, which means that 'neither party shall do
> anything which will have the effect of destroying or injuring the right
> of the other party to receive the fruits of the contract.' " *Paul, supra*,
> 754 A.2d at 310 (*quoting Hais v. Smith*, 547 A.2d 986, 987
> (D.C.1988)). "If the party to a contract evades the spirit of the
> contract, willfully renders imperfect performance, or interferes with
> performance by the other party, he or she may be liable for breach of
> the implied covenant of good faith and fair dealing." *Id.* (*citing Hais,
> supra*, 547 A.2d at 987-88).

*Allworth v. Howard University*, 890 A.2d 194, 201 (D.C. 2006).

Here, however, Defendants do not allege that Great Northern did anything to destroy or injure

the Hirsches' right to receive coverage benefits under the Policy; nor do they allege that Great

Northern did anything to "evade[] the spirit of the contract," or that it "willfully render[ed] imperfect

performance" under the Policy.  Rather, the premise of this claim is that Great Northern allegedly

breached the covenant by exercising its Policy rights to investigate the Hirsches' claim once it

suspected fraud by the policyholder, and then by suing to recover its payments once it determined that

Joel Hirsch's misconduct had indeed voided the Policy.  This argument, of course, stands the

covenant theory on its head.[*]

---

[*] The District of Columbia has expressly refused to create or to imply a private cause of
action under which an insured may sue for improper claims-handling practices on the part of their
insurers.  *See* D.C. Code §§ 31-2231.02 and 2231.17 (2001).  The Courts have refused to create a
common law claim.  *See Fireman's Fund*, 480 F. Supp. 2d at 9-11.

15

The District's law is clear. Where, as here, a party is merely exercising its rights under its contract, there can be no breach of the duty of good faith and fair dealing as a matter of law. *Cambridge Holdings Group, Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d 89, 96 (D.D.C. 2004) ("The Court simply cannot infer any set of facts under which a denial of benefits constitutes 'bad faith' where the express language of the agreement demands that the insurance company do so."), *appeal dismissed*, 489 F.3d 1356 (D.C. Cir. 2007); *Nationsbank of D.C., N.A. v. Cole*, Civ. A. No. 91-708, 1993 WL 468437, at *2 (D.D.C. Nov. 1, 1993) ("Plaintiff does not violate its duty of good faith and fair dealing when it proceeds in a manner both parties agreed to in advance.").

A second reason to dismiss this counterclaim is its failure to allege any facts supporting the conclusory assertions that Great Northern acted in bad faith. The litany of alleged wrongs -- investigating the claim after the Hirsches allegedly had spent the claim money, exercising its rights under the Policy to demand the insureds' cooperation, not responding as promptly as Joel Hirsch would have liked to his communications, not properly adjusting the claim, etc. (Counterclaim ¶ 69, 72) -- simply do not make out allegations of wilful or spiteful misconduct in the performance (or non-performance) of Great Northern's contractual obligations.

Rather, the only conclusion that may properly be drawn from Defendants' pleadings is that Great Northern's efforts, expressly permitted by the Policy and required by statute, to investigate and recover its claims payments cannot be characterized as a breach of the duty of good faith. *See, e.g.*, *Flecha De Lima v. Int'l Med. Group, Inc.*, No. 01CA6866, 2004 WL 2745654, at *6 (D.C. Super. Nov. 29, 2004) (finding that, *a fortiori*, denying coverage that was simply unavailable under terms of contract could not constitute "destroying or injuring the right of [insured] to receive the fruits of the contract") (internal quotations omitted). Moreover, if Great Northern prevails, this would mean

16

that its interpretation of the Policy is correct, and the law is clear that, where a party is correct in its view of the contract, there necessarily can be no breach of the duty of good faith. *See, e.g., Obelisk Corp. v. Riggs Nat'l Bank of Was., D.C.,* 668 A.2d 847, 854 n.4 (D.C. 1995) (duty of good faith does not "prohibit[] a party from relying upon rights expressly reserved in a contract"). The good-faith-and-fair-dealing claim simply cannot stand, then, as a matter of law.<sup>*</sup>

Finally, the pleadings are also deficient for their absence of any claimed damages caused by the alleged breach. The only potential relief that the Hirsches seek is that they not be required to return claim payments already made to them. However, whether they are entitled to keep those payments turns not on Great Northern's conduct, but on whether Defendants lost their coverage benefits as a result of Joel Hirsch's misrepresentations. Thus, the failure to allege cognizable damages is an additional, independent reason to dismiss the second counterclaim.

## III

### THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM SHOULD BE DISMISSED BECAUSE NO OUTRAGEOUS CONDUCT BY GREAT NORTHERN OR COGNIZABLE DAMAGES HAVE BEEN ALLEGED

The Hirsches' third counterclaim borders on the frivolous, and should be dismissed. The Hirsches allege that Great Northern's claims-handling, claim investigation, and attempt to recover claim payments that the Hirsches are not permitted to keep constitute an intentional infliction of emotional distress, and entitle them to damages for their alleged suffering. (Counterclaim ¶¶ 76-78.)

---

<sup>*</sup> The contention the claims representative's failure to reply to Joel Hirsch's emails promptly enough to suit Hirsch does not support a claim for breach of the good faith covenant. Recently, a similar claim was dismissed as a matter of law on far more egregious alleged facts. There the insured had alleged that its carrier "refuse[d] to process, discuss, or pay the plaintiff the loss it suffered." *Cambridge Holdings*, 357 F. Supp. 2d at 92.

17

This counterclaim, however, alleges no atrocious behavior by Great Northern or cognizable damages, and, therefore, it should be dismissed.

A claim for intentional infliction of emotional distress requires a showing of "extreme and outrageous conduct" that "intentionally or recklessly" caused the plaintiff to suffer "severe emotional distress." *Athridge v. Aetna Cas. & Sur. Co.*, 163 F. Supp. 2d 38, 53 (D.D.C. 2001) (internal quotations omitted), *aff'd in part, rev'd in part on other grounds*, 351 F.3d 1166 (D.C. Cir. 2003). To plead such a claim, the Hirsches must allege facts that Great Northern's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.* (internal quotations omitted); *see also Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (noting that "liability has been found only where the conduct [additionally is] regarded as atrocious, and utterly intolerable in a civilized community"). Not surprisingly, the "requirement of outrageousness is not an easy one to meet." *Athridge*, 163 F. Supp. 2d at 53 (internal quotations omitted). In addition, "the defendant's actions must proximately cause the plaintiff emotional distress 'of so acute a nature that harmful physical consequences might be not unlikely to result.'" *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007) (quoting *Clark v. Associated Retail Credit Men of Wash., D.C.*, 105 F.2d 62, 65 (D.C. Cir.1939)).

The allegations that the Hirsches make in their third counterclaim plainly do not satisfy what the law requires to assert a claim. Those allegations show nothing more than an ordinary effort by Great Northern to investigate suspected claim fraud, followed by the filing of a lawsuit after the investigation confirmed that Joel Hirsch's material misrepresentations had voided the coverage for the claim that the Hirsches had made under the Policy. Great Northern did nothing that went "beyond all possible bounds of decency" or could "be regarded as atrocious, and utterly intolerable in a

18

civilized community." *See, e.g., Ross v. DynCorp.*, 362 F. Supp. 2d 344, 364 (D.D.C. 2005) (noting that "actions taken for undisputably legitimate business reasons cannot, by definition, be 'extreme and outrageous' in support of an intentional infliction of emotional distress claim").

This claim further fails because there are no allegations regarding the manner in which Great Northern's alleged conduct was the proximate cause of the Hirsches' alleged injuries -- sleeplessness, loss of appetite, unspecified "medical issues . . . aggravated by stress" -- and because those alleged injures are not compensable injuries for the tort alleged. *See Black v. Dist. of Columbia*, 480 F. Supp. 2d 136, 140 (D.D.C. 2007) (finding that there can be no claim of intentional infliction of emotional distress absent an allegation that the harm was actually caused by the alleged wrongful acts); *Lyles v. Micenko*, 468 F. Supp. 2d 68, 75 (D.D.C. 2006) (no claim where plaintiff was merely treated by physician and social worker following arrest and incarceration); *Alexander v. Washington Gas Light Co.*, 481 F. Supp. 2d 16, 38 (D.D.C. 2006) (dismissing emotional distress claim where plaintiff failed to allege "any facts suggesting that he experienced any reaction that could be defined as acute" such that no reasonable person could be expected to endure it), aff'd No. 06-7040, 2006 WL 3798858 (D.C. Cir.Aug. 24, 2006); *accord Ross*, 362 F. Supp. 2d at 360 (D.D.C. 2005) (remarking "mere mental anguish and stress [do] not rise to the level of [severity] required by the case law") (internal quotations omitted, alterations in original). Accordingly, this claim, too, should be dismissed.

IV

## THE CONTRACT COUNTERCLAIM SHOULD BE
## DISMISSED BECAUSE NO BREACH HAS BEEN ALLEGED

The Hirsches attempt to allege a breach of contract in their fourth counterclaim. They contend that Great Northern breached the Policy by bringing the instant action "seeking to void [the Policy] for reasons that are not set forth under the terms of the" Policy. (Counterclaim ¶ 82.) There is a further throwaway allegation that Great Northern breached the Policy "by its other conduct alleged herein," presumably the manner in which Great Northern handled and investigated the claim. (*Id.*) This is another frivolous claim, devoid of merit, and it should be dismissed.

First, the counterclaim does not allege any contractual provision that was breached. That alone defeats the pleading of the claim. Second, Great Northern's lawsuit seeks a declaration that the material misrepresentations made by Joel Hirsch voided the Policy per the very terms of that Policy. The Hirsches' effort to assert a claim by ignoring the plain language of the Complaint and the plain language of the Policy should be recognized for what it is and be soundly rejected. Third, this counterclaim does not allege any damages flowing from such supposed breach. These fundamental failures to allege basic elements of a contract claim require dismissal of Defendants' fourth counterclaim. *See, e.g., King & King, Chartered v. Harbert Int'l, Inc.,* 436 F. Supp. 2d 3, 10 (D.D.C. 2006), *aff'd,* 503 F.3d 153 (D.C. Cir. 2007); *Franklin Asaph, Ltd. P'ship v. FDIC,* 794 F. Supp. 402, 405 (D.D.C. 1992); *cf. Butler v. Fairbanks Capital,* No. Civ.A. 04-0367(RMU), 2005 WL 5108537, at *7 (D.D.C. Jan. 3, 2005).

V.

THE UNFAIR TRADE PRACTICES
COUNTERCLAIM IS MERITLESS AND SHOULD BE DISMISSED

In their fifth counterclaim, Defendants contend that Great Northern has violated the District's Consumer Protection Procedures Act, D.C. Code 28-3901, *et seq.*, ("CPPA") in two ways. First, they allege that they relied upon general statements in unidentified promotional materials regarding the quality of Great Northern's claims-handling which allegedly were inconsistent with respect to the manner in which their personal claim was handled. Second, they contend that Great Northern violated the CPPA because it did not explicitly warn Defendants that they would be subject to a claims investigation and would lose their coverage benefits if they breached the Fraud or Concealment provision in the Policy. Both of these contentions are frivolous, and the counterclaim should be dismissed.

This counterclaim also is deficient in other respects. The pleadings fall short of the requirements of Rule 8(a) of the Federal Rules of Civil Procedure because of the failure to cite a specific statutory provision that was allegedly violated by Great Northern, or set forth the manner in which Great Northern's conduct actually violated that provision. The Counterclaim at ¶ 85 refers only to the entire CPPA, and ¶ 86 proceeds to set forth a variety of acts by which Great Northern allegedly violated the statute. Based on these defects alone, this claim should be dismissed. *See, e.g., Karim-Panahi v. United States Congress*, 105 Fed. App'x 270, 274 (D.C. Cir. 2004) (affirming dismissal with prejudice where "complaint does not provide fair notice to the defendants of the claims against them").

21

There is yet a more fundamental pleading defect which requires its dismissal. Misrepresentation claims under CPPA "must be pleaded with particularity because they are akin to allegations of fraud." *Witherspoon v. Philip Morris, Inc.*, 964 F. Supp. 455, 464 (D.D.C. 1997). This counterclaim, however, contains no allegations setting forth what specific material was provided to Defendants, who provided it, what the promotional material precisely said, the basis for the contention that they justifiably relied on those statements or the manner in which that reliance allegedly caused injury. Without such specificity, the counterclaim must be dismissed pursuant to Rule 9(b), Federal Rules of Civil Procedure.

Another flaw in the Hirsches' CPPA claim is the absence of any monetary damages purportedly caused by Great Northern's alleged violation of the CPPA. This failure to allege damages caused by any deceptive trade practice is fatal to a CPPA claim. *See, e.g., Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1176-77 (D.C. Cir. 2003). The only "damages" alleged in this counterclaim are a contingent avoidance of a liability, namely, Defendants seek to avoid repayment of the $280,000 that Great Northern paid towards settlement of their fraudulent claim due to Joel Hirsch's misrepresentations, which violated the Policy's Fraud or Concealment provision. These "damages," however, are not caused by, and have nothing to do with, any alleged misstatement concerning "hassle free" claims-handling in Great Northern's promotional material. There being no other damages alleged as a result of the supposed CPPA violation, this claim is fatally defective, and should be dismissed.[*]

_____ _____

[*] It further follows that the Counterclaim's request for treble damages should also be dismissed, since treble damages are available only upon proving a claim and compensable damages under the Consumer Protection Procedures Act, and not for avoiding repayment of insurance proceeds to which the insured is not entitled to keep.

Finally, the Hirsches' claim fails simply because none of the alleged statements or omissions are actionable under the CPPA.  The Counterclaim sets forth two general classes of alleged CPPA violations.  In the first set of allegations, they challenge statements made in Great Northern's promotional materials; for example, they contend that Great Northern, having allegedly represented that it offers "hassle free" claims-handling, was not permitted to bother them with an investigation of their claim after suspecting fraud, or to require them to provide the cooperation that the Policy requires of every insured upon making a claim.  (Counterclaim ¶ 86.a-b.)

In the second set of allegations, Defendants claim that Great Northern omitted material facts by making payments towards settlement of their claim without first telling them that they would be required to return that money if their misconduct voided the Policy.[*]  (Counterclaim ¶ 86.c-f.)  None of these theories supports a claim for relief under the CPPA.[**]

The claim concerning Great Northern's alleged promotional materials is meritless for the simple reason that such statements are not actionable.  Courts interpreting the CPPA and similar consumer protection acts consistently have refused to deem actionable general descriptions set forth in companies' promotional literature about customer service practices.  A classic example is Allstate

---

[*]  Paragraph 86.e of the Counterclaim also contends that Great Northern refused to advise the Hirsches that it would seek to deny coverage on the basis of any ground not set forth in the Policy.  This claim fails for the same reason as the Hirsches' claim under contract fails:  if Great Northern has sought contractual relief that is not available to it, its contract claim will not prevail, and the Hirsches will not have suffered any damage.  If Great Northern prevails, then the Hirsches are simply wrong.

[**]  The Hirsches also contend, without any particularity, that Great Northern misrepresented that its claims adjusters had authority to settle their claim, when he did not.  (Counterclaim ¶ 86.g.)  This contention, however, is just another way of saying that they should have been told that they would have to return the claim payments if, under the terms of the Policy, they were not entitled to those payments.

Insurance's slogan, "You're in good hands." Courts have repeatedly denied the claims of disgruntled insureds based on that slogan, concluding that it was inactionable "puffery" upon which no reasonable person could rely. *See, e.g., Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 3 n.3 (D.D.C. 2002) (claim non-actionable under CPPA); *Bologna v. Allstate Ins. Co.*, 138 F. Supp. 2d 310, 323-24 (E.D.N.Y. 2001) ("Because Allstate's promise is a generalized, exaggerated statement of opinion, a reasonable person would not rely upon it as a statement of Allstate's obligations."); *Rodio v. Smith*, 587 A.2d 621, 624 (N.J. 1991) (dismissing claim under analogous New Jersey consumer protection statute).

The purported statements attributed to Great Northern alleged here are to similar effect: whether Great Northern's claims-handling practices are, in fact, "world-class," "hassle-free," "prompt," "fair," or replete with "integrity" would depend on a subjective inquiry into an unprovable set of facts. These sorts of promotional statements simply are not among the class of information that the Consumer Protection Procedures Act covers.[*]

Moreover, in light of the circumstances alleged in the pleadings, it would be unreasonable for the Hirsches to believe that the words "hassle free" mean that an insurer would not investigate a claim that it suspected was fraudulent (as mandated by District law), and would not be persistent in its efforts when confronted with the insured's stonewalling.

_____

[*] In non-insurance contexts, similar claims about dependability, reliability, and quality have been dismissed because they were too subjective to support claimed violation of a consumer protection statute. *See, e.g., Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 30 (D.D.C. 2007) (statements about having the "best food" found to be "bald statement of superiority that is non-actionable puffery" under CPPA) (citations omitted); *Cytyc Corp. v. Neuromed. Sys., Inc.*, 12 F. Supp. 2d 296, 300 (S.D.N.Y. 1998) (dismissing claim concerning description of product as "new 'Gold Standard'"); *Hubbard v. Gen. Motors Corp.*, No. 95 Civ. 4362, 1996 WL 274018 (S.D.N.Y. May 22, 1996) (statements that automobiles were "popular," "dependable," and "like a rock").

Nor does the CPPA support a claim for Great Northern's alleged failure to inform Defendants that it would seek to recover its claims payments upon learning that Joel Hirsch had made material misrepresentations to it during the claim adjustment process. If nothing else, the Fraud or Concealment provision in the Policy expressly informed Defendants of the consequences of Hirsch's misconduct. Even if the Hirsches had not read the Policy, they are presumed to know its terms. *Bitting v. Home Ins. Co. of New York*, 155 A. 329, 333 (Md. 1931) ("it will be presumed, in the absence of fraud preventing such knowledge, that [the insured] did know . . . the terms of the policy"). More importantly, common sense tells Defendants that they may not keep what they wrongly obtained. As such, Great Northern had no obligation to inform them of the consequences of any wrongful conduct concerning the Policy.

For these reasons, the statutory claim should be dismissed.

VI

THE COUNTERCLAIM IS DEVOID OF ANY
ALLEGATIONS OF MALICIOUS CONDUCT, THEREFORE
THE PUNITIVE DAMAGES CLAIMS SHOULD BE DISMISSED

The claims for punitive damages in the first, third and fifth counterclaims should be dismissed, assuming *arguendo* that one or more of those counterclaims withstands dismissal.[*] The reason for this is simple: notwithstanding its gratuitous use of words such as "oppression," "malice," "extreme,"

---

[*] The Hirsches also seek punitive damages for their second counterclaim which alleges a breach of the implied contractual covenant of good faith. However, "[w]here the basis of a complaint is . . . a breach of contract, punitive damages will not lie, even if it is proved that the breach was willful, wanton, or malicious. . . . The rule in this jurisdiction is that only where the alleged breach of contract 'merges with, and assumes the character of, a willful tort' will punitive damages be available." *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (citations omitted). Thus, that damage claim fails as a matter of law.

25

and "outrageous" (*see*, *e.g.*, Counterclaim ¶¶ 56, 79), the Counterclaim simply has not alleged any specific actions taken by Great Northern that could possibly support an award of punitive damages.

"It is well-recognized that punitive damages are not favored in the law." *Sere*, 443 A.2d at 37. Further, Courts in the District of Columbia have held that "they are available only in cases which present circumstances of extreme aggravation," *i.e.*, where the defendant's conduct was "outrageous" and "characterized by malice, wantonness, gross fraud, recklessness, or willful disregard of the plaintiff's rights." *Id.* As a general matter, mere assertions that a defendant's actions were "malicious and wanton" will not suffice; there needs to be some facts alleged that constitute "egregious conduct." *Kahal v. J.W. Wilson & Assocs., Inc.*, 673 F.2d 547, 549 (D.C. Cir. 1982) (applying jurisdictional legal-certainty standard to dismiss punitive claim based on empty assertions); *see also Am. Nat'l Red Cross v. Travelers Indem. Co. of R.I.*, 924 F. Supp. 304, 308 (D.D.C. 1996) (noting that "bare assertion of bad faith does not, in and of itself, justify sending the punitive damages issue to the jury").

There are no alleged facts plead in the Counterclaim that could possibly constitute egregious or outrageous conduct. Nor are there any facts alleged that support an inference that Great Northern acted with malice towards Defendants. These counterclaims do not come close to supporting a claim for punitive damages. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Hoang*, 682 A.2d 202, 209 (D.C. 1996) (punitive damages not appropriate where denial of insurance claim made without "ill will, recklessness, wantonness, [or] oppressiveness") (internal quotations omitted); *O'Connell v. The Home Ins. Co.*, Civ. A. No. 88-3523, 1990 WL 137386 (D.D.C. Sept. 10, 1990) (no punitive damages where parties merely had "genuine dispute" over whether policy coverage was owed); *Fireman's Fund*, 480 F. Supp. 2d at 12-16 (no punitive damages where allegation involves "nothing

more than a willful breach of contract").  Accordingly, to the extent that the first, third or fifth

counterclaims *arguendo* state a viable claim for relief, Defendants should not be allowed to seek any

punitive damages in connection therewith, and those portions of the Counterclaim seeking punitive

damages should be dismissed.

### CONCLUSION

For the reasons stated, the Counterclaim should be dismissed with prejudice.

Respectfully submitted,

KORNSTEIN VEISZ WEXLER & POLLARD, LLP

Dated: January 18, 2008

By: *William B Pollard III*

William B. Pollard, III
D.C. Bar No. 947275
David T. McTaggart (*pro hac vice*)
757 Third Avenue
New York, NY 10017
(212) 418-8600

-- and --

Karen Ventrell
D.C. Bar No. 466150
ROSS, DIXON & BELL, LLP
2001 K Street, NW
Washington, DC 20006
(202) 662-2000

***Attorneys for Plaintiff/Counter-Defendant,***
***Great Northern Insurance Co.***

27

UNITED STATES DISTRICT COURT
THE DISTRICT OF COLUMBIA
-------------------------------------------------------------------X
GREAT NORTHERN INSURANCE COMPANY,  :
                                             :

                                             :
           Plaintiff and Counter-Defendant,    :
                                             :     Case No: 1:07-cv-01804-EGS
           -against-                     :
                                             :
JOEL HIRSCH and CAROL HIRSCH,
                                           :

          Defendants and Counter-Plaintiffs.  :
-------------------------------------------------------------------X

## [PROPOSED] ORDER GRANTING MOTION TO DISMISS THE COUNTERCLAIM

      Plaintiff/Counter-Defendant Great Northern' Motions to Dismiss the First, Second, Third,

Fourth and Fifth Counterclaims asserted in the Defendants' Answer and Counterclaim having

come before the Court and the Court having considered same, it is hereby

      ORDERED that the Motion to Dismiss be, and hereby is, GRANTED; and it is further

      ORDERED that the First, Second, Third, Fourth and Fifth Counterclaims asserted in the

Defendants' Answer and Counterclaim are dismissed with prejudice.

      Entered this _____ day of ___, 2008.

                                         _____
                                       The Honorable Emmet G. Sullivan

With copies sent to counsel of record for the parties:

William B. Pollard, III
D.C. Bar No. 947275
David T. McTaggart (*pro hac vice*)
KORNSTEIN VEISZ WEXLER
& POLLARD, LLP
757 Third Avenue
New York, NY 10017
(212) 418-8600


Karen Ventrell
D.C. Bar No. 466150
ROSS, DIXON & BELL, LLP
2001 K Street, NW
Washington, DC 20006
(202) 662-2000
***Attorneys for Plaintiff/Counter-Defendant***
***Great Northern Insurance Co.***


Lorelie S. Masters
D.C. Bar No. 358686
Jessica Ring Amunson
D.C. Bar No. 497223
JENNER & BLOCK, LLP
601 13th Street, NW, Suite 1200
Washington, DC 20005
(202) 639-6000

***Attorneys for Defendants/ Counter-Plaintiffs Joel and Carol Hirsch***

UNITED STATES DISTRICT COURT
THE DISTRICT OF COLUMBIA
-----------------------------------------------------------------X
GREAT NORTHERN INSURANCE COMPANY, :
                              :
                              :
           Plaintiff,             :
                              :
          -against-            :
                              :
JOEL HIRSCH and CAROL HIRSCH,    :
                              :
         Defendants.        :
-----------------------------------------------------------------X   Case No: 1:07-cv-01804-EGS
                              :
JOEL HIRSCH and CAROL HIRSCH    :
                              :
                              :
         Counter-Plaintiffs,   :
                              :
         -against-            :
                              :
GREAT NORTHERN INSURANCE COMPANY, :
                              :
         Counter-Defendant.   :
-----------------------------------------------------------------X

STATE OF DELAWARE        )
                            )  ss.:
COUNTY OF NEW CASTLE   )

### AFFIDAVIT OF DAN JAEGER

      DAN JAEGER, being duly sworn, deposes and says:

      1.     I am employed as a Special Investigator by Chubb & Son, a division of Federal

Insurance Company which acts as the claim manager for Plaintiff/Counter-Defendant Great

Northern Insurance Company ("Great Northern"). I was involved in the investigation of the

claim Defendants Joel Hirsch and Carol Hirsch made under a Great Northern homeowners insurance policy which is the subject of the Complaint and Counterclaim in this action. I also have knowledge of the facts set forth herein. I submit this affidavit in support of Great Northern's Motion to Dismiss the Counterclaim.

2.    Attached hereto as Exhibit "A" is a true and correct copy of the Masterpiece Deluxe Insurance Policy 11822276-02 referenced in Paragraph 10 of the Counterclaim that Great Northern issued to Joel Hirsch.

3.    Attached hereto as Exhibit "B" is a true and correct copy of the certified transcript of the recorded interview that I conducted of Joel Hirsch on December 11, 2006 referenced in paragraphs 45-47, 57, 65, 75, 80 and 84 of the Counterclaim.

_____
DAN JAEGER

Sworn to before me this
18th day of January, 2008

_____
Notary Public
BARRETT O. BLACKWELDER
NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires March 23, 2008

2

# Jaeger Affidavit Exhibit A (part 1)



# CHUBB GROUP OF INSURANCE COMPANIES

202 Hall's Mill Road, Whitehouse Station, New Jersey 08889-1600

**July 17, 2007**

Attn: Karen Moore

Policy:  11833276-02

Insured:  JOEL HIRSCH

Writing Co:  GREAT NORTHERN

I certify that the above mentioned, enclosed policy is a true and accurate copy.

Yours truly,
Chubb & Son
A Division of Federal Insurance Company

By:

Theresa R. Zarrello
Personal Lines Service Branch

# *Masterpiece*®



**Name and address of Insured**

JOEL HIRSCH
3115 CLEVELAND AVENUE N.W.
WASHINGTON, DC 20008-3534

**Effective Date** 6/21/06
**Policy no.** 11833276-02
**Issued by** Great Northern Insurance Company
a stock insurance company
incorporated in Minnesota
**Policy period** 6/21/06 to 6/21/07

**If you have any questions, please contact**
AON PRIVATE RISK MANAGEMENT (GNY)
1000 N MILWAUKEE AVENUE
GLENVIEW, IL  60025
866-225-5266

To our Valued Customer:

We want to remind you of an important requirement under your Excess Liability Coverage. In exchange for a reduced premium, you and your family members have agreed to maintain in full effect primary underlying insurance for your registered vehicles in the minimum amount of $500,000/$500,000/$25,000 split limits or $500,000 single limit. This higher minimum amount of insurance for registered vehicles is shown in your Coverage Summary.

We will pay only for covered damages in excess of these minimum amounts of insurance. Therefore, if you or your family members do not maintain these minimum amounts of insurance, you will have a gap in coverage in the event of a loss.

Please call your agent or broker to confirm you have the minimum amounts of insurance noted in your Excess Liability Coverage. If you have any questions or need assistance, your agent or broker is the best source for additional information.

In a world of choices, thank you for insuring through Chubb.

Robert Mc Ginley
Customer Relations Manager
Chubb Personal Insurance

**Relax. You're insured with Chubb.**[SM]
www.chubb.com/personal      E-Mail: customercare@chubb.com

Chubb refers to the insurers of the Chubb Group of Insurance Companies.
Actual coverage is subject to the language of the policy.

© Copyright 1984 by Chubb & Son Inc.   Form no.  Q6495008                              INSURED 07/16/07 23.31.49

645

 ®    **Premium Summary**
**Renewal**



JOEL HIRSCH
3115 CLEVELAND AVENUE N.W.
WASHINGTON, DC 20008-3534

**Page** 1
**Effective Date** 6/21/06
**Policy no.** 11833276-02
**Policy period** 6/21/06 to 6/21/07
**Producer name** AON PRIVATE RISK MANAGEMENT
(GNY)

We are pleased to enclose your Chubb Masterpiece Policy, which includes an annual premium **savings of $619** as listed below.

This chart shows at a glance what coverages you have and the related premiums.

|  | Property covered | Coverage | Premium |
|---|---|---|---|
| **Homes and Contents** | HOUSE AT<br>3115 CLEVELAND AVENUE NW<br>WASHINGTON, DC | HOME, CONTENTS,<br>LIABILITY | $    7,014.00 |
| **Valuable Articles** | JEWELRY, FURS, FINE ARTS,<br>SILVERWARE, CAMERAS | VALUABLE ARTICLES | $    5,832.00 |
| **Vehicles** | 2005 BMW 745IL | EXCESS LIABILITY | $      127.00 |
| **Total Premium** |  |  | $   12,973.00 |

Your policy includes a Coverage Summary and policy provisions that explain your coverage in more detail.

**Chubb Masterpiece provides many different credits for home, valuable articles, automobile and excess liability coverages. We recommend that you contact your agent or broker for an annual review to ensure that your coverages, policy limits and available credits are accurate and meet your personal insurance needs.**

**Your policy provides the following annual premium credits for the coverages listed below:**

Your homeowners premium was reduced by $587 as a result of one or more credits.

Your excess premium was reduced by $32 as a result of one or more credits.

**You will shortly receive a statement and bill.**

If you choose one of our convenient installment plans, your payments will be slightly higher than the premium shown above because of the small service charge.

We appreciate your continued business. Since 1882, personal service and comprehensive coverages have been the hallmarks of the Chubb Group of Insurance Companies.

Thank you for insuring through Chubb.

© Copyright 1984 by Chubb & Son Inc.    Form no.  Q0700000 05/85                    INSURED  07/16/07  23.31.49

647

*Masterpiece*®

CHUBB

## PRIVACY POLICY AND PRACTICES

Chubb has been serving the insurance needs of our customers for more than a century. To continue to provide innovative products and services that respond to your insurance needs, Chubb collects certain personal information about you, which is described below in **The Personal Information We Collect.** At Chubb, we respect the privacy of our customers. We do not sell or share our customer lists with anyone else for the purpose of marketing their products to you. Chubb's personal information handling practices are regulated by law and this Privacy Policy describes those practices.

### Chubb's Privacy Policy

**The Personal Information We Collect.** Chubb collects personal information about you and the members of your household to conduct business operations, provide customer service, offer new products, and satisfy legal and regulatory requirements.

We may collect the following categories of information about you from these sources:

- Information from you directly or through your agent, broker or automobile assigned risk plan, including information from applications, worksheets, questionnaires, claim forms or other documents (such as name, address, driver's license number and amount of coverage requested).

- Information about your transactions with us, our affiliates or others (such as products or services purchased, claims made, account balances and payment history).

- Information from a consumer reporting agency (such as motor vehicle reports).

- Information from other non-Chubb sources (such as prior loss information and demographic information).

- Information from visitors to our web sites (such as that provided through online forms and online information-collecting devices known as "cookies"). Chubb does not use "cookies" to retrieve information from a visitor's computer that was not originally sent in a "cookie".

### "Opt Out" Option

The law permits certain types of disclosures, such as for the processing of the insurance transaction without allowing an opt out. Chubb does not have an opt out option as we do not disclose your personal information to nonaffiliated third parties other than as described below. Therefore, no action is required by you.

**The Personal Information We Share.** Chubb may disclose the personal information we collect only to service, process or administer business operations such as underwriting and claims, and for other purposes such as the marketing of products or services, regulatory compliance, the detection or prevention of fraud, or as otherwise required or allowed by law. These disclosures may be made without prior authorization from you, as permitted by law.

**Sharing Personal Information With Others.** Chubb may disclose the personal information we collect to affiliated and nonaffiliated parties for processing and servicing transactions, such as reinsurers, insurance agents or brokers, property and automobile appraisers, auditors, claim adjusters and third party administrators. For example, Chubb may disclose personal information to our affiliates and other parties that perform services for us such as customer service or account maintenance. Specific examples include mailing information to you and maintaining or developing software for us. Chubb may also disclose personal information to nonaffiliated parties as permitted by law. For example, we may disclose information as required in response to a subpoena, to detect or prevent fraud or to comply with an inquiry or requirement of a government agency or regulator.

continued on the next page

© Copyright 1984 by Chubb & Son Inc.   Form no. 0799999 (Rev. 9-01)

649

**Sharing Personal Information With Service Providers or for Joint Marketing.** Chubb may disclose the personal information we collect to your agent or broker so that they can market our financial products and services to you, and to service providers who perform functions for us. Any such disclosure is required to be subject to an agreement with us that includes a confidentiality provision. We do not disclose personal information to other financial institutions.

**Confidentiality and Security of Personal Information.** Access to personal information is allowed for business purposes only. The people who have access to personal information, including employees of Chubb and its affiliates, and nonemployees performing business functions for Chubb, are under obligations to safeguard such information. Chubb maintains physical, electronic and procedural safeguards to guard your personal information.

**Personal Health Information.** Under certain circumstances, we also collect personal health information about our customers, such as information regarding an accident, disability or injury, for underwriting or claim purposes. Chubb does not disclose your personal health information to others for the purpose of marketing to you unless we have your express consent.

**Personal Information of Former Customers.** Chubb's personal information privacy policy also applies to former customers.

**Changes in Privacy Policy.** Chubb may choose to modify this policy at any time. We will notify customers of any modifications at least annually. If we change our disclosure practices in a way that allows an opt out, we will provide customers an opportunity to request that information not to be disclosed for marketing purposes.

**Definitions.**
"Chubb" means the following companies on whose behalf this notice is given:

| | |
|---|---|
| Chubb & Son Inc. | Executive Risk Indemnity Inc. |
| Chubb & Son Inc. (of Illinois) | Executive Risk Specialty Insurance Company |
| Chubb Custom Insurance Company | Federal Insurance Company |
| Chubb Custom Market, Inc. | Great Northern Insurance Company |
| Chubb Indemnity Insurance Company | Northwestern Pacific Indemnity Company |
| Chubb Insurance Company of New Jersey | Pacific Indemnity Company |
| Chubb Lloyds Insurance Company of Texas | Quadrant Indemnity Company |
| Chubb Multinational Managers, Inc. | Texas Pacific Indemnity Company |
| Chubb National Insurance Company | Vigilant Insurance Company |

"Customer" and "you" mean any individual who obtains or has obtained a financial product or service from Chubb that is to be used primarily for personal, family or household purposes. This notice applies to customers only.

"Personal information" means nonpublic personal information, which is defined by law as personally identifiable financial information provided by you to Chubb, resulting from a transaction with or any service performed for you by Chubb, or otherwise obtained by Chubb. Personal information does not include publicly available information as defined by applicable law.

Chubb Personal Insurance
Attention: Privacy Inquiries
P.O. Box 1615
Warren, NJ 07061-1615

© Copyright 1984 by Chubb & Son Inc.    Form no. 0799999 (Rev. 9-01)

# *Masterpiece*®

**Coverage Summary Renewal**



CHUBB

---

**Name and address of Insured**

JOEL HIRSCH
3115 CLEVELAND AVENUE N.W.
WASHINGTON, DC 20008-3534

**Page** 1
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Issued by** Great Northern Insurance Company
a stock insurance company
incorporated in Minnesota
**Policy period** 6/21/06 to 6/21/07

**If you have any questions, please contact**
AON PRIVATE RISK MANAGEMENT (GNY)
1000 N MILWAUKEE AVENUE
GLENVIEW, IL  60025
866-225-5266

This Coverage Summary is part of your policy. **PLEASE READ YOUR POLICY CAREFULLY, INCLUDING THIS COVERAGE SUMMARY, FOR A COMPLETE DESCRIPTION OF YOUR COVERAGES.**

---

## Homes and Contents

Your policy provides coverage against physical loss if your home or its contents are damaged, destroyed, or lost. The kinds of losses that are covered, and any special limits that apply, are explained in detail in the policy.

| Address | Dwelling | Contents |
|---|---|---|
| HOUSE AT 3115 CLEVELAND AVENUE NW WASHINGTON, DC | $2,264,000 DELUXE COVERAGE | $1,686,680 DELUXE COVERAGE |
| | EXTENDED REPLACEMENT COST | REPLACEMENT COST |

The base deductible for each occurrence is  $2,500. We will waive the base deductible for covered losses of more than $50,000 except for covered losses subject to any special deductibles. Special deductibles include the vacant house deductible, water backup deductible, wind or hail deductible, and earthquake deductible.

### Additional coverages or conditions

**Important notice regarding mold remediation expenses**
You have the standard $10,000 mold remediation expense coverage as described in your policy for the residence at 3115 CLEVELAND AVENUE NW,  WASHINGTON,  DC. To increase the amount of coverage for mold remediation expenses, you must contact your agent or broker shown at the top of this Coverage Summary prior to the effective date of this renewal. The request will be subject to underwriting acceptance.

---

## Valuable Articles

This policy provides you with coverage against physical loss if your valuable articles are lost, damaged, or destroyed. The kinds of losses that are covered, and any special limits that apply, are explained in detail in the policy.

---

© Copyright 1984 by Chubb & Son Inc.  Form no.  Q0802000 05/85

continued on the next page
INSURED 07/16/07 23.31.49

051

*Coverage Summary*
*Renewal*

**Page** 2
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Name** JOEL HIRSCH

## Valuable Articles
(Continued)

### Blanket coverage

We will pay up to the amount shown in the following chart for each category of valuable articles. However, the most we will pay for any one article is the blanket limit per item shown for that category.

### Itemized articles

The amount of coverage for your valuable articles is shown in the following chart. A list of your itemized valuable articles, and the specific coverage amounts, can be found at the end of the Coverage Summary.

| Class | Amount of blanket coverage | Blanket limit per item | Amount of itemized coverage |
|-------|----------------------------|------------------------|------------------------------|
| JEWELRY | NO COVERAGE | NO COVERAGE | $ 361,960 |
| FURS | NO COVERAGE | NO COVERAGE | $ 44,890 |
| FINE ARTS | $ 100,000 | $ 10,000 | $ 389,140 |
| SILVERWARE | NO COVERAGE | NO COVERAGE | $ 46,008 |
| CAMERAS | NO COVERAGE | NO COVERAGE | $ 2,475 |

**There is no deductible for this coverage.**

## Liability

Amount of liability coverage: **$2,000,000.**

This is the total amount of your liability coverage. It applies to all property for which you have liability coverage, as shown in the following chart.

Your liability coverage covers damages for which you are legally responsible. For each occurrence, we will pay up to the amount of your liability coverage, as explained in your policy.

© Copyright 1984 by Chubb & Son Inc.   Form no.   Q0802000 05/85

continued on the next page

*Coverage Summary*
*Renewal*



**Page** 3
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Name** JOEL HIRSCH

## *Liability*
(Continued)

However, when you have **excess** liability only, we will pay for a covered loss **only** after the loss exceeds the required primary underlying insurance shown in your policy. This applies whether you have other liability coverage provided under a separate policy with us or by another insurance company.

In lieu of the required primary underlying insurance for registered vehicles shown in your policy, under Excess Liability Coverage, the minimum amount of required primary underlying insurance for registered vehicles is $500,000 single limit each occurrence or $500,000/$500,000/$25,000 split limits.

| **Home** | HOUSE AT 3115 CLEVELAND AVENUE NW WASHINGTON, DC | PERSONAL LIABILITY |
| --- | --- | --- |
| **Vehicle** | 2005 BMW 745IL | EXCESS LIABILITY ONLY |

Whenever vehicles are shown we have included the type of Uninsured or Underinsured (UM/UIM) coverage you have selected. For vehicles where no UM/UIM appears there is no coverage. The amount of UM/UIM is determined by where the vehicle is garaged, which appears in the Mandated Coverages Section.

As the duly authorized representative of the company my signature validates this policy.

*Robert Hamburger*

Authorized representative

© Copyright 1984 by Chubb & Son Inc.    Form no.   Q0802000 05/85

INSURED 07/19/07 23.31 49

653

# Masterpiece®    *Itemized Articles*    

**Name and address of insured**

JOEL HIRSCH
3115 CLEVELAND AVENUE N.W.
WASHINGTON, DC 20008-3534

**Page** 1
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Issued by** Great Northern Insurance Company
a stock insurance company
incorporated in Minnesota
**Policy period** 6/21/06 to 6/21/07

**If you have any questions, please contact**
AON PRIVATE RISK MANAGEMENT (GNY)
1000 N MILWAUKEE AVENUE
GLENVIEW, IL  60025
866-225-5266

| Class | No. | Description | | Value |
|-------|-----|-------------|---|------:|
| Jewelry | 1 | 14K Y/G BANGLE BRACELET WITH SEVENTEEN OPALS | $ | 1,022 |
| | 2 | 14K W/G HEART WITH SEVENTEEN SMALL DIAMONDS SUSPENDED FROM A 14K W/G CHAIN | $ | 681 |
| | 3 | LADY'S FREE-FORM DESIGN RING, 14K Y/G, WITH FIVE DIAMONDS, EACH APPROXIMATELY 0.03 PT., AND FOUR RUBIES EACH APPROXIMATELY 0.04 PT. | $ | 1,022 |
| | 4 | LADY'S RING, 14K W/G, WITH CENTER PEAR SHAPED OPAL SURROUNDED BY ELEVEN DIAMONDS, EACH APPROXIMATELY 0.02 PT. | $ | 681 |
| | 5 | PAIR OF FILIGREE DESIGN EARRINGS, 14K Y/G WITH EACH EARRING CONTAINING ONE SMALL PEAR SHAPED OPAL | $ | 454 |
| | 6 | PAIR OF ANTIQUE DROP EARRINGS | $ | 681 |
| | 7 | ANTIQUE NECKLACE OF NINETY-SIX BEADS, 14K GOLD, MEASURING APPROX. 4 3/4MM X 5MM | $ | 908 |
| | 8 | 18K W/G RING WITH CENTER AQUAMARINE OF 5.00 CTS. WITH SIX BRILLIANT CUT DIAMONDS, TOTAL WEIGHT 0.48 | $ | 1,249 |
| | 9 | MAN'S 18K Y/G CORUM WRISTWATCH, S/N 102486, STYLE #57104 | $ | 7,040 |
| | 10 | 14K Y/G 20" CHAIN | $ | 795 |
| | 11 | LADY'S OMEGA BRACELET WRISTWATCH, S/N 40162640, STYLE #HH864Y/2 | $ | 1,249 |
| | 12 | CHARM BRACELET, 14K Y/G, WITH FIVE GOLD | | |

© Copyright 1984 by Chubb & Son Inc.    Form no.   Q1200000 05/85                                    INSURED  07/16/07  23:31:49
655

## *Itemized Articles*

**Page** 2
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Name** JOEL HIRSCH

| Class | No. | Description | | Value |
|-------|-----|-------------|---|-------|
| **Jewelry** (continued) | | CHARMS | $ | 908 |
| | 13 | ANTIQUE REPRODUCTION OF SOLID GOLD COIN, 14K Y/G, SUSPENDED FROM 14K Y/G CHAIN, 15" LONG | $ | 795 |
| | 14 | MAN'S 14K Y/G INITIAL RING· J H WITH ONE SMALL DIAMOND | $ | 681 |
| | 15 | LADY'S 14K Y/G BALCK ONYX RING | $ | 568 |
| | 16 | LADY'S 14K W/G RING WITH CENTER DIAMOND OF 0.15 PT SURROUNDED BY EIGHT SMALL RUBIES | $ | 681 |
| | 17 | PAIR OF STUD EARRINGS, 14K W/G, WITH A BRILLIANT-CUT DIAMOND, 0.25 PT. IN EACH EARRING | $ | 1,476 |
| | 18 | 14K Y/G LINK NECKALCE, 18" LONG | $ | 454 |
| | 19 | 14K Y/G BRACELET, 7 1/2" LONG | $ | 454 |
| | 20 | 14K Y/G MONKEY PENDANT SUSPENDED FROM A CHAIN OF 14K | $ | 454 |
| | 21 | 14K Y/G FILIGREE FRAME, IN WHICH IS SET A BROWN AND WHITE CAMEO, SUSPENDED FROM A 16" LONG CHAIN | $ | 795 |
| | 22 | 14K W/G CONFORMING WEDDING BAND WITH EIGHT BAGUETTE DIAMONDS | $ | 681 |
| | 23 | LADY'S 14K Y/G BRACELET WITH NINETEEN BRILLIANT CUT DIAMONDS, EACH 0.08 PT. | $ | 4,655 |
| | 24 | LADY'S 14K Y/G RING, HANDCRAFTED, WITH FOUR BRILLIANT CUT DIAMONDS TOTALLING APPROX. 0.10 PT AND THREE SAPPHIRES | $ | 795 |
| | 25 | LADY'S 14K W/G DIAMOND ENGAGEMENT RING WITH .80 PT EUROPEAN CUT DIAMOND IN CENTER WITH SEVEN BAGUETTE AND FIVE SQUARE-CUT DIAMONDS SURROUNDING IT. TOTAL WEIGHT .61 PT (SURROUNDING DIAMONDS) | $ | 2,498 |
| | 26 | MAN'S 18K Y/G HANDMADE RING OF OPEN | | |

© Copyright 1984 by Chubb & Son Inc.   Form no.  Q1200000 05/85

## *Itemized Articles*



**Page** 3
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Name** JOEL HIRSCH

| Class | No. | Description | Value |
|---|---|---|---|
| **Jewelry**<br>(continued) | | FLOATING GEOMETRIC DESIGN WITH ON 5.64 OVAL CABOCHON CUT GENUINE BLUE STAR SAPPHIRE | $ 2,839 |
| | 27 | LADY'S 14K Y/G 17" NECKLACE | $ 1,136 |
| | 28 | LADY'S 14K Y/G RING W/35 DIAMONDS-1 CT TOTAL WEIGHT | $ 2,611 |
| | 29 | GENT'S 14K Y/G PAIR OF CUFF LINKS | $ 908 |
| | 30 | GENT'S 14K Y/G SET OF 3 STUDS | $ 454 |
| | 31 | LADY'S NECKALCE OF BEADS OF MALACHITE AND BEADS OF 14K Y/G | $ 681 |
| | 32 | LADY'S 18K Y/G NECKLACE WITH ONE CENTER DIAMOND WEIGHING 33 PTS. AND 58 DIAMONDS WEIGHING A TOTAL OF 1.10 | $ 7,608 |
| | 33 | LADY'S OPERA LENGTH NECKLACE OF 78 CULTURED PEARLS W/A 18K Y/G CLASP W/121 DIAMONDS TOTALING 1.60 CTS. (PAVE SET) | $ 17,373 |
| | 34 | LADY'S 18K Y/G RING WITN AN 8 1/2MM CULTURED PEARL AND 16 DIAMONDS TOTALING .50 CT | $ 1,249 |
| | 35 | LADY'S PLATINUM 3.38 CT DIAMOND RING WITH TWO BAGUETTE DIAMONDS WEIGHING .60 CT TOTAL | $ 70,400 |
| | 36 | PARKER 75 PENCIL 14K YELLOW GOLD | $ 1,136 |
| | 37 | PARKER 75 FOUNTAIN PEN 14K YELLOW GOLD | $ 1,362 |
| | 38 | LADIES CHOKER ROUND LINK DESIGN 14KT YELLOW GOLD | $ 2,839 |
| | 39 | LADIES BRACELET ROUND LINK DESIGN 14KT YELLOW GOLD | $ 1,476 |
| | 40 | 1 PAIR LAPIS CUFF LINKS 14KT YELLOW GOLD | $ 1,136 |
| | 41 | SOLID ROPE CHAIN 14KT YELLOW GOLD 30" | $ 1,590 |
| | 42 | 1 LIBERTY 20$ US GOLD COIN DATED 1907 SET IN ROPE | $ 1,249 |
| | 43 | 1 PAIR EARRING JACKET 14KT YELLOW GOLD | |

© Copyright 1984 by Chubb & Son Inc.   Form no.   Q1200000 05/85                    INSURED 07/16/07 23.31.49

## *Itemized Articles*

Page 4
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Name** JOEL HIRSCH

| Class | No. | Description | Value |
|---|---|---|---|
| **Jewelry** (continued) | | WITH 6 BRILLIANT CUT DIAMONDS .56 CT. | $ 1,022 |
| | 44 | 1 PAIR EARRING JACKETS 14KT YELLOW GOLD | $ 341 |
| | 45 | 1 LINK CHAIN TWISTED WIRE DESIGN 14KT YELLOW GOLD | $ 1,476 |
| | 46 | 1 LADIES TWISTED WIRE BANGLE BRACELET 14KT YELLOW GOLD | $ 454 |
| | 47 | 1 PENDANT 14KT YELLOW GOLD WITH 22 BRILLIANT CUT DIAMONDS .60 CARATS WITH 16" CHAIN 14KT YELLOW GOLD | $ 1,476 |
| | 48 | ONE PAIR OF 18KT YELLOW GOLD DIAMOND AND PEARL PENDANT EARRINGS, EACH WITH ONE GEM, 11.0 X 12.5MM, DROP SHAPED SOUTH SEA PEARL, THE EARRINGS SET WITH A TOTAL OF 106 ROUND BRILLIANT CUT DIAMONDS, WEIGHING 1.60 CTS. | $ 7,268 |
| | 49 | ONE LADIES PLATINUM AND DIAMOND BROOCH HAVING A BROOCH JACKET HANDCRAFTED OF 18KT YELLOW GOLD. THE BROOCH CONTAINS TEN (10) MARQUISE DIAMONDS WEIGHING A TOTAL OF 1.80 CTS, TEN (10) BRILLIANT CUT DIAMONDS WEIGHING A TOTAL OF 0.30 CTS., THREE (3) BRILLIANT CUT DIAMONDS WEIGHING A TOTAL OF 0.50 CTS. AND SIXTY-TWO (62) BAGUETTES WEIGHING A TOTAL OF 3.77 CTS. | $ 8,970 |
| | 50 | LADIES PLATINUM AND DIAMOND GUARD RING, CHANNEL SET WITH A TOTAL OF 2.05 CTS. OF COLORLESS AND CLEAN BAGUETTE CUT DIAMONDS | $ 3,406 |
| | 51 | TRIPLE STRAND 24" TORSADE NECKLACE OF FINE 4.0MM ROUND BLACK AND GREY-BLACK CULTURED PEARLS, INTERSPERSED WITH 14KT YELLOW GOLD RHONDELS ACCENTING FINE OVAL DRILLED BURMA RUBY BEADS, STRUNG TO AN 18KT YELLOW GOLD CABOCHON RUBY AND DIAMOND FLORAL CLASP | $ 2,498 |
| | 52 | PAIR OF PLATINUM HANDMADE FLORAL CLUSTER EARRINGS, EACH CENTERING A | |

© Copyright 1984 by Chubb & Son Inc.    Form no.  Q1200000 05/85

*Itemized Articles*



**Page** 5
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Name** JOEL HIRSCH

| Class | No. | Description | Value |
|---|---|---|---|
| Jewelry<br>(continued) | | ROUND FACETED EXTREMELY FINE RUBY WEIGHING 2.50 CTS. FOR THE PAIR, SURROUNDED BY 10 COLORLESS AND CLEAN ROUND BRILLIANT CUT DIAMONDS WEIGHING 1.90 CTS. IN TOTAL FOR THE PAIR | $ 10,447 |
| | 53 | 18KT YELLOW GOLD FLAT LINK BRACELET WITH BRUSHED GOLD LEAF MOTIF ON TOP | $ 3,520 |
| | 54 | SINGLE KNOTTED STRAND OF 59 GRADUATED CULTURED PEARLS, 6.3 TO 8.6MM, CREAMY BODY COLOR, FAINT ROSE HUE, LIGHTLY BLEMISHED, GOOD LUSTER WITH A 14KT YELLOW AND WHITE GOLD CLASP CONTAINING 9 ROUND BRILLIANT CUT DIAMONDS WEIGHING APPROX. .09 CTS. | $ 1,704 |
| | 55 | 14KT YELLOW GOLD FANCY FREE FORM LILY PAD EARRINGS | $ 341 |
| | 56 | 18KT BRUSHED YELLOW GOLD BIRD BROOCH WITH 1 ROUND BRILLIANT CUT RUBY EYE WEIGHING APPROX. 05CT. | $ 1,022 |
| | 57 | ONE STRAND OF 30 GROOVED FROSTED CRYSTAL BEADS WITH 30 GROOVED BLACK FROSTED CRYSTAL BEADS WITH 60 METAL RONDELS IN BETWEEN | $ 568 |
| | 58 | ONE STRAND OF 114 GRADUATED WHITE OPAL BEADS WITH 114 FACETED CRYSTAL RONDELS IN BETWEEN | $ 3,520 |
| | 59 | 14KT YELLOW GOLD DOUBLE RING FLEXIBLE CUFFLINKS | $ 681 |
| | 60 | 18KT YELLOW GOLD UNICORN PIN WITH 1 ROUND BRILLIANT CUT RUBY EYE WEIGHING APPROX. .01CT., 1 ROUND BRILLIANT CUT DIAMOND WEIGHING APPROX. .05CT. | $ 1,249 |
| | 61 | 14KT YELLOW GOLD MONEY CLIP WITH 1925 LIBERTY COIN | $ 1,704 |
| | 62 | PAIR OF 14KT YELLOW GOLD DIAMOND EARRINGS EACH CONTAIN- ING 16 ROUND | |

© Copyright 1984 by Chubb & Son Inc.     Form no.  Q1200000 05/85

INSURED  07/16/07  23.31 49

659

## *Itemized Articles*

**Page** 6
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Name** JOEL HIRSCH

| Class | No. | Description | | Value |
|---|---|---|---|---|
| **Jewelry**<br>(continued) | | BRILLIANT CUT DIAMONDS WEIGHING APPROX. 1.28 CTS. (THE PAIR) | $ | 2,157 |
| | 63 | FIVE-STRAND PEARL BRACELET WITH 4.0 TO 4.5MM CULTURED PEARLS, WHITE WITH NICE ROSE HUE AND GOOD LUSTER WITH A 14KT YELLOW GOLD HOLLOW BALL CLASP | $ | 1,930 |
| | 64 | A. 18KT YELLOW GOLD DOUBLE LOOP CUFFLINKS, STAMPED VAN CLEEF & ARPELS, NEW YORK - $500.00 B. WITH 4 HEMATITE BARS - $250.00 C. 4 18KT YELLOW GOLD BARS - $975.00 D. 4 CARNELIAN BARS - $200.00 | $ | 2,271 |
| | 65 | 18KT MULTI COLOR GOLD HANDMADE TEDDY BEAR PIN | $ | 908 |
| | 66 | 18KT MULTI COLOR GOLD HANDMADE TEDDY BEAR EARRINGS | $ | 1,362 |
| | 67 | 18KT MULTI COLOR GOLD HANDMADE TEDDY BEAR GENTS CUFFLINKS | $ | 1,476 |
| | 68 | A. 18KT YELLOW GOLD HANDMADE WOVEN KNOT LINK CHOKER NECKLACE - $8,850.00 B. MATCHING BRACELET - $4,500.00 | $ | 15,556 |
| | 69 | PLATINUM, RUBY AND DIAMOND LADIES RING WITH 3.40 CT BURMA RU BY FLANKED BY A PAIR OF COLORLESS TRILLIANT SHAPED DIAMONDS WEIGHING 1.10 CTS FOR THE PAIR | $ | 67,447 |
| | 70 | PAIR OF PLATINUM SIX-PRONG STUD EARRINGS SET WITH ONE 2.29CT COLORLESS SLIGHTLY INCLUDED ROUND BRILLIANT DIAMOND (G.I.A. GRADE FSI1) AND ONE 2.32 COLORLESS, SLIGHTLY INCLUDED ROUND BRILLIANT CUT DIAMOND (G.I.A. GRADE FSI1) | $ | 55,751 |
| | 71 | ONE LADIES ESTATE CORNELIAN CAMEO AND ONYX DOUBLE-SIDED WATCH FOB LOCKET SET IN 14KT GOLD HANGING ON A WALDEMAR CIRCA 1880 14KT ROSE GOLD CHAIN. WT 53.6 GRAMS. | $ | 2,999 |
| | 72 | GENT'S PATEK PHILIPPE GONDOLO POCKET WATCH, 18KT YELLOW GOLD, CIRCA 1906 | $ | 10,712 |

© Copyright 1994 by Chubb & Son Inc.   Form no.   Q1200000 05/85

*Itemized Articles*



Page 7
Effective date 6/21/06
Policy no. 11833276-02
Name JOEL HIRSCH

| Class | No. | Description | | Value |
|-------|-----|-------------|---|-------|
| Furs | 1 | ONE NATURAL BLACK VELVET RANCH MINK JACKET | $ | 7,990 |
| | 2 | NATURAL INDIGO FOX COAT | $ | 11,500 |
| | 3 | BLACK SWAKARA BROADTAIL EAST WITH RANCH MINK TUXEDO TRIM REVERSIBLE TO GOLDEN SWEDE | $ | 9,500 |
| | 4 | NATURAL ALL FEMALE RANCH MINK COAT 48" LONG, 66" SWEEP | $ | 15,900 |
| Fine Arts | 1 | LE CHAPEAU EPINGLE-(THE PINNING OF THE HAT) PIERRE AUGUSTE RENOIR ORIGINAL ETCHING, CIRCA 1894 | $ | 1,750 |
| | 2 | TEBRIZ PERSIAN RUG 9'8" X 13 - WOOL PILE ON COTTON WARP AND WEFT, EXCELLENT CONDITION | $ | 17,500 |
| | 3 | PAINTING TITLED "LA PROMENADE" BY JEAN DUFY | $ | 3,230 |
| | 4 | ONE CHIPPENDALE MAHOGANY GRANDFATHER CLOCK WITH BRASS AND SILVER FACE WITH MOON DIAL | $ | 10,500 |
| | 5 | ANTIQUE BRONZE SEATED HOTEI WITH STAND, 7-1/2 INCHES IN HEIGHT, JAPAN, MEIJI PERIOD CIRCA: 1870 #6441-1931 | $ | 1,800 |
| | 6 | GREEN CRACKLE-GLAZED VASE, MELON SHAPED CHINA, TAO KUANG PERIOD, 1821-50 #6542-4094 | $ | 1,500 |
| | 7 | IMARI BOWL WITH LANDSCAPE AND FAN PAINTING SCENES ON IRON RED ENAMEL WITH GOLD FEATHERS, JAPAN, CIRCA 1880 #6542-5157B | $ | 3,000 |
| | 8 | ANTIQUE BROCADE IMARI CHARGER WITH FIGURE DESIGN ON GOLD AND GREEN GEOMETRIC PATTERN, MT. FUJI AND OBI CENTER DESIGN, JAPAN, CIRCA 1870 - #6542-5296B | $ | 2,500 |
| | 9 | ANTIQUE YELLOW GLAZED PORCELAIN BOX WITH INCISED GEOMETRIC PATTERN, GREEN | | |

*Itemized Articles*

**Page** 8
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Name** JOEL HIRSCH

| Class | No. | Description | Value |
|---|---|---|---|
| **Fine Arts**<br>(continued) | | GLAZED INSIDE, CHINA, CIRCA 1870 - #6340-92782234 | $ 1,650 |
| | 10 | A PAIR OF GEORGE III MAHOGANY CARD TABLES HAVING FLAME MAHOGANY TOPS DIVIDED INTO GEOMETRIC SECTIONS WITH WALNUT CROSSBANDING. THE TOPS ARE RAISED ON DELICATE CABRIOLE LEGS WITH CARVED CORNER BRACKETS AND END IN SCROLL FEET, ENGLISH, CIRCA 1765 | $ 25,600 |
| | 11 | 34 X 44 OIL PAINTING "DON QUIXOTE" BY MITCH KOLN | $ 4,000 |
| | 12 | OIL PAINTING - "STILL LIFE" BY WILLIAM HUGHES | $ 4,800 |
| | 13 | CHIPPENDALE ANTIQUE CHEST | $ 4,000 |
| | 14 | 4 BESLER COPPER PLATES | $ 5,700 |
| | 15 | BLANC DE CHINE LIBATION CUP, 18TH CENTURY (J-1007) | $ 1,500 |
| | 16 | BLANC DE CHINE LIBATION CUP, 18TH CENTURY (J-1008) | $ 1,400 |
| | 17 | ONE BLANC DE CHINE BEAKER VASE, CH'ING DYNASTY, K'ANG HSI PERIOD - 1662-1722 (J-858) | $ 7,200 |
| | 18 | FAMILLE JAUNE JAR AND COVER, DECORATED WITH BUTTERFLIES, CH'ING DYNASTY, K'ANG-HSI PERIOD - 1662-1722 (038) | $ 2,320 |
| | 19 | ANTIQUE CARVED ROCK CRYSTAL RAM ON STAND | $ 2,750 |
| | 20 | VERY FINE GEORGE III MAHOGANY ARM CHAIR HAVING A SHAPED BACK CENTERING A CARVED PATERAE AND PIERCED SPLATS. THE CARVED AND SCROLLED ARMS FLANK AN UPHOLSTERED SEAT ON A SHAPED APRON. ENGLISH, C.1785 | $ 20,000 |
| | 21 | VERY FINE GEORGE III MAHOGANY DOUBLE SERPENTINE CHEST OF DRAWERS HAVING CAMFERED SIDES WITH STOP FLUTING. THE | |

© Copyright 1984 by Chubb & Son Inc.   Form no.   Q1200000 05/85

652

## *Itemized Articles*



Page 9
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Name** JOEL HIRSCH

| Class | No. | Description | Value |
|---|---|---|---|
| **Fine Arts** (continued) | | THUMB MOLDED TOP ABOVE GRADUATED DRAWERS AND RESTING ON SHAPED BRACKET FEET. ENGLISH, C.1760. 32" X 28"D X 56" W. | $ 28,000 |
| | 22 | A FINE PAIR OF GEORGE III, OVAL GILT MIRRORS, SURMOUNTED BY CARVED CLASSICAL URNS, FLANKED BY RAM HEADS ABOVE FLORAL CARVING. THE OVAL MIRROR PLATE IS FLANKED BY HEADED FRAMES WITH SCROLLING CANDLE ARMS ALL ABOVE A CARVED ACANTHUS CARTOUCHE ON THE BOTTOM SECTION. | $ 38,000 |
| | 23 | ONE CHIPPENDALE MAHOGANY RECTANGULAR BENCH WITH GOTHIC CARVED LEGS, CIRCA 1770 | $ 14,000 |
| | 24 | ONE GEORGE III MAHOGANY SERPENTINE SIDEBOARD WITH INLAID MARQUETRY, CIRCA 1780 | $ 36,000 |
| | 25 | ONE VERY FINE ADAM CARVED GILTWOOD RECTANGULAR MIRROR HAVING A BEADED AND FLUTED BORDER, THE CRESTING OF VASE FORM FLANKED BY RAM'S HEADS WITH PENDANT BELLFLOWERS AND FOLIATE SCROLLS SURMOUNTED BY ANTHEMION. ENGLISH, CIRCA 1780, MEASURING 58" HIGH, 24" WIDE | $ 24,000 |
| | 26 | ONE 18TH CENTURY ANTIQUE ENGLISH PINE MATEL WITH A CASTER MEDALLION | $ 7,500 |
| | 27 | JAPANESE WOODBLOCK TRYPTICH KUMIS ADA (1786-1864) | $ 850 |
| | 28 | FIVE GREEK DESIGN COOPER PLATE ENGRAVINGS, FINE ORIGINAL COLOR. | $ 1,925 |
| | 29 | THREE COSTUME PRINTS PUBLISHED 1920 | $ 420 |
| | 30 | VERY FINE CHIPPENDEL MAHOGANY RECTANGULAR PEMBROKE TABLE | $ 45,000 |
| | 31 | MOULDED BLANC DE CHINE VASE, DEHUA WARE, QUING DYNASTY QUIAN LONG PERIOD 9 1/4 INCHES HIGH | $ 4,500 |

*Itemized Articles*

**Page** 10
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Name** JOEL HIRSCH

| Class | No. | Description | Value |
|---|---|---|---|
| **Fine Arts**<br>(continued) | 32 | VERY FINE CHIPPENDALE MAHOGANY BEDSIDE TABLE, HAVING A SHAPED GALLERIED TOP ABOVE TWO PANELLED CUPBOARD DOORS WITH CARTOUCHE MOULDINGS, ABOVE A COCKBEADED DRAWER WITH TWO ROCOCO ORMOLU HANDLES, HAVING A SHAPED APRON, ON BRACKET FEET. EACH SIDE WITH A GILT BRASS CARRYING HANDLE. ENGLISH C. 1770.(PRICE 12,500), THE PULL OUT LOWER SECTION TO BE CONVERTED TO A DRAWER HAVING A GILT-TOOLED LEATHERED SLIDE (CHARGES AT COST $400). | $ 12,900 |
| | 33 | PAIR BACC. BASES WIRED AS LAMPS | $ 1,870 |
| | 34 | PAIR SMALL LAMPS WITH CRANE | $ 565 |
| | 35 | AMERICAN FAUX BAMBOO DRESSING TABLE | $ 6,000 |
| | 36 | AMERICAN FAUX BAMBOO BENCH WITH UPHOLSTERED SEAT | $ 2,000 |
| | 37 | CHIEN LUNG FAMILLE ROSE BIRDS OF PARADISE, LATE 18TH CENTURY PORCELAIN MATCHED PAIR | $ 4,860 |
| | 38 | PAIR OF ROCK CRYSTAL ELEPHANTS | $ 3,000 |
| | 39 | ANTIQUE OVAL VASE OF ENGRAVED AND EMBOSSED GLASS BY LALIQUE | $ 3,500 |
| | 40 | LALIQUE BOOKENDS | $ 2,750 |
| | 41 | STUBEN CAROUSEL WITH SILVER FLAG | $ 3,200 |
| | 42 | ANTIQUE IMARI GINGER JAR | $ 3,000 |
| | 43 | BASALT VASE BY WEDGWOOD | $ 1,800 |
| | 44 | STUBEN LION | $ 2,800 |
| | 45 | 5 PC ANTIQUE FAUX BAMBOO BEDROOM SET CIRCA 1870 FROM O AND COMPANY | $ 15,200 |
| | 46 | PAIR DARK BRONZE CONTINENTAL CHAMBERSTICKS, FIGURAL SUPPORTS OF BEARDED TRITON HOLDING OVERHEAD SEASHELL AND KNEELING ON A TURTLE. | $ 1,850 |

© Copyright 1984 by Chubb & Son Inc.   Form no.  Q1200000 05/85

664

*Itemized Articles*



Page 11
Effective date 6/21/06
Policy no. 11833276-02
Name JOEL HIRSCH

| Class | No. | Description | Value |
|---|---|---|---|
| **Fine Arts** (continued) | 47 | LARGE CHINESE PORCELAIN SHALLOW CHARGER, GREYISH WHITE GROUND, HAND DECORATED IN SOFT ENAMEL COLORS IN MANNER OF MILLEFIORE. LARGE PINK PEONIES, LOTUS, CARNATION, AND PROFUSION OF OTHER BLOOMS, SOME BLUE, ORANGE, AND YELLOWISH. THREE VARIOUS FLOWER SPRAYS ON REVERSE WIDE BORDER, INCLUDING DAINTY MAUVE TIPPED WITH BLUE. SQUARE RED SEAL IN CENTER OF RIMMED BASE. CIRCA 1840 | $    950 |
| **Silverware** | 1 | "SCULPTURED ROSE" PATTERN, BY TOWLE | $  3,800 |
| | 2 | TWELVE PLACE FORKS    $316.66 EACH | $  4,700 |
| | 3 | TWELVE TEASPOONS    $241.66 EACH | $  2,900 |
| | 4 | TWELVE SOUP SPOONS    $375 EACH | $  4,500 |
| | 5 | TWELVE PLACE KNIVES    $266.66 EACH | $  3,200 |
| | 6 | SUGAR SPOON | $    250 |
| | 7 | TWELVE BUTTER SPREADERS    $200 EACH | $  2,400 |
| | 8 | BUTTER KNIFE | $    200 |
| | 9 | FOUR DEMITASSE SPOONS    $200 EACH | $    800 |
| | 10 | PIERCED TABLESPOON | $    584 |
| | 11 | TWO TABLESPOONS    $600 EACH | $  1,200 |
| | 12 | TWO SERVING FORKS    $650 EACH | $  1,300 |
| | 13 | MISCELLANEOUS SILVERWARE; TWO SETS SIX-BRANCH CANDELABRA    $1500 SET | $  3,000 |
| | 14 | TWO DRINKING STRAWS    $200 EACH | $    400 |
| | 15 | CAKE SERVER | $    380 |
| | 16 | SIX ANTIQUE NUT PICKS    $166.66 EACH | $  1,000 |
| | 17 | SILVER-PLATE: BUTTER DISH | $    100 |
| | 18 | 4 1/2" REVERSE BOWL | $     50 |
| | 19 | KIDNEY-SHAPED CANDY OR RELISH DISH | $     75 |
| | 20 | 11" X 15" RECTANGULAR TRAY | $    100 |

© Copyright 1984 by Chubb & Son Inc.   Form no.  Q1200000 05/85

*Itemized Articles*

**Page** 12
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Name** JOEL HIRSCH

| Class | No. | Description | | Value |
|---|---|---|---|---|
| **Silverware**<br>(continued) | 21 | 14" ROUND TRAY | $ | 100 |
| | 22 | SIXTEEN FORKS     $20 EACH | $ | 320 |
| | 23 | TWELVE PLACE KNIVES     $25 EACH | $ | 300 |
| | 24 | BUTTER SPREADER | $ | 25 |
| | 25 | SIXTEEN SOUP SPOONS     $23.75 EACH | $ | 380 |
| | 26 | TWO KIDDUSH CUPS     $150 EACH | $ | 300 |
| | 27 | PIE SERVER | $ | 100 |
| | 28 | STERLING SILVER FLATWARE SERVICE, BUCCELLATI "TORCHON" CONSISTING OF THE FOLLOWING PIECES: 12 PIECES: 12 DINNER FORKS $232 - $2,784 12 DINNER KNIVES $182 - $2,184 12 TEASPOONS $162 - $1,944 12 SALAD FORKS $184 - $2,208 12 DESSERT SPOONS $195 - $2,340 1 GRAVY LADLE $252 1 COLD MEAT FORK $456 1 SERVING SPOON $654 1 TABLESPOON $252 | $ | 13,544 |
| **Cameras** | 1 | NIKON 50MM 1.4, S/N 4137462 | $ | 250 |
| | 2 | NIKON FM, S/N 301440 | $ | 200 |
| | 3 | NIKON 50M 1.8, S/N 1377587 | $ | 250 |
| | 4 | NIKON 24M 2.8, S/N 580959 | $ | 175 |
| | 5 | NIKON F3, S/N 1231759 | $ | 700 |
| | 6 | NIKON 80-200MM, S/N 84851 | $ | 650 |
| | 7 | NIKON 105MM, S/N 811378 | $ | 250 |

© Copyright 1984 by Chubb & Son Inc.   Form no.   Q1200000 05/85

666

# Masterpiece®

**Additional Interests
Summary**



---

**Name and address of Insured**

JOEL HIRSCH
3115 CLEVELAND AVENUE N.W.
WASHINGTON, DC 20008-3534

**Page** 1
**Effective date** 6/21/06
**Policy no.** 11833276-02
**Issued by** Great Northern Insurance Company
a stock insurance company
incorporated in Minnesota
**Policy period** 6/21/06 to 6/21/07

**If you have any questions, please contact**
AON PRIVATE RISK MANAGEMENT (GNY)
1000 N MILWAUKEE AVENUE
GLENVIEW, IL  60025
866-225-5266

This summary lists the Additional Interests you have requested to be shown on your policy. We notify each Additional Interest separately. Regardless of the number of Additional Interests shown on your policy, the amount of coverage for any one occurrence does not increase.

---

## Mortgagee

This section shows the Mortgagee(s) for your home(s) shown below.

| Address | Mortgagee |
|---|---|
| HOUSE AT<br>3115 CLEVELAND<br>AVENUE NW<br>WASHINGTON, DC | BRANCH BANKING AND<br>TRUST COMPANY OF VA<br>ISAOA ATIMA<br>P.O. BOX 2088<br>GREENVILLE, SC  29602-2088<br><br>Loan Number 606112317 |

---

© Copyright 1984 by Chubb & Son Inc   Form no   Q6010000 10/89

INSURED  07/16/07 23.31.49

667

# *Masterpiece*®

**Table of Contents**



---

**Name and address of insured**

JOEL HIRSCH
3115 CLEVELAND AVENUE N.W.
WASHINGTON, DC  20008-3534

**Effective date**  6/21/06
**Policy no.**  11833276-02
**Issued by**  Great Northern Insurance Company
a stock insurance company
incorporated in  Minnesota
**Policy period**  6/21/06  to  6/21/07

**If you have any questions, please contact**
AON PRIVATE RISK MANAGEMENT (GNY)
1000 N MILWAUKEE AVENUE
GLENVIEW, IL   60025
866-225-5266

This table of contents lists your policy provisions. Please attach this table of contents to your policy so you have a current list of your coverages at all times.

## Contents

| Chapter | Edition Date | State | Page |
|---------|-------------|-------|------|
| Introduction | | | A-1 |
| Deluxe House Coverage | 12/03 | D C | B-1 |
| Deluxe Contents Coverage | 12/03 | D C | C-1 |
| Valuable Articles Coverage | 09/04 | D C | N-1 |
| Personal Liability Coverage | 12/03 | D C | T-1 |
| Excess Liability Coverage | 03/05 | D C | W-1 |
| Policy Terms | 12/03 | D C | Y-1 |
| Policy Information Notice | 02/03 | D C | |

© Copyright 1984 by Chubb & Son Inc.   Form No.Q0903000 05/85

INSURED  07/16/07  23.31.49

669

Jaeger Affidavit
Exhibit A
(part 2)

# *Masterpiece*®  *Introduction*  

This is your Chubb Masterpiece Policy. Together with your Coverage Summary, it explains your coverages and other conditions of your insurance in detail.

This policy is a contract between you and us. **READ YOUR POLICY CAREFULLY** and keep it in a safe place.

## Agreement

We agree to provide the insurance described in this policy in return for your premium and compliance with the policy conditions.

## Definitions

In this policy, we use words in their plain English meaning. Words with special meanings are defined in the part of the policy where they are used. The few defined terms used throughout the policy are defined here:

**You** means the person named in the Coverage Summary, and a spouse who lives with that person.

**We** and **us** mean the insurance company named in the Coverage Summary.

**Family member** means your relative who lives with you, or any other person under 25 in your care or your relative's care who lives with you.

**Policy** means your entire Masterpiece Policy, including the Coverage Summary and any Mortgagee's Coverage Summary.

**Coverage Summary** means the most recent Coverage Summary we issued to you, including any subsequent Coverage Updates.

**Occurrence** means a loss or accident to which this insurance applies occurring within the policy period. Continuous or repeated exposure to substantially the same general conditions unless excluded is considered to be one occurrence.

**Business** means any employment, trade, occupation, profession, or farm operation including the raising or care of animals.

© Copyright 1985 by Chubb & Son Inc. Form no. 0200000 5/85

235    11/11/86 19.43.35    1/31/05 23:55:38

# Masterpiece®

**Deluxe House Coverage**



This part of your Masterpiece Policy provides you with coverage against all risk of physical loss to your house unless stated otherwise or an exclusion applies.

"House" means the main one-family or two-family dwelling at each District of Columbia location with Deluxe House Coverage shown in the Coverage Summary.

## *Payment for a Loss*

### Amount of coverage
The amount of coverage for each house for each occurrence is shown in the Coverage Summary. At the time of a covered loss, the amount of coverage for your house will be adjusted to include any increase in the United States Consumer Price Index calculated from the beginning of the policy period.

To help you and us agree on the appropriate amount of coverage, we may, but are not obligated to, conduct appraisals of your house and also make periodic adjustments to the amount of coverage. To maintain an appropriate amount of coverage, it is your duty to advise us of additions, alterations or renovations to your house.

### Deductibles
A deductible is that amount we will subtract from the amount of a covered loss we pay. Either the base deductible listed in the Coverage Summary or one of the special deductibles applies to each occurrence, unless stated otherwise.

**Vacant house deductible.** In lieu of the base deductible, a 5% vacant house special deductible applies to each occurrence if your house has been substantially empty of furnishings and contents for more than 30 consecutive days at the time of a covered loss, and you did not notify us it would be vacant. This deductible applies to your house, contents and extra coverages. The dollar amount of this deductible is equal to 5% of the amount of coverage for the house at the time of a covered loss. If your house coverage amount is increased because of extended replacement cost, the deductible will be based on the increased amount. However, if any other special deductible applies and the dollar amount of that special deductible is greater than the dollar amount of the vacant house special deductible, the greater special deductible applies. If the dollar amount of the base deductible is greater than the dollar amount of the applicable special deductible, the dollar amount of that special deductible is increased to the dollar amount of the base deductible.

### Payment basis
Your Coverage Summary indicates the payment basis for each house.

"Reconstruction cost" means the lesser of the amount required at the time of loss to repair, replace or rebuild, at the same location, your house or any other permanent structure, using like design, and materials and workmanship of comparable kind and quality.

"Reconstruction cost" does not include any amount required for:
- the excavation, replacement or stabilization of land under or around your house or any other permanent structure;
- conforming to any law or ordinance that regulates the repair, replacement, rebuilding or demolition of your house or any other permanent structure; or
- removing the debris of a covered loss or the property that caused a covered loss.

© Copyright 1985 by Chubb & Son Inc. Form no. 0800008 5/85     10/02/03 9:26:26

*Deluxe House Coverage*

---

## Payment for a Loss
(continued)

**Extended replacement cost.** If the payment basis is extended replacement cost, we will pay the reconstruction cost even if this amount is greater than the amount of coverage shown in your policy.

Extended replacement cost is provided on the condition that you maintain at least the amount of coverage for your house as previously agreed to, including any adjustments by us based on appraisals, revaluations and annual adjustments for inflation.

This payment basis is subject to the following limitations:
- If you have a covered partial loss to your house or other permanent structure and do not begin to repair, replace or rebuild the lost or damaged property within 180 days from the date of loss, we will only pay the reconstruction cost, less depreciation.
- If you do not repair, replace, or rebuild your house or other permanent structure at the same location, the payment basis will be verified replacement cost.
- If at any time during any policy period of this coverage:
  - you are newly constructing your house or an other permanent structure; or
  - you are constructing additions, alterations, or renovations to your house or an other permanent structure that results in your living out of the house during any part of the construction,
  your payment basis for your house or other permanent structures will be conditional replacement cost. Conditional replacement cost will remain your payment basis until construction is completed and you and we agree on the appropriate amount of coverage for your house or other permanent structures.
    **Your duty:** To reduce the possibility of being underinsured, you must notify your agent or broker at the beginning of construction so that the amount of coverage for your house or other permanent structures can be adjusted to reflect the proper reconstruction cost.
- If you cannot repair, replace or rebuild your house because your primary mortgagee or its assignees has recalled your mortgage, we will pay up to the amount of coverage shown in the Coverage Summary for your house, minus what is due to the mortgagee.

**Verified replacement cost.** If the payment basis is verified replacement cost, we will pay the reconstruction cost of:
- your house up to the amount of coverage shown in the Coverage Summary; and
- other permanent structures up to the amount of coverage for other permanent structures, whether or not you actually repair, replace or rebuild.

Verified replacement cost is provided on the condition that you maintain at least 90% of the full amount of coverage we recommend for your house, including any adjustments by us based on appraisals, revaluations and annual adjustments for inflation.

If you have a covered partial loss to your house or an other permanent structure, and do not begin to repair, replace or rebuild the lost or damaged property within 180 days from the date of loss, we will only pay the reconstruction cost less depreciation.

**Conditional replacement cost.** If the payment basis is conditional replacement cost, our payment will be the greater of the following:
- the reconstruction cost less depreciation; or
- the proportion of the covered loss to your house or other permanent structure determined by dividing the amount of coverage for your house as shown in the Coverage Summary, by 80% of the amount required to rebuild your entire house.

© Copyright 1985 by Chubb & Son Inc. Form no. 0800008 5/85                    10/02/03 9:26:26

*Deluxe House*
*Coverage*



## Payment for a Loss
(continued)

However, our payment will not exceed the lesser of:
- the reconstruction cost; or
- the amount of coverage for your house as shown in the Coverage Summary or the amount of coverage for other permanent structures.

If you have a covered partial loss to your house or an other permanent structure, and do not begin to repair, replace or rebuild the lost or damaged property within 180 days from the date of loss, our payment will be the lesser of the following:
- the reconstruction cost less depreciation; or
- the proportion of the covered loss to your house or other permanent structure determined by dividing the amount of coverage for your house as shown in the Coverage Summary by 80% of the amount required to rebuild your entire house.

However, our payment will not exceed the lesser of:
- the reconstruction cost; or
- the amount of coverage for your house as shown in the Coverage Summary or the amount of coverage for other permanent structures.

## Deluxe House Coverage

In Deluxe House Coverage, a "covered loss" includes **all risk** of physical loss to your house or other property covered under this part of your Masterpiece Policy, unless stated otherwise or an exclusion applies. Exclusions to this coverage are described in **Exclusions**.

## Extra Coverages

In addition to covering the physical loss to your house, we also provide many related coverages. These payments are in addition to the amount of coverage for your house unless stated otherwise or an exclusion applies. All deductibles apply to Extra Coverages unless stated otherwise. Exclusions to these coverages are described in **Exclusions**.

### Homeowner assessments
We cover your share of an assessment charged against all homeowners in your homeowners association. But the assessment must be a result of a loss that would be covered under this policy to property owned collectively by all homeowners, or of liability that would be covered under this policy. We will not pay homeowners assessments caused by earthquake even if earthquake coverage is shown in your Coverage Summary for that location. But we do insure ensuing covered loss due to fire, explosion, theft or glass breakage unless an exclusion applies.

*Deluxe House*
*Coverage*

## Extra Coverages
(continued)

We will pay up to $50,000 for any one loss, regardless of the number of assessments. But we will not pay more than $1,000 in any one loss for assessments that result from a deductible in your homeowners association's insurance.

There is no deductible for this coverage.

### Other permanent structures
We cover other permanent structures on the grounds of your house. For each occurrence, we will pay up to a total of 20% of the amount of house coverage for the location at which a covered loss to these structures occurs, plus any additional amount of coverage shown in the Coverage Summary for "other permanent structures" at this location. The same payment basis applies to other permanent structures as to the house itself.

### Additional living expenses
As described below, under certain conditions when your house cannot be lived in because of a covered loss to your house or, if applicable, your contents, we provide coverage for additional living expenses which consists of extra living expenses, loss of fair rental value and forced evacuation expenses. There is no deductible for this coverage.

**Extra living expenses.** If your house cannot be lived in because of a covered loss to your house or, if applicable, your contents, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living. We cover this increase for the reasonable amount of time required to repair, replace or rebuild your house or, your contents, or if you permanently relocate, the shortest amount of time required for your household to settle elsewhere. This period of time is not limited by the expiration of this policy.

**Fair rental value.** If part of your house which you usually rent to others cannot be lived in because of a covered loss to your house or, if applicable, your contents, we cover its fair rental value for the reasonable amount of time required to repair, replace or rebuild the part of your house or your contents rented or held for rental, during the period of time it is usually rented. This period of time is not limited by the expiration of this policy.

**Forced evacuation expenses.** If your house cannot be lived in because a civil authority prohibits you from using it, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living. We also cover any loss in fair rental value if your house is usually held for rental, but we do not cover any loss of rents due to cancellation of a lease or agreement. The prohibition must be a direct result of a loss to neighboring premises that would be a covered loss under this policy. We cover these forced evacuation expenses for up to 30 days, even if the policy period ends during that time.

"Contents" means personal property you or a family member owns or possesses covered by us.

### Land
Whenever there is a covered loss to your house or other permanent structure and the related repair or rebuilding requires excavation, replacement, or stabilization of land under or around your house or other permanent structure, we will also pay up to 10% of the amount of the covered loss to your house or other permanent structure for the excavation, replacement, or stabilization of the land.

© Copyright 1985 by Chubb & Son Inc. Form no. 0800008 5/85    10/02/03 9:26:26
544

*Deluxe House*
*Coverage*



---

## *Extra Coverages*
(continued)

### Landscaping
We cover trees, shrubs, plants, and lawns at your house against certain kinds of perils. These are fire, lightning, explosion, civil disturbance, vandalism, malicious mischief, theft, and loss caused by a vehicle or aircraft.

We will pay up to a total of 5% of the amount of coverage for the house at which the loss occurs, but not more than $1,000 for any one tree, shrub, or plant. If your payment basis is extended replacement cost, the 5% is applied to the increased amount of coverage.

This extra coverage applies only if you begin to repair or replace the lost or damaged property within 180 days of the date of loss.

### Tree removal
Unless covered elsewhere under this policy, we will pay the reasonable expenses you incur up to a total of $1,000 for each occurrence to remove trees fallen due to wind, hail, sleet or the weight of ice or snow. These payments apply only to fallen trees at a location shown in the Coverage Summary.

### Fire department charges
If a fire department is called to protect your house or its grounds against a covered loss, we will pay up to $1,000 for any charges imposed by law or assumed by written agreement. There is no deductible for this coverage.

### Lock replacement
If the keys to your house are lost or stolen, we will pay the cost of replacing the locks, up to $500. But you must notify us in writing within 72 hours of discovering the loss. There is no deductible for this coverage.

### Debris removal
We cover the reasonable expenses you incur to remove debris of a covered loss and of the property that caused a covered loss.

### Temporary precautionary repairs
After a covered loss, we cover the reasonable expenses you incur for necessary temporary precautionary repairs made solely to protect your house or other permanent structure against further covered damage. These payments do not increase the amount of coverage for your house or other permanent structures.

### Construction materials
We cover the materials and supplies owned by you on the grounds of your house for use in the construction, alteration, and repair of your house or other permanent structures. These payments apply only to a covered loss, and they do not increase the amount of coverage for your house or other permanent structures.

© Copyright 1985 by Chubb & Son Inc. Form no. 0800008 5/85                10/02/03 9:26:26

*Deluxe House*
*Coverage*

## Extra Coverages
(continued)

### Rebuilding to code

After a covered loss, we cover the cost of conforming to any law or ordinance that regulates the repair, replacement, rebuilding or demolition of your house or other permanent structure made necessary by the covered loss.

This coverage does not apply unless you repair, replace, or rebuild your house or other permanent structure at the same location.

### Mine subsidence

We cover your house and other permanent structures on the grounds of your house against direct loss caused by mine subsidence.

Mine subsidence means loss caused by lateral or vertical movement of a man-made underground mine or underground mine related excavations including any resulting collapse of your house or other permanent structures on the grounds of your house, including but not limited to coal, clay, limestone, and fluorspar mines. Mine subsidence does not mean loss caused by collapse of storm and sewer drains, and rapid transit tunnels.

The amount of coverage is limited to the amount shown in the Coverage Summary.

The exclusions of loss caused by structural movement, and earth movement in this policy do not apply to mine subsidence.

### Mold remediation expenses

We provide coverage for mold remediation expenses you incur, made necessary by a covered water damage loss to your house, other permanent structure, or to contents if contents coverage is provided under this policy. For each occurrence, we will pay up to a total of $10,000, plus any additional amount of coverage shown in the Coverage Summary for mold remediation expenses at this location. This coverage applies only to the portion of the house, other permanent structure or contents, which directly sustained the covered water damage loss. These payments do not increase the amount of coverage for your house, other permanent structures, or contents.

"Mold remediation" means the reasonable and necessary costs not otherwise covered for:
- testing the indoor air quality for mold;
- testing the surfaces and materials of your house, other permanent structure or contents for mold;
- developing a mold remediation plan; and
- implementing a mold remediation plan including the clean up, removal, containment, treatment, or disposal of mold.

"Mold remediation" also means the reasonable and necessary costs, including the increased cost, not otherwise covered for:
- removing debris solely due to mold; and
- repairing or replacing covered property damaged or removed solely due to mold.

We also provide coverage for temporary relocation expenses you incur, made necessary by mold remediation. For each occurrence, we will pay up to 20% of the total amount of mold remediation expense coverage. There is no deductible for temporary relocation expenses.

© Copyright 1985 by Chubb & Son Inc. Form no. 0800008 5/85                    10/02/03 9:26:26
546

*Deluxe House*
*Coverage*



## Extra Coverages
(continued)

"Temporary relocation expenses" means:
- the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living for the reasonable amount of time required to complete mold remediation; and
- the fair rental value of that part of your house rented or held for rental, for the reasonable amount of time required to complete mold remediation, during the period of time it is usually rented.

"Contents" means personal property you or a family member owns or possesses covered by us.

"Mold" means fungi, mold, mold spores, mycotoxins, and the scents and other byproducts of any of these.

We will not make any additional payments for mold remediation expenses or temporary relocation expenses under any other Extra Coverage. The amount of coverage for mold remediation expenses and temporary relocation expenses is the most we will pay for the sum of all mold remediation expenses and temporary relocation expenses, regardless of the number of covered water damage losses that occur during the policy period.

## Exclusions

These exclusions apply to your Deluxe House Coverage, including the Extra Coverages, unless stated otherwise.

The words "caused by" mean any loss that is contributed to, made worse by, or in any way results from that peril.

**Gradual or sudden loss.** We do not provide coverage for the presence of wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping, however caused, or any loss caused by wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping. We also do not cover any loss caused by inherent vice, latent defect or mechanical breakdown. But we do insure ensuing covered loss unless another exclusion applies.

**Contamination.** We do not cover any loss caused by the discharge, dispersal, seepage, migration or release or escape of pollutants. Nor do we cover the cost to extract pollutants from land or water, or the cost to remove, restore or replace polluted or contaminated land or water. A "pollutant" is any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. A "contaminant" is an impurity resulting from the mixture of or contact of a substance with a foreign substance. "Waste" includes materials to be disposed of, recycled, reconditioned or reclaimed.

**Loss by animals.** We do not cover any loss caused by birds, vermin, insects, rodents, or domestic animals except loss to glass that is part of a building, storm door, or storm window. But we do insure ensuing covered loss unless another exclusion applies.

© Copyright 1985 by Chubb & Son Inc. Form no. 0800008 5/85                    10/02/03 9:26:26
547

*Deluxe House*
*Coverage*

## Exclusions
(continued)

**Structural movement.** We do not cover any loss caused by the settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs, or ceilings except loss to glass that is part of a building, storm door, or storm window. But we do insure ensuing covered loss unless another exclusion applies.

**Special rules for escaping water.** If any of the causes of loss previously described in the exclusions for Gradual or sudden loss, Contamination, Loss by animals, or Structural movement cause water to escape from within a household appliance, swimming pool, or plumbing, heating, or air conditioning system, we cover the loss caused by the water. We provide this coverage unless an exclusion applies other than the exclusions for Gradual or sudden loss, Contamination, Loss by animals, or Structural movement. This coverage also includes the cost of tearing out and replacing any part of the house or other permanent structure necessary to repair the appliance, swimming pool, or system. We do not cover loss to the appliance, swimming pool, or system itself.

**Discharge, overflow or backup.** We do not cover any loss caused by the discharge, leakage, seepage, overflow or backup from within a plumbing system, sewer or drain when the discharge, leakage, seepage, overflow or backup exits the plumbing system, sewer or drain outside the foundation of your house or other permanent structure.

**Freezing water.** We do not cover any loss caused by water freezing in a plumbing, heating, or air conditioning system, or household appliance if the house is vacant, unoccupied, or being constructed, unless you used reasonable care to maintain heat in the building or shut off and drained the water system or appliance. But we do insure ensuing covered loss unless another exclusion applies.

**Surface water.** We do not cover any loss caused by:
- flood, surface water, waves, tidal water, or water borne material from any of these;
- overflow of water or water borne material from a body of water;
- run off of water or water borne material from a paved surface, driveway, walkway, patio, or other similar surface; or
- spray from any of these,

from any source, even if driven by wind. But we do insure ensuing covered loss unless another exclusion applies.

**Ground water.** We do not cover any loss caused by water or water borne material in the ground, or by its pressure, leakage, or seepage. But we do insure ensuing covered loss unless another exclusion applies.

**Water damage to outside structures.** We do not cover certain kinds of loss to a fence, pavement, patio, swimming pool, hot tub, septic system, foundation, retaining wall, bulkhead, pier, wharf, dock, or bridge. These are losses caused by freezing, thawing, or the pressure or weight of water or ice, even if the water or ice is driven by wind. But we do insure ensuing covered loss unless another exclusion applies.

**Dampness or temperature.** We do not cover any loss caused by air dampness, water vapor or temperature extremes.

© Copyright 1985 by Chubb & Son Inc. Form no. 0800008 5/85          10/02/03 9:26:26

*Deluxe House*
*Coverage*



## *Exclusions*
(continued)

**Fungi and mold.** We do not provide coverage for the presence of mold, however caused, or any loss caused by mold, other than as provided under the Extra Coverage, Mold remediation expenses. But we do cover mold resulting from fire or lightning unless another exclusion applies. "Mold" means fungi, mold, mold spores, mycotoxins, and the scents and other byproducts of any of these.

**Neglect.** We do not cover any loss caused by your failure to use all reasonable means to protect property before, at, or after the time of a loss.

**Intentional acts.** We do not cover any loss caused intentionally by you or a family member, or by a person directed by you or a family member to cause a loss. But we do provide coverage for you or a family member who is not responsible for causing the intentional loss. An intentional act is one whose consequences could have been foreseen by a reasonable person.

**Faulty planning, construction or maintenance.** We do not cover any loss caused by the faulty acts, errors or omissions of you or any other person in planning, construction or maintenance. It does not matter whether the faulty acts, errors or omissions take place on or off the insured property. But we do insure ensuing covered loss unless another exclusion applies. "Planning" includes zoning, placing, surveying, designing, compacting, setting specifications, developing property and establishing building codes or construction standards. "Construction" includes materials, workmanship, and parts or equipment used for construction or repair.

**Earthquake.** We do not cover any loss caused by earthquake unless shown in your Coverage Summary for that location. But we do insure ensuing covered loss due to fire, explosion, theft, or glass breakage unless another exclusion applies.

**Earth movement.** We do not cover any loss caused by earth movement including volcanic eruptions, landslides, mud flows, and the sinking, rising, or shifting of land. But we do cover losses caused by the eruption of a volcano when the loss is the result of:
- a volcanic blast or airborne shock waves;
- ash, dust, or particulate matter; or
- lava flow.

We also insure ensuing covered loss due to fire, explosion, theft, or glass breakage unless another exclusion applies.

**Acts of war.** We do not cover any loss caused directly or indirectly by war, undeclared war, civil war, insurrection, rebellion, revolution, warlike acts by military forces or personnel, the destruction or seizure of property for a military purpose, or the consequences of any of these actions.

**Nuclear or radiation hazard.** We do not cover any loss caused directly or indirectly by nuclear reaction, radiation, or radioactive contamination, regardless of how it was caused. But we do insure ensuing covered loss due to fire resulting from a nuclear hazard unless another exclusion applies.

© Copyright 1985 by Chubb & Son Inc. Form no. 0800008 5/85                    10/02/03 9:26:26
549

# *Masterpiece*®

**Deluxe Contents Coverage**



CHUBB

This part of your Masterpiece Policy provides you with coverage against all risk of physical loss to your contents anywhere in the world unless stated otherwise or an exclusion applies.

"Contents" means personal property you or a family member owns or possesses.

## *Payment for a Loss*

### Amount of coverage

The amount of coverage for contents at each house for each occurrence is shown in the Coverage Summary. At the time of a covered loss, the amount of coverage for contents will be adjusted to include any increase in the United States Consumer Price Index calculated from the beginning of the policy period.

If a change in the amount of coverage for your house is made, including the application of extended replacement cost, the amount of coverage for contents will be adjusted proportionately. To reduce the possibility of being underinsured, you should periodically review your amount of coverage for contents and request an increase if you feel the amount of coverage is insufficient.

For a covered loss to contents, the amount of coverage depends on where the loss occurs:

**At a house with contents coverage.** If the covered loss takes place at a listed house with contents coverage in this policy, we will pay up to the amount of contents coverage for that house, for each occurrence.

**Away from your residences.** If the covered loss takes place away from any residence you own or live at, for each occurrence we will choose the single listed location on which the payment is to be made, based upon the most favorable combination of the following:
- amount of contents coverage
- payment basis
- type of contents coverage
Regardless of the number of policies providing you with contents coverage, payment will be made based only on this chosen location and will not be made under more than one policy.

**At your residence not listed in this policy or other policies.** If the covered loss takes place at a residence you own or live at that does not have contents, condominium, cooperative or renters coverage listed in this or any other policy issued by a direct or indirect subsidiary of the Chubb Corporation, we will pay up to 10% of the highest amount of contents coverage in this policy, for each occurrence. However, contents in a newly acquired principal residence is not subject to this limitation for the 60 days immediately after you begin to move your contents there.

We will choose the single listed location on which the payment is to be made, based upon the most favorable combination of the following:
- amount of contents coverage
- payment basis
- type of contents coverage
Regardless of the number of policies providing you with contents coverage, payment will be made based only on this chosen location and will not be made under more than one policy.

© Copyright 1985 by Chubb & Son Inc. Form no. 1200008 5/85          10/02/03 9:26:26

*Deluxe Contents
Coverage*

## *Payment for a Loss*
(continued)

### Deductibles
A deductible is that amount we will subtract from the amount of a covered loss we pay. Either the base deductible listed in the Coverage Summary or one of the special deductibles applies to each occurrence, unless stated otherwise.

### Payment basis
Your Coverage Summary indicates the payment basis for contents.

**Replacement cost.** If the payment basis is replacement cost, we will pay the full cost to replace the contents without deduction for depreciation, or the amount required to repair the damage, whichever is less, up to the amount of coverage.

However, for contents which are obsolete or unusable for the purpose for which they were originally intended because of their age or condition, the payment basis will be actual cash value.

**Actual cash value.** If the payment basis is actual cash value, we will pay the cost to replace the contents less depreciation, or the amount required to repair the damage, whichever is less, up to the amount of coverage.

**Pairs, sets, and parts.** For a covered loss to a pair or set, or to part of a larger unit, we will pay whichever is least:
- the cost to repair the damaged property to its condition before the loss;
- the cost to replace it; or
- the cost to make up the difference between its market value before and after the loss.

However, if you agree to surrender the undamaged article(s) of the pair, set, or parts to us and we agree to accept, we will pay you the full replacement cost of the entire pair, set, or parts.

### Special limits
For a covered loss to the following types of contents, we will not pay more than the amounts shown. These special limits do not increase the amount of coverage on your contents or on any item covered elsewhere in this policy.

Money, money orders, checks, drafts, bank notes, bullion, gold, silver or platinum . . . . . . . $1,000

Securities, accounts, deeds, evidences of debt, letters of credit, notes other than
bank notes, manuscripts, passports, or tickets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000
    However, when this property is located in a bank vault or bank safe deposit box, your full
    contents coverage away from your residences will apply for a covered loss.

Trailers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $3,000

Watercraft, including their furnishings, equipment, and outboard motors . . . . . . . . . . . . . . $2,000

Jewelry, watches or precious and semi-precious stones, whether set or unset,
that are lost, misplaced, or stolen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000

© Copyright 1985 by Chubb & Son Inc. Form no. 1200008 5/85        10/02/03 9:26:26

## Deluxe Contents
## Coverage



## Payment for a Loss
(continued)

Furs that are lost, misplaced, or stolen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000

Plated ware, silverware, goldware, pewterware, tableware, trays, trophies, and
other household and personal articles, other than jewelry, that consist principally
of sterling silver, gold, or pewter that are lost, misplaced, or stolen . . . . . . . . . . . . . . . . $10,000

Collectible stamps, coins, and medals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000
    However, when this property is located in a bank vault or bank safe deposit box, your full
    contents coverage away from your residences will apply for a covered loss.

Guns that are lost, misplaced, or stolen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000

Grave markers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,000

## Deluxe Contents Coverage

In Deluxe Contents Coverage, a "covered loss" includes  **all risk** of physical loss to your contents
or other property covered under this part of your Masterpiece Policy, unless stated otherwise or an
exclusion applies. Exclusions to this coverage are described in **Exclusions**.

## Extra Coverages

In addition to covering the physical loss to your contents, we also provide other related coverages.
These payments are in addition to the amount of coverage for your contents unless stated
otherwise or an exclusion applies. All deductibles apply to Extra Coverages unless stated otherwise.
Exclusions to these coverages are described in **Exclusions.**

### Business property
We will pay up to $25,000 for a covered loss to business property you own or possess. However, if
a covered loss to electronic data processing property used to conduct your business takes place
away from any residence you own or live at, we will not pay more than $2,500 for each occurrence.
The same payment basis applies to business property as to contents, except that we will pay the
cost of replacing or recreating business data contained in books, records and software if it is
actually replaced or recreated.

"Business property" means:
- furniture, supplies, equipment, inventory;
- books, records; and
- electronic data processing property;
  used to conduct your business.

© Copyright 1985 by Chubb & Son Inc. Form no. 1200008 5/85                    10/02/03 9:26:26
653

*Deluxe Contents*
*Coverage*

## Extra Coverages
(continued)

"Electronic data processing property" means:
- electronic data processing equipment, and accessories;
- software; and
- data stored on software.

### Electronic data restoration
We cover your personal data stored on computer software which you own or possess, anywhere in the world. We will pay up to $5,000 for replacing or recreating that personal data as a result of a covered loss or computer virus if it is actually replaced or recreated at your expense.

"Computer virus" means an illegal or malicious entry into electronic data processing property which results in functions that distort, corrupt or manipulate the electronic data processing property.

"Electronic data processing property" means:
- electronic data processing equipment, and accessories;
- software; and
- data stored on software.

### Food spoilage
We cover food while contained in a refrigerator or freezer which spoils due to changes or extremes of temperature caused by:
- off premises power interruption;
- interruption of premises power supply; or
- mechanical or electrical breakdown of refrigeration equipment.

This coverage applies only to spoilage which occurs at any residence you own or live at. This payment does not increase the amount of coverage for your contents. Our payment is subject to a $250 deductible, which is waived if there is another loss:
- from the same occurrence;
- covered under any part of this policy; and
- which is subject to a deductible.

### Endangered property
Covered contents removed from your house because the house is endangered by a covered peril are covered against any peril for up to 90 days. These payments do not increase the amount of coverage for your contents.

## Exclusions

These exclusions apply to your Deluxe Contents Coverage, including the Extra Coverages, unless stated otherwise.

The words "caused by" mean any loss that is contributed to, made worse by, or in any way results from that peril.

© Copyright 1985 by Chubb & Son Inc. Form no. 1200008 5/85          10/02/03 9:26:26

554

*Deluxe Contents*
*Coverage*



## Exclusions
(continued)

**Gradual or sudden loss.** We do not provide coverage for the presence of wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping, however caused, or any loss caused by wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping. We also do not cover any loss caused by inherent vice, latent defect or mechanical breakdown. But we do insure ensuing covered loss unless another exclusion applies.

**Contamination.** We do not cover any loss caused by the discharge, dispersal, seepage, migration or release or escape of pollutants. Nor do we cover the cost to extract pollutants from land or water, or the cost to remove, restore or replace polluted or contaminated land or water. A "pollutant" is any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. A "contaminant" is an impurity resulting from the mixture of or contact of a substance with a foreign substance. "Waste" includes materials to be disposed of, recycled, reconditioned or reclaimed.

**Loss by animals.** We do not cover any loss caused by birds, vermin, insects, rodents, or domestic animals. But we do insure ensuing covered loss unless another exclusion applies.

**Special rules for escaping water.** If any of the causes of loss previously described in the exclusions for Gradual or sudden loss, Contamination, or Loss by animals cause water to escape from within a household appliance, swimming pool, or plumbing, heating, or air conditioning system, we cover the loss caused by the water. We provide this coverage unless an exclusion applies other than the exclusions for Gradual or sudden loss, Contamination, or Loss by animals. We do not cover loss to the appliance, swimming pool, or system itself.

**Discharge, overflow or backup.** We do not cover any loss caused by the discharge, leakage, seepage, overflow or backup from within a plumbing system, sewer or drain when the discharge, leakage, seepage, overflow or backup exits the plumbing system, sewer or drain outside the foundation of your house or other permanent structure.

**Freezing water.** We do not cover any loss caused by water freezing in a plumbing, heating, or air conditioning system, or household appliance if the house is vacant, unoccupied, or being constructed, unless you used reasonable care to maintain heat in the building or shut off and drained the water system or appliance. But we do insure ensuing covered loss unless another exclusion applies.

**Surface water.** We do not cover any loss caused by:
- flood, surface water, waves, tidal water, or water borne material from any of these;
- overflow of water or water borne material from a body of water;
- run off of water or water borne material from a paved surface, driveway, walkway, patio, or other similar surface; or
- spray from any of these,
  from any source, even if driven by wind. But we do insure ensuing covered loss unless another exclusion applies. We also cover surface water damage to contents away from any residence you own or live at, unless another exclusion applies.

**Ground water.** We do not cover any loss caused by water or water borne material in the ground, or by its pressure, leakage, or seepage. But we do insure ensuing covered loss unless another exclusion applies. We also cover ground water damage to contents away from any residence you own or live at, unless another exclusion applies.

© Copyright 1985 by Chubb & Son Inc. Form no. 1200008 5/85          10/02/03 9:26:26
sss

*Deluxe Contents*
*Coverage*

## Exclusions
(continued)

**Computer error.** We do not cover any loss resulting from an error in computer programming or instructions to the computer.

**Business property.** We do not cover any loss to business property other than as provided under Extra Coverages.

**Tenant property.** We do not cover any loss to property of roomers, boarders, or other tenants. But we do cover personal property of your guests, domestic workers or relatives while it is in any home occupied by you or a family member.

**Motorized land vehicles.** We do not cover any loss to a motorized land vehicle. But we do cover motorized land vehicles used solely on and to service a residence premises shown in the Coverage Summary. We also cover motorized land vehicles used to assist the disabled that are not designed for or required to be registered for use on public roads.

**Theft of sound equipment from a motorized land vehicle.** We do not cover any theft of sound reproducing, receiving, and transmitting equipment from a motorized land vehicle if the equipment is operated by power from the electrical system of that vehicle. This includes radios, tape players, CBs, scanning monitors, televisions, and any other similar equipment, including their accessories and antennas.

**Repairs and renovations.** We do not cover loss caused by repairing, refinishing, or renovating any kind of property except jewelry, watches, and furs.

**Watercraft accidents.** We do not cover any loss caused by the sinking, swamping, stranding, or collision of a watercraft or its trailer, equipment, or outboard motor. But we do cover collision of a watercraft with a land vehicle unless another exclusion applies.

**Dampness or temperature.** We do not cover any loss caused by air dampness, water vapor or temperature extremes. This exclusion does not apply to the Extra Coverage for Food spoilage.

**Fungi and mold.** We do not provide coverage for the presence of mold, however caused, or any loss caused by mold. But we do cover mold resulting from fire or lightning unless another exclusion applies. "Mold" means fungi, mold, mold spores, mycotoxins, and the scents and other byproducts of any of these.

**Confiscation.** We do not cover any loss caused by the confiscation, destruction, or seizure of property by any government or public authority.

**Breakage of fragile articles.** We do not cover breakage of fragile articles, including any type of: eyeglasses, crystal, china not regularly used, porcelains, figurines, statues, sculptures, mirrors, bric-a-brac and similar items. But we do cover breakage caused by fire, lightning, wind, hail, or smoke (except industrial or agricultural smoke); by explosion, riot, civil commotion, aircraft, or vehicles; by vandalism, malicious mischief, or collapse of a building or part of a building; by earth movement, earthquake, water, theft, or attempted theft; or by the sudden and accidental tearing apart, cracking, burning, or bulging of a plumbing, heating, or air conditioning system or household appliance, unless another exclusion applies.

© Copyright 1985 by Chubb & Son Inc. Form no. 1200008 5/85            10/02/03 9:26:26

*Deluxe Contents*
*Coverage*



## Exclusions
(continued)

Fragile articles do not include jewelry, watches, bronzes, cameras, and photographic lenses.

**Personal property insured with other companies.** We do not cover loss to personal property separately described and insured with a specific value or insured on a blanket basis under a personal articles floater policy or similar policy not issued by a direct or indirect subsidiary of The Chubb Corporation.

**Loss to animals.** We do not cover any loss to animals, birds, or fish.

**Aircraft.** We do not cover any loss to an aircraft or aircraft parts.

**Intentional acts.** We do not cover any loss caused intentionally by you or a family member, or by a person directed by you or a family member to cause a loss. But we do provide coverage for you or a family member who is not responsible for causing the intentional loss. An intentional act is one whose consequences could have been foreseen by a reasonable person.

**Misappropriation.** We do not cover any loss to contents caused by the taking or other misappropriation of the contents from you or a family member by your spouse or another family member.

**Faulty planning, construction or maintenance.** We do not cover any loss caused by the faulty acts, errors or omissions of you or any other person in planning, construction or maintenance. It does not matter whether the faulty acts, errors or omissions take place on or off the insured property. But we do insure ensuing covered loss unless another exclusion applies. "Planning" includes zoning, placing, surveying, designing, compacting, setting specifications, developing property and establishing building codes or construction standards. "Construction" includes materials, workmanship, and parts or equipment used for construction or repair.

**Neglect.** We do not cover any loss caused by your failure to use all reasonable means to protect property before, at, or after the time of a loss.

**Acts of war.** We do not cover any loss caused directly or indirectly by war, undeclared war, civil war, insurrection, rebellion, revolution, warlike acts by military forces or personnel, the destruction or seizure of property for a military purpose, or the consequences of any of these actions.

**Nuclear or radiation hazard.** We do not cover any loss caused directly or indirectly by nuclear reaction, radiation, or radioactive contamination, regardless of how it was caused. But we do insure ensuing covered loss due to fire resulting from a nuclear hazard unless another exclusion applies.

© Copyright 1985 by Chubb & Son Inc. Form no. 1200008 5/85        10/02/03 9:26:26
557

# Masterpiece®

**Valuable Articles Coverage**



This part of your Masterpiece Policy provides you with coverage against all risk of physical loss to your valuable articles anywhere in the world unless stated otherwise or an exclusion applies.

"Valuable article" means personal property you own or possess for which an amount of coverage is shown in the **Valuable Articles** section of your Coverage Summary.

## Payment for a Loss

### Amount of coverage
The amount of coverage for each category of valuable articles, and for each itemized article, is shown in your Coverage Summary.

To help you maintain an appropriate amount of coverage, if itemized jewelry is shown in your Coverage Summary, we increase the amount of coverage for each article of itemized jewelry annually by a percentage based on industry trends for jewelry values plus, if you request, an additional percentage amount.

### Itemized articles
For a covered loss to an article listed in your schedule of itemized articles, we will pay as follows:

**Total loss.** If the itemized article is totally destroyed or lost, we will pay the amount of itemized coverage for that article. However, if the market value of the itemized article immediately before the loss exceeds the amount of itemized coverage for that article, we will pay its market value immediately before the loss, up to 150% of the amount of itemized coverage for that article.

**Partial loss.** If the itemized article is partially lost or damaged, you may choose to restore the article and we will pay to restore it to its condition immediately before the loss. If you choose not to restore the article, or the article cannot be fully restored to its condition immediately before the loss, we will pay the restoration costs, if restoration is attempted, plus any loss of market value, determined as follows:
- If the amount of coverage for the article is less than the market value immediately before the loss, we will apply the percentage change to the market value immediately before the loss.
- If the amount of coverage for the article is greater than the market value immediately before the loss, we will apply the percentage change to the amount of coverage for that article.
The maximum amount we will pay is 150% of the amount of itemized coverage for that article.

"Percentage change" means the change in market value resulting from the covered loss, after restoration if any, expressed as a percentage.

**In-vault jewelry.** Itemized jewelry described in the Coverage Summary as "in-vault" must be kept in a bank vault. There is no coverage for these items while they are out of a vault, unless we agree in advance to cover them.

### Blanket coverage
For a covered loss to valuable articles with blanket coverage, we will pay the amount required to repair or replace the property, whichever is less, without deduction for depreciation. If the restored value is less than the market value immediately prior to the loss, we will pay the difference. But we will not pay more than the amount of blanket coverage for that category. And we will not pay more than the blanket limit per item for loss to any one article as shown in the Coverage Summary.

*Valuable Articles*
*Coverage*

## *Payment for a Loss*
(continued)

The following valuable articles are eligible for blanket coverage:

**Jewelry.** An article of personal adornment containing gemstones, silver, gold, platinum, or other precious metals or alloys.

**Furs.** Garments made of, trimmed in, or consisting principally of fur.

**Fine arts.** Private collections of paintings, etchings, pictures, tapestries, art glass windows, other bona fide works of art (for example, statues, antiques, rare books and manuscripts, porcelains, rare glass), and items of historical value or artistic merit.

**Silverware.** Sterling silver, gold, or pewter: plated ware, tableware, trays, trophies, and other household and personal articles other than jewelry.

**Stamps and coins.** Stamps and/or coins contained in an individually owned stamp and/or coin collection and not owned by dealers or auctioneers. This includes other philatelic property, including books, pages and mountings; and other numismatic property including coin albums, containers, frames, cards and display cabinets used with your collection.

**Musical instruments.** Musical instruments and equipment.

**Cameras.** Cameras, projection machines, films, and related equipment.

**Collectibles.** Private collections of rare, unique or novel items of personal interest (for example, dolls, banks, guns, model trains, wine) including memorabilia.

### Pairs, sets, and parts
If the covered loss is to part of a pair or set, or larger unit listed in your schedule of itemized articles, you may choose either of the following:
- If you do not surrender the undamaged article(s) of the pair, set or unit, we will pay the covered loss as a partial loss for the damaged article(s) of the pair, set or unit as previously described under **Itemized articles.**
- If you agree to surrender the undamaged article(s) of the pair, set or unit to us, we will pay the covered loss as a total loss for that pair, set or unit as previously described under **Itemized articles.**

If the covered loss is to part of a pair or set, or larger unit with blanket coverage we will pay whichever is least:
- the cost to repair the damaged property to its condition before the loss;
- the cost to replace it; or
- the difference between its market value immediately before and after the loss.
  If you agree to surrender the undamaged article(s) of the pair, set or unit to us and we agree to accept, we will pay you the full replacement cost of the entire pair, set or unit, as a total loss, subject to the applicable blanket limit per item and amount of blanket coverage for that valuable articles category.

© Copyright 1985 by Chubb & Son Inc. Form no. 3400008 5/85    7/27/04 15:16:55

*Valuable Articles*
*Coverage*



---

## Payment for a Loss
(continued)

"Replacement cost" means the amount required to repair or replace the pair, set, or unit, whichever is less.

### Our option
When we pay for a total loss, we may keep all or part of the damaged property.

### Recoveries
If we pay for a covered loss to property and we recover that property, we agree to offer you an opportunity to buy it back. We will offer it to you at no higher an amount than we paid to you for that property.

---

## Valuable Articles Coverage

In Valuable Articles Coverage, a "covered loss" includes **all risk** of physical loss to valuable articles unless stated otherwise or an exclusion applies. Exclusions to this coverage are described in **Exclusions**.

---

## Extra Coverages

In addition to covering the physical loss to your valuable articles, we also provide other related coverages. These payments are in addition to the amount of coverage for your valuable articles unless stated otherwise or an exclusion applies. Exclusions to these coverages are described in **Exclusions**.

### Newly acquired valuable articles
For some categories of valuable articles, we automatically cover newly acquired articles that you own if you already have itemized articles shown on the Coverage Summary in that category. The amount of coverage for these articles is described below.

**Fine arts.** We cover your newly acquired fine arts for 25% of your total itemized coverage for fine arts. But you must request coverage for the newly acquired fine arts within 90 days after you acquire them, and pay the additional premium from the date acquired. We reserve the right not to insure the newly acquired articles after the 90th day.

**Jewelry, furs, cameras, musical instruments, and collectibles.** We cover your newly acquired jewelry, furs, cameras, musical instruments, and collectibles for 25% of your total itemized coverage in the same category, up to $50,000 for each category. But you must request coverage for these newly acquired articles within 90 days after you acquire them, and pay the additional premium from the date acquired. We reserve the right not to insure the newly acquired articles after the 90th day.

© Copyright 1985 by Chubb & Son Inc. Form no. 3400008 5/85                7/27/04 15:16:55
627

*Valuable Articles*
*Coverage*

## Exclusions

These exclusions apply to your Valuable Articles Coverage, including the Extra Coverages, unless stated otherwise.

The words "caused by" mean any loss that is contributed to, made worse by, or in any way results from that peril.

**Musical and photographic articles used for profit.** We do not cover any loss to musical instruments, cameras, or related equipment used for profit, except in an incidental business activity that does not have gross revenues of $5,000 or more in any year and conforms to local, state and federal laws.

**Intentional acts.** We do not cover any loss caused intentionally by you or a family member, or by a person directed by you or a family member to cause a loss. But we do provide coverage for you or a family member who is not responsible for causing the intentional loss. An intentional act is one whose consequences could have been foreseen by a reasonable person.

**Misappropriation.** We do not cover any loss to valuable articles caused by the taking or other misappropriation of the article(s) from you or a family member by your spouse or another family member.

**Gradual or sudden loss.** We do not provide coverage for the presence of wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping, however caused, or any loss caused by wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, warping, insects or vermin. We also do not cover any loss caused by inherent vice, latent defect or mechanical breakdown. But we do insure ensuing covered loss unless another exclusion applies.

**Fungi and mold.** We do not provide coverage for the presence of mold, however caused, or any loss caused by mold. But we do cover mold resulting from fire or lightning unless another exclusion applies. "Mold" means fungi, mold, mold spores, mycotoxins, and the scents and other byproducts of any of these.

**Computer error.** We do not cover any loss caused by an error in computer programming or instructions to the computer.

**Acts of war.** We do not cover any loss caused directly or indirectly by war, undeclared war, civil war, insurrection, rebellion, revolution, warlike acts by military forces or personnel, the destruction or seizure of property for a military purpose, or the consequences of any of these actions.

**Nuclear or radiation hazard.** We do not cover any loss caused directly or indirectly by nuclear reaction, radiation, or radioactive contamination, regardless of how it was caused. But we do insure ensuing covered loss due to fire resulting from a nuclear hazard unless another exclusion applies.

**Special exclusions for fine arts.** We do not cover any loss to fine arts caused by repairing, restoring, or retouching. We also do not cover any loss to fine arts while exhibited at a fairground, or at the premises of a national or international exposition, unless the premises are covered by this policy.

© Copyright 1985 by Chubb & Son Inc. Form no. 3400008 5/85
7/27/04 15:16:55

*Valuable Articles*
*Coverage*



## *Exclusions*
(continued)

**Special exclusions for stamps and coins.** We do not cover any loss to stamps or coins caused by:
- fading, creasing, denting, scratching, tearing, thinning, color transfer, dampness, or temperature extremes; or
- handling or being worked on.

We also do not cover the disappearance of an individual stamp, coin, or other item that is insured as part of a collection unless it is mounted in a volume and the page is also lost.

**Special exclusions for collectibles.** We do not cover any loss to collectibles caused by:
- fading, creasing, denting, scratching, tearing, thinning, color transfer, dampness, change in temperature, or temperature extremes;
- repairing, restoring, retouching or being worked on; or
- use other than as a collectible.
However, we do cover loss to wine caused by change in temperature or temperature extremes due to loss of utility service or premises power supply, or mechanical or electrical breakdown of climate control equipment.

*09/20/04*
© Copyright 1985 by Chubb & Son Inc. Form no. 3400008 5/85
629
**District of Columbia** Valuable Articles Coverage
7/27/04 15:16:55
*Page N-5*

Jaeger Affidavit
Exhibit A
(part 3)

# *Masterpiece*®    Personal Liability Coverage



This part of your Masterpiece Policy provides you with personal liability coverage for which you or a family member may be legally responsible anywhere in the world unless stated otherwise or an exclusion applies.

## Payment for a Loss

### Amount of coverage
The amount of coverage for liability is shown in the Coverage Summary. We will pay on your behalf up to that amount for covered damages from any one occurrence, regardless of how many claims, homes, or people are involved in the occurrence.

Any costs we pay for legal expenses (see **Defense coverages**) are in addition to the amount of coverage.

## Personal Liability Coverage

We cover damages a covered person is legally obligated to pay for personal injury or property damage which take place anytime during the policy period and are caused by an occurrence, unless stated otherwise or an exclusion applies. Exclusions to this coverage are described in **Exclusions**.

In lieu of the definition for "occurrence" in the Introduction, the following definition of "occurrence" applies:
"Occurrence" means an accident or offense to which this insurance applies and which begins within the policy period. Continuous or repeated exposure to substantially the same general conditions unless excluded is considered to be one occurrence.

A "covered person" means:
- you or a family member;
- any person using a vehicle or watercraft covered under this part of your Masterpiece policy with permission from you or a family member with respect to their legal responsibility arising out of its use;
- any person or organization with respect to their legal responsibility for acts or omissions of you or a family member; or
- any combination of the above.

"Damages" means the sum that is paid or is payable to satisfy a claim settled by us or resolved by judicial procedure or by a compromise we agree to in writing.

"Personal injury" means the following injuries, and resulting death:
- bodily injury;
- shock, mental anguish, or mental injury;
- false arrest, false imprisonment, or wrongful detention;
- wrongful entry or eviction;
- malicious prosecution or humiliation; and
- libel, slander, defamation of character, or invasion of privacy.

"Bodily injury" means physical bodily harm, including sickness or disease that results from it, and required care, loss of services and resulting death.

© Copyright 1985 by Chubb & Son Inc Form no. 4610008 5/85    10/02/03 9:26:26

*Personal Liability*
*Coverage*

---

## *Personal Liability Coverage*
(continued)

"Property damage" means physical injury to or destruction of tangible property, including the loss of its use. Tangible property includes the cost of recreating or replacing stocks, bonds, deeds, mortgages, bank deposits, and similar instruments, but does not include the value represented by such instruments.

"Registered vehicle" means any motorized land vehicle not described in "unregistered vehicle".

"Unregistered vehicle" means:
- any motorized land vehicle not designed for or required to be registered for use on public roads;
- any motorized land vehicle which is in dead storage at your residence;
- any motorized land vehicle used solely on and to service a residence premises shown in the Coverage Summary; or
- golf carts.

"Employment discrimination" means a violation of applicable employment discrimination law protecting any residential staff based on his or her race, color, religion, creed, age, sex, disability, national origin or other status according to any federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico.

"Employment practices crisis" means:
- an allegation of, or your discovery of, a wrongful employment act committed against any residential staff that is reasonably likely to result in a civil action against you or a family member; or
- a threat by any residential staff to disclose publicly that you or a family member committed or allegedly committed a wrongful employment act.

"Reputation management firm" means:
- a professional public relations consulting firm;
- a professional security consulting firm; or
- a professional media management consulting firm.

"Residential staff" means your or a family member's employee who is:
- employed by you or a family member, or through a firm under an agreement with you or a family member, to perform duties related only to a covered person's domestic, personal, or business pursuits covered under this part of your policy;
- compensated for labor or services directed by you or a family member; and
- employed regularly to work 15 or more hours per week.
Residential staff includes a temporary worker. Residential staff does not include an independent contractor or any covered person.

"Temporary worker" means your or a family member's employee who is:
- employed by you or a family member, or through a firm under an agreement with you or a family member, to perform duties related only to a covered person's domestic, personal, or business pursuits covered under this part of your policy;
- compensated for labor or services directed by you or a family member; and
- employed to work 15 or more hours per week to substitute for any residential staff on leave or to meet seasonal or short-term workload demands for 30 consecutive days or longer during a 6 month period.
Temporary worker does not include an independent contractor or any covered person.

© Copyright 1985 by Chubb & Son Inc. Form no. 4610008 5/85                    10/02/03 9:26:26
560

*Personal Liability*
*Coverage*



CHUBB

## *Personal Liability Coverage*
(continued)

"Wrongful employment act" means any employment discrimination, sexual harassment, or wrongful termination of any residential staff actually or allegedly committed or attempted by you or a family member, while acting in the capacity as an employer, that violates applicable employment law of any federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico. "Sexual harassment" as it relates solely to a wrongful employment act means unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature that:
- is made a condition of employment of any residential staff;
- is used as a basis for employment decisions;
- interferes with performance of any residential staff's duties; or
- creates an intimidating, hostile, or offensive working environment.

"Wrongful termination" means:
- the actual or constructive termination of employment of any residential staff by you or a family member in violation of applicable employment law; or
- breach of duty and care when you or a family member terminates an employment relationship with any residential staff.

### Defense coverages
We will defend a covered person against any suit seeking covered damages for personal injury or property damage or for covered damages under Employment practices liability, if Employment practices liability coverage is shown in the Coverage Summary. We provide this defense at our own expense, with counsel of our choice, even if the suit is groundless, false, or fraudulent. We may investigate, negotiate, and settle any such claim or suit at our discretion.

As part of our investigation, defense, negotiation, or settlement we will pay:
- all premiums on appeal bonds required in any suit we defend;
- all premiums on bonds to release attachments for any amount up to the amount of coverage (but we are not obligated to apply for or furnish any bond);
- all expenses incurred by us;
- all costs taxed against a covered person;
- all interest accruing after a judgement is entered in a suit we defend on only that part of the judgement we are responsible for paying. We will not pay interest accruing after we have paid the judgement up to the amount of coverage;
- all prejudgement interest awarded against a covered person on that part of the judgement we pay or offer to pay. We will not pay any prejudgement interest based on that period of time after we make an offer to pay the amount of coverage;
- all earnings lost by each covered person at our request, up to $250 a day, to a total of $10,000;
- other reasonable expenses incurred by a covered person at our request; and
- the cost of bail bonds required of a covered person because of a covered loss.

These Defense coverages are limited for Employment practices liability as follows:
Our duty to defend you or a family member and our obligation to pay defense expenses ends when we have exhausted the amount of coverage per occurrence for Employment practices liability shown in the Coverage Summary by paying for covered damages from any one occurrence, or exhausted the maximum annual amount of coverage for Employment practices liability shown in the Coverage Summary by paying for covered damages, whichever occurs sooner.

© Copyright 1985 by Chubb & Son Inc. Form no. 4610008 5/85                    10/02/03 9:26:26
551

*Personal Liability*
*Coverage*

## Personal Liability Coverage
(continued)

In jurisdictions where we may be prevented by local law from carrying out these Defense Coverages, we will pay only those defense expenses that we agree in writing to pay and that are incurred by you.

## Extra Coverages

In addition to covering damages and defense costs, we also provide many related coverages. These payments are in addition to the amount of coverage for damages and defense costs unless stated otherwise.

### Medical payments to others
We will pay the necessary medical expenses, up to a total of $10,000 for each person, for personal injury to anyone **except** you, a family member or a domestic employee of yours who is eligible to receive Workers' Compensation benefits. These expenses must be incurred or medically ascertained within three years of an accident that:
- occurs at a home with liability coverage in this policy, to a person with permission from you or a family member to be there;
- arises from a condition at a home, or at the steps, driveways or sidewalks immediately adjoining, with liability coverage in this policy;
- was caused by the activities of a covered person;
- was caused by a domestic worker in the course of his or her employment by a covered person; or
- was caused by an animal owned by or in the care of a covered person.

"Medical expenses" includes reasonable charges for first aid, medical, funeral, surgical, x-ray, dental, ambulance, hospital, rehabilitation, professional nursing services, and prosthetic devices.

### Damaged property
We cover the replacement cost of other people's property, up to $1,000 for each occurrence, if the property was damaged or destroyed by a covered person.

"Replacement cost" is the amount required to repair or replace other people's property, whichever is less.

But we will **not** pay for property damage to property owned by or rented to a tenant or resident in your household.

### Kidnap expenses
We will pay for a covered person's kidnap expenses, up to a maximum of $100,000, for each kidnap and ransom occurrence. We also will pay up to $25,000 to any person or organization for information leading to the arrest and conviction of any person(s) who kidnaps you, a family member or a covered relative.

**District of Columbia** Personal Liability Coverage    *Page T-4*
© Copyright 1985 by Chubb & Son Inc. Form no. 4610008 5/85    10/02/03 9:26:26
562

*Personal Liability*
*Coverage*



CHUBB

## Extra Coverages
(continued)

"Kidnap and ransom occurrence" means the actual or alleged wrongful taking of:
- you or a family member; or
- a covered relative while visiting or legally traveling with you or a family member;
  that includes a demand for ransom payment which would be paid by you or a family member in exchange for the release of that kidnapped person.

"Kidnap expenses" means the reasonable costs for:
- a professional negotiator;
- a professional security consultant;
- professional security guard services;
- a professional public relations consultant;
- travel, meals, lodging and phone expenses incurred by you or a family member;
- advertising, communications and recording equipment;
- related medical, cosmetic, psychiatric and dental expenses incurred by the kidnapped person within 12 months from that person's release;
- attorneys fees;
- a professional forensic analyst;
- earnings lost by you or a family member, up to $250 a day, to a total of $10,000.

However, "kidnap expenses" does not include expenses incurred due to any kidnap and ransom occurrence caused by you, a family member, or a covered relative, or any person acting on behalf of you, a family member, or a covered relative, whether acting alone or in collusion with others.

"Covered relative" means the following relatives of the person named in the Coverage Summary and a spouse who lives with that person:
- children, their children or other descendents of theirs;
- parents, grandparents or other ancestors of theirs; or
- siblings, their children or other descendents of theirs;
  who do not live with you, including spouses or domestic partners of all of the above. Parents, grandparents and other ancestors include adoptive parents, stepparents and stepgrandparents.

### Identity fraud
We will pay for a covered person's identity fraud expenses, up to a maximum of $25,000, for each identity fraud occurrence. A $500 deductible applies to each identity fraud occurrence.

"Identity fraud" means the act of knowingly transferring or using, without lawful authority, a covered person's means of identity which constitutes a violation of federal law or a crime under any applicable state or local law.

"Identity fraud occurrence" means any act or series of acts of identity fraud by a person or group commencing in the policy period.

"Identity fraud expenses" means:
- the costs for notarizing affidavits or similar documents for law enforcement agencies, financial institutions or similar credit grantors, and credit agencies;
- the costs for sending certified mail to law enforcement agencies, financial institutions or similar credit grantors, and credit agencies;

*Personal Liability
Coverage*

## Extra Coverages
(continued)

- the loan application fees for re-applying for loan(s) due to the rejection of the original application because the lender received incorrect credit information;
- the telephone expenses for calls to businesses, law enforcement agencies, financial institutions or similar credit grantors, and credit agencies;
- earnings lost by a covered person as a result of time off from work to complete fraud affidavits, meet with law enforcement agencies, credit agencies, merchants, or legal counsel, up to $250 a day, to a total of $10,000.
- the reasonable attorney fees incurred with prior notice to us for:
  - the defense of a covered person against any suit(s) by businesses or their collection agencies;
  - the removal of any criminal or civil judgments wrongly entered against a covered person; and
  - any challenge to the information in a covered person's consumer credit report.

However, "identity fraud expenses" does not include expenses incurred due to any fraudulent, dishonest or criminal act by a covered person or any person acting with a covered person, or by any authorized representative of a covered person, whether acting alone or in collusion with others.

In addition to the duties described in Policy Terms, Liability Conditions, Your duties after a loss, a covered person shall notify an applicable law enforcement agency.

This coverage does not apply to losses covered under Credit cards, forgery, and counterfeiting.

### Credit cards, forgery, and counterfeiting
We cover a covered person's legal obligation, up to a total of $10,000 for:
- loss or theft of a credit or bank card issued to you or a family member, provided that all the terms for using the card are complied with;
- loss caused by theft of a credit card number or bank card number issued to you or a family member when used electronically, including use on the Internet, provided that all the terms for using the card are complied with;
- loss caused by forgery or alteration of any check or negotiable instrument; or
- loss caused by accepting in good faith any counterfeit paper currency.

We will defend a claim or suit against you or a family member for loss or theft of a credit or bank card. We have the option to defend a claim or suit against you or a family member (or against a bank, with respect to this coverage) for forgery or counterfeiting.

We may investigate, negotiate, and settle any such claim or suit at our discretion. Our obligation to defend ends when our payment for the loss equals $10,000.

In the event of a claim, the covered person shall comply with the duties described in Policy Terms, Property Conditions, Your duties after a loss and Policy Terms, Liability Conditions, Your duties after a loss. In addition, the covered person shall notify the credit card service company or the issuing bank.

This coverage does not apply to losses covered under Identity fraud.

© Copyright 1985 by Chubb & Son Inc. Form no. 4610008 5/85

10/02/03 9:26:26

564

*Personal Liability*
*Coverage*



---

## Extra Coverages
(continued)

### Rented or borrowed vehicles

We cover damages a covered person is legally obligated to pay for personal injury and property damage caused by an occurrence during the policy period resulting from a covered person's use of a rented or borrowed vehicle if the limit of liability shown in the Coverage Summary is $1 million or more, provided the rental or loan does not exceed 30 days.

We will provide this coverage in excess of any underlying insurance that applies to these damages. If no underlying coverage exists, we will pay total damages up to the limit of liability shown in the Coverage Summary.

This Extra Coverage is not provided when:
- you have coverage provided by an excess or umbrella policy with us or another company;
- you or a family member own a private passenger vehicle, a pickup, panel truck or van.

This Extra Coverage does not cover damages a person is legally entitled to receive from the owner or operator of an uninsured or underinsured motorized land vehicle.

### Fungi and mold

We cover damages a covered person is legally obligated to pay, up to $100,000 for each occurrence, for bodily injury or property damage arising out of mold. "Mold" means fungi, mold, mold spores, mycotoxins, and the scents and other byproducts of any of these. These payments do not increase the amount of personal liability coverage.

### Employment practices liability coverage

If Employment practices liability coverage is shown in the Coverage Summary, we provide coverage for Employment practices liability and Reputational injury.

This coverage applies only if on the effective date of any policy period, the number of residential staff does not exceed 5. However, if after the effective date of any policy period you or a family member employs more than 5 residential staff, we will cover, through the remainder of the policy period, only those 5 residential staff with the longest period of uninterrupted employment in chronological order of hiring at the time of the Employment practices liability coverage occurrence. This condition does not apply to your or a family member's employment of a temporary worker to substitute for any residential staff on leave, performing the same duties for the same or fewer number of hours. It is your duty to advise us as soon as reasonably possible if you or a family member employs more than 5 residential staff at any time during the policy period in order to reduce the possibility of being underinsured.

**Employment practices liability.** We cover damages you or a family member is legally obligated to pay any residential staff for a wrongful employment act caused by an occurrence when the claim is made or the suit is brought in the United States of America, its territories or possessions, or Puerto Rico, unless stated otherwise or an exclusion applies.

© Copyright 1985 by Chubb & Son Inc. Form no. 4610008 5/85
10/02/03 9:26:26

*Personal Liability*
*Coverage*

---

## Extra Coverages
(continued)

**Amount of coverage for Employment practices liability.** The maximum amount of coverage for Employment practices liability available for any one occurrence is the amount of coverage for Employment practices liability shown in the Coverage Summary. We will not pay more than this amount in any one occurrence for covered damages regardless of how many claims or people are involved in the occurrence.

The maximum annual amount of coverage for Employment practices liability shown in the Coverage Summary is the most we will pay for the sum of all covered damages during the policy period regardless of the number of claims, people, or occurrences.

**Deductible.** A deductible is that amount we will subtract from the amount of covered damages we pay. The deductible shown in the Coverage Summary for Employment practices liability applies to each Employment practices liability occurrence, unless stated otherwise.

**Reputational injury.** We cover the reasonable and necessary fees or expenses that you incur for services provided by a reputation management firm to minimize potential injury to the reputation of you or a family member solely as a result of an employment practices crisis caused by an occurrence if:
- the employment practices crisis is reported to us as soon as reasonably possible but not later than 30 days after the employment practices crisis begins; and
- you obtain approval of the reputation management firm from us before incurring any fees or expenses,
unless stated otherwise or an exclusion applies. There is no deductible for this coverage.

**Amount of coverage for Reputational injury.** The maximum amount of coverage for Reputational injury available for any one occurrence is the amount of coverage for Reputational injury shown in the Coverage Summary. We will not pay more than this amount in any one occurrence for covered damages regardless of how many claims or people are involved in the occurrence.

The maximum annual amount of coverage for Reputational injury shown in the Coverage Summary is the most we will pay for the sum of all covered damages during the policy period regardless of the number of claims, people, or occurrences.

**Condition for Employment practices liability coverage.** The following condition applicable to Employment practices liability coverage is in addition to the General Conditions, Liability Conditions, and Special Conditions described under Policy Terms.

If on the effective date of any policy period the number of residential staff exceeds 5, your eligibility for Employment practices liability coverage will cease as of that date. If Employment practices liability coverage has been provided, it will be cancelled or nonrenewed at the earliest date allowed by law and an appropriate notice of cancellation or nonrenewal will be issued.

© Copyright 1985 by Chubb & Son Inc. Form no. 4610008 5/85    10/02/03 9:26:26

*Personal Liability*
*Coverage*



## Exclusions

These exclusions apply to this part of your Masterpiece Policy, unless stated otherwise.

**Motorized land vehicles.** We do not cover any damages arising out of the ownership, maintenance, use, loading, unloading or towing of any motorized land vehicle. This includes any trailers or any watercraft being towed by or carried on any registered vehicle.

This exclusion does not apply to motorized land vehicles in dead storage at your residence, to motorized land vehicles used solely on and to service a residence premises shown in the Coverage Summary, or to golf carts.

This exclusion does not apply to the Extra Coverage, Rented or Borrowed Vehicles.

**Aircraft.** We do not cover any damages arising out of the ownership, maintenance, use, loading, unloading, or towing of any aircraft, except a chartered aircraft operated and piloted by a professional crew. We do not cover any property damages to aircraft rented to, owned by, or in the care, custody or control of a covered person.

**Large watercraft.** We do not cover any damages arising out of the ownership, maintenance, use, loading, unloading or towing of any watercraft 26 feet or longer or with more than 50 engine rated horsepower owned by a covered person, or furnished or rented to a covered person for longer than 30 days. But we do cover watercraft being stored, unless another exclusion applies.

**Motorized land vehicle, watercraft and aircraft racing.** We do not cover any damages arising out of the participation in or practice for competitive racing of any motorized land vehicle, watercraft or aircraft. This exclusion does not apply to sailboat racing even if the sailboat is equipped with an auxiliary motor.

**Workers' compensation or disability.** We do not cover any damages a covered person is legally obligated to provide under any workers' compensation, disability benefits, unemployment compensation or similar laws. But we do provide coverage in excess over any other insurance for damages a covered person is legally obligated to pay for bodily injury to a domestic employee of a residence shown in the Coverage Summary which are not compensable under workers' compensation, unless another exclusion applies.

**Director's liability.** We do not cover any damages for any covered person's actions or failure to act as an officer or member of a board of directors of any corporation or organization. This exclusion does not apply to a not-for-profit corporation or organization, or to a condominium or cooperative association.

**Damage to covered person's property.** We do not cover any person for property damage to property owned by any covered person.

**Damage to property in your care.** We do not cover any person for property damage to property rented to, occupied by, used by, or in the care of any covered person, to the extent that the covered person is required by contract to provide insurance. But we do cover such damages for loss caused by fire, smoke, or explosion unless another exclusion applies.

## *Personal Liability*
## *Coverage*

## *Exclusions*
(continued)

**Wrongful employment act.** We do not cover any damages arising out of a wrongful employment act. This exclusion does not apply to Employment practices liability coverage if Employment practices liability coverage is shown in the Coverage Summary.

**Discrimination.** We do not cover any damages arising out of discrimination due to age, race, color, sex, creed, national origin, or any other discrimination. This exclusion does not apply to Employment practices liability coverage.

**Intentional acts.** We do not cover any damages arising out of an act intended by any covered person to cause personal injury or property damage, even if the injury or damage is of a different degree or type than actually intended or expected. An intentional act is one whose consequences could have been foreseen by a reasonable person. But we do cover such damages if the act was intended to protect people or property unless another exclusion applies. This exclusion does not apply to Employment practices liability coverage.

**Molestation, misconduct or abuse.** We do not cover any damages arising out of any actual, alleged or threatened:
- sexual molestation;
- sexual misconduct or harassment; or
- abuse.
This exclusion does not apply to Employment practices liability coverage.

**Nonpermissive use.** We do not cover any person who uses a motorized land vehicle or watercraft without permission from you or a family member.

**Business pursuits.** We do not cover any damages arising out of a covered person's business pursuits, investment or other for-profit activities, for the account of a covered person or others, or business property.

But we do cover damages arising out of volunteer work for an organized charitable, religious or community group, an incidental business away from home, incidental business at home, incidental business property, incidental farming, or residence premises conditional business liability unless another exclusion applies.

"Incidental business away from home" is a self-employed sales activity, or a self-employed business activity normally undertaken by persons under the age of 18 such as newspaper delivery, babysitting, caddying, and lawn care. Either of these activities must:
- not yield gross revenues in excess of $5,000 in any year;
- have no employees subject to worker's compensation or other similar disability laws;
- conform to local, state, and federal laws.

"Incidental business at home" is a business activity, other than farming, conducted on your residence premises which must:
- not yield gross revenues in excess of $5,000 in any year, except for the business activity of managing one's own personal investments;
- have no employees subject to workers' compensation or other similar disability laws;
- conform to local, state, and federal laws.

© Copyright 1985 by Chubb & Son Inc. Form no. 4610008 5/85    10/02/03 9:26:26

*Personal Liability*
*Coverage*



---

## Exclusions
(continued)

"Incidental business property" is limited to the rental or holding for rental, to be used as a residence, of a condominium or cooperative unit owned by you, an apartment unit rented to you, a one or two family dwelling owned by you, or a three or four family dwelling owned and occupied by you. We provide this coverage only for premises listed in the Coverage Summary unless the rental or holding for rental is for:
- a residence of yours that is occasionally rented and that is used exclusively as a residence; or
- part of a residence of yours by one or two roomers or boarders; or
- part of a residence of yours as an office, school, studio, or private garage.

"Incidental farming" is a farming activity which meets all of the following requirements:
- is incidental to your use of the premises as your residence;
- does not involve employment of others for more than 1,000 hours of farm work during the policy period;
- does not produce more than $2,500 in gross annual revenue from agricultural operations;
- and with respect to the raising or care of animals:
  - does not produce more than $25,000 in gross annual revenues;
  - does not involve more than 10 sales transactions during the policy period;
  - does not involve the sale of more than 25 animals during the policy period.

"Residence premises conditional business liability" is limited to business or professional activities when legally conducted by you or a family member at your residence shown in the Coverage Summary. We provide coverage only for personal injury or property damage arising out of the physical condition of that residence if:
- you do not have any employees involved in your business or professional activities who are subject to workers' compensation or other similar disability laws; or, if you are a doctor or dentist, you do not have more than two employees subject to such laws;
- you do not earn annual gross revenues in excess of $5,000, if you are a home day care provider;
- there is no other valid and collectible insurance.

We do not cover damages or consequences resulting from business or professional care or services performed or not performed.

**Financial guarantees.** We do not cover any damages for any covered person's financial guarantee of the financial performance of any covered person, other individual or organization.

**Professional services.** We do not cover any damages for any covered person's performing or failure to perform professional services, or for professional services for which any covered person is legally responsible or licensed.

**Acts of war.** We do not cover any damages caused directly or indirectly by war, undeclared war, civil war, insurrection, rebellion, revolution, warlike acts by military forces or personnel, the destruction or seizure of property for a military purpose, or the consequences of any of these actions.

© Copyright 1985 by Chubb & Son Inc. Form no. 4610008 5/85                                    10/02/03 9:26:26

*Personal Liability*
*Coverage*

---

## *Exclusions*
(continued)

**Contractual liability.** We do not cover any assessments charged against a covered person as a member of a condominium or cooperative association. We also do not cover any damages arising from contracts or agreements made in connection with any covered person's business. Nor do we cover any liability for unwritten contracts, or contracts in which the liability of others is assumed after a covered loss.

**Covered person's or dependent's personal injury.** We do not cover any damages for personal injury for any covered person or their dependents where the ultimate beneficiary is the offending party or defendant. We also do not cover any damages for personal injury for which you can be held legally liable, in any way, to a family member or your spouse or for which a family member or your spouse can be held legally liable, in any way, to you.

However, we do cover damages for bodily injury arising out of the use of a motorized land vehicle for which you can be held legally liable to a family member or your spouse or for which a family member or your spouse can be held legally liable to you to the extent that coverage is provided under this part of your Masterpiece policy.

**Liability for dependent care.** We do not cover any damages for personal injury for which a covered person's only legal liability is by virtue of a contract or other responsibility for a dependent's care.

**Illness.** We do not cover personal injury or property damage resulting from any illness, sickness or disease transmitted intentionally or unintentionally by a covered person to anyone, or any consequence resulting from that illness, sickness or disease. We also do not cover any damages for personal injury resulting from the fear of contracting any illness, sickness or disease, or any consequence resulting from the fear of contracting any illness, sickness or disease.

**Fungi and mold.** We do not cover any actual or alleged damages arising out of mold, the fear of mold, or any consequences resulting from mold or the fear of mold, other than as provided under the Extra Coverage, Fungi and mold. "Mold" means fungi, mold, mold spores, mycotoxins, and the scents and other byproducts of any of these.

**Parental liability.** We do not cover any damages arising from parental liability for the acts of a minor using a motorized land vehicle, watercraft 26 feet or longer or with more than 50 engine rated horsepower, or aircraft. This exclusion does not apply to any other coverage provided under an exclusion in this part of your policy.

**Entrustment.** We do not cover any damages arising from the entrustment by any covered person of a motorized land vehicle, watercraft 26 feet or longer or with more than 50 engine rated horsepower, or aircraft to any person. This exclusion does not apply to any other coverage provided under an exclusion in this part of your policy.

**Nuclear or radiation hazard.** We do not cover any damages caused directly or indirectly by nuclear reaction, radiation, or radioactive contamination, regardless of how it was caused.

© Copyright 1985 by Chubb & Son Inc. Form no. 4610008 5/85                10/02/03 9:26:26
570

*Personal Liability*
*Coverage*



*CHUBB*

---

## Exclusions
(continued)

**The following additional exclusions apply solely to Employment practices liability coverage.**

**Malicious or criminal acts.** We do not cover any damages arising out of a willful, malicious, or criminal act or omission by any person whether or not the injuries or damages are actually intended, expected, or foreseeable by a reasonable person. But we do cover such damages if the act was intended to protect people, unless another exclusion applies.

**Special exclusions.** We do not cover the following:
- matters which may be deemed uninsurable according to any federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico under which the policy is construed;
- occurrences arising out of the breach of an actual or implied written or oral agreement related to employment;
- costs incurred to comply with any order, grant, or agreement to provide non-monetary relief; or
- occurrences arising out of any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by the Consolidated Omnibus Budget Reconciliation Act, Employment Retirement Income Security Act of 1974, Fair Labor Standards Act (except the Equal Pay Act), state wage payment and collection laws, Federal Insurance Contributions Act, Immigration Reform and Control Act of 1986, National Labor Relations Act, Occupational Safety and Health Act, Social Security Act, Workers' Adjustment and Retraining Notification Act, including any amendments to these laws, promulgated rules, or regulations or any provisions of any similar federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico.

© Copyright 1985 by Chubb & Son Inc. Form no. 4610008 5/85
10/02/03 9:26:26
571

# *Masterpiece*®

**Excess Liability
Coverage**



CHUBB

This part of your Masterpiece Policy provides you with liability coverage in excess of your underlying insurance anywhere in the world unless stated otherwise or an exclusion applies.

---

## *Payment for a Loss*

### Amount of coverage
The amount of coverage for liability is shown in the Coverage Summary. We will pay on your behalf up to that amount for covered damages from any one occurrence, regardless of how many claims, homes, vehicles, watercraft, or people are involved in the occurrence.

Any costs we pay for legal expenses (see **Defense coverages**) are in addition to the amount of coverage.

### Underlying insurance
We will pay only for covered damages in excess of **all** underlying insurance covering those damages, even if the underlying coverage is for more than the minimum amount.

"Underlying insurance" includes all liability coverage other than this part of your policy that applies to the covered damages, except for other insurance purchased in excess of this policy.

### Required primary underlying insurance
Regardless of whatever other primary underlying insurance may be available in the event of a claim or loss, it is a condition of this part of your policy that you and your family members must maintain in full effect primary underlying liability insurance of the types and in at least the amounts set forth below, either under other parts of this policy or some other policy, covering your personal liability and to the extent you have such liability exposures, all vehicles and watercraft you or your family members own, or rent for longer than 30 days, or have furnished for longer than 30 days, as follows:

Personal liability (homeowners) for bodily injury and property damage in the minimum amount of $50,000 each occurrence.

Registered vehicles in the minimum amount of:
- $250,000/$500,000 bodily injury and $25,000 property damage; or
- $300,000 single limit each occurrence;
unless any higher minimum amount of insurance for registered vehicles is shown in your Coverage Summary.

Unregistered vehicles in the minimum amount of $50,000 bodily injury and property damage each occurrence.

Watercraft less than 26 feet and 50 engine rated horsepower or less for bodily injury and property damage in the minimum amount of $50,000 each occurrence.

Watercraft 26 feet or longer or more than 50 engine rated horse power for bodily injury and property damage in the minimum amount of $500,000 each occurrence.

Uninsured and underinsured motorists protection in the minimum amount of $250,000/$500,000 bodily injury and $25,000 property damage or $300,000 single limit each occurrence.

---

© Copyright 1985 by Chubb & Son Inc. Form no. 5400008 5/85     1/04/05 12:36:25

*Excess Liability*
*Coverage*

---

## Payment for a Loss
(continued)

Failure by you or your family members to comply with this condition, or failure of any of your primary underlying insurers due to insolvency or bankruptcy, shall not invalidate this part of your policy. In the event of any such failure, we shall only be liable in excess of the foregoing minimum amounts and to no greater extent with respect to coverages, amounts and defense costs than we would have been had this failure not occurred.

You must also give notice of losses and otherwise cooperate and comply with the terms and conditions of such primary underlying insurance.

---

## Excess Liability Coverage

We cover damages a covered person is legally obligated to pay for personal injury or property damage, caused by an occurrence:
- in excess of damages covered by the underlying insurance; or
- from the first dollar of damage where no underlying insurance is required under this policy and no underlying insurance exists; or
- from the first dollar of damage where underlying insurance is required under this policy but no coverage is provided by the underlying insurance for a particular occurrence,
unless stated otherwise or an exclusion applies.

Exclusions to this coverage are described in **Exclusions**.

"Follow form" means:
We cover damages to the extent they are both covered under the Required Primary Underlying Insurance and, not excluded under this part of your Masterpiece Policy. Also, the amount of coverage, defense coverages, cancellation and "other insurance" provisions of this policy supersede and replace the similar provisions contained in such other policies. When this part of your policy is called upon to pay losses in excess of required primary underlying policies exhausted by payment of claims, we do not provide broader coverage than provided by such policies. When no primary underlying coverage exists, the extent of coverage provided on a follow form basis will be determined as if the required primary underlying insurance had been purchased from us.

In lieu of the definition for "occurrence" in the Introduction, the following definition of "occurrence" applies:
"Occurrence" means an accident or offense to which this insurance applies and which begins within the policy period. Continuous or repeated exposure to substantially the same general conditions unless excluded is considered to be one occurrence.

A "covered person" means:
- you or a family member;
- any person using a vehicle or watercraft covered under this part of your Masterpiece policy with permission from you or a family member with respect to their legal responsibility arising out of its use;

---

© Copyright 1985 by Chubb & Son Inc. Form no. 5400008 5/85
**District of Columbia** Excess Liability Coverage    *Page W-2*
1/04/05 12:36:25
632

*Excess Liability*
*Coverage*



## Excess Liability Coverage
(continued)

- any person or organization with respect to their legal responsibility for acts or omissions of you or a family member; or
- any combination of the above.

"Damages" means the sum that is paid or is payable to satisfy a claim settled by us or resolved by judicial procedure or by a compromise we agree to in writing.

"Personal injury" means the following injuries, and resulting death:
- bodily injury;
- shock, mental anguish, or mental injury;
- false arrest, false imprisonment, or wrongful detention;
- wrongful entry or eviction;
- malicious prosecution or humiliation; and
- libel, slander, defamation of character, or invasion of privacy.

"Bodily injury" means physical bodily harm, including sickness or disease that results from it, and required care, loss of services and resulting death.

"Property damage" means physical injury to or destruction of tangible property and the resulting loss of its use. Tangible property includes the cost of recreating or replacing stocks, bonds, deeds, mortgages, bank deposits, and similar instruments, but does not include the value represented by such instruments.

"Registered vehicle" means any motorized land vehicle not described in "unregistered vehicle".

"Unregistered vehicle" means:
- any motorized land vehicle not designed for or required to be registered for use on public roads;
- any motorized land vehicle which is in dead storage at your residence;
- any motorized land vehicle used solely on and to service a residence premises shown in the Coverage Summary; or
- golf carts.

"Employment discrimination" means a violation of applicable employment discrimination law protecting any residential staff based on his or her race, color, religion, creed, age, sex, disability, national origin or other status according to any federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico.

"Employment practices crisis" means:
- an allegation of, or your discovery of, a wrongful employment act committed against any residential staff that is reasonably likely to result in a civil action against you or a family member; or
- a threat by any residential staff to disclose publicly that you or a family member committed or allegedly committed a wrongful employment act.

"Reputation management firm" means:
- a professional public relations consulting firm;
- a professional security consulting firm; or
- a professional media management consulting firm.

© Copyright 1985 by Chubb & Son Inc. Form no. 5400008 5/85

1/04/05 12:36:25

*Excess Liability*
*Coverage*

## Excess Liability Coverage
(continued)

"Residential staff" means your or a family member's employee who is:
- employed by you or a family member, or through a firm under an agreement with you or a family member, to perform duties related only to a covered person's domestic, personal, or business pursuits covered under this part of your policy;
- compensated for labor or services directed by you or a family member; and
- employed regularly to work 15 or more hours per week.
  Residential staff includes a temporary worker. Residential staff does not include an independent contractor or any covered person.

"Temporary worker" means your or a family member's employee who is:
- employed by you or a family member, or through a firm under an agreement with you or a family member, to perform duties related only to a covered person's domestic, personal, or business pursuits covered under this part of your policy;
- compensated for labor or services directed by you or a family member; and
- employed to work 15 or more hours per week to substitute for any residential staff on leave or to meet seasonal or short-term workload demands for 30 consecutive days or longer during a 6 month period.
  Temporary worker does not include an independent contractor or any covered person.

"Wrongful employment act" means any employment discrimination, sexual harassment, or wrongful termination of any residential staff actually or allegedly committed or attempted by you or a family member, while acting in the capacity as an employer, that violates applicable employment law of any federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico. "Sexual harassment" as it relates solely to a wrongful employment act means unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature that:
- is made a condition of employment of any residential staff;
- is used as a basis for employment decisions;
- interferes with performance of any residential staff's duties; or
- creates an intimidating, hostile, or offensive working environment.

"Wrongful termination" means:
- the actual or constructive termination of employment of any residential staff by you or a family member in violation of applicable employment law; or
- breach of duty and care when you or a family member terminates an employment relationship with any residential staff.

## Excess uninsured and underinsured motorists protection
This coverage is in effect only if excess uninsured and underinsured motorists protection is shown in the Coverage Summary.

We cover damages for bodily injury and property damage a covered person is legally entitled to receive from the owner or operator of an uninsured or underinsured motorized land vehicle. We cover these damages in excess of the underlying insurance or the Required Primary Underlying Insurance, whichever is greater, if they are caused by an occurrence during the policy period, unless otherwise stated.

*Excess Liability*
*Coverage*


CHUBB

---

## Excess Liability Coverage
(continued)

**Amount of coverage.** The maximum amount of Excess uninsured and underinsured motorists protection available for any one occurrence is the amount of coverage for Excess uninsured and underinsured motorists protection shown in the Coverage Summary regardless of the number of vehicles shown in the Coverage Summary. We will not pay more than this amount in any one occurrence for covered damages regardless of how many claims, vehicles or people are involved in the occurrence.

This coverage will follow form.

### Uninsured and underinsured motorists protection arbitration
If we and a covered person disagree whether that person is legally entitled to recover damages from the owner or operator of an uninsured or underinsured motor vehicle, or do not agree as to the amount of damages, the covered person may request that the claim be resolved by the Board of Consumer Claims Arbitration for the District of Columbia. If we agree, the Board may hear and decide the matter. A decision agreed to by the Board will be binding. However, if we do not agree:
- the Board of Consumer Claims Arbitration will be disqualified as the arbitrator; and
- either party may make a written demand for arbitration.

In this event, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge having jurisdiction. Each party will pay the expenses it incurs and bear the expenses of the third party equally.

Unless both parties agree otherwise, arbitration will take place in the county where the covered person lives. Local rules of law as to procedure and evidence will apply. A decision agreed to by two of the arbitrators will be binding as to whether the covered person is legally entitled to recover damages and the amount of the damages. This applies only if the amount does not exceed the minimum limit of liability specified by the District of Columbia no-fault law. If the amount exceeds that limit, either party may demand the right to a trial. This demand must be made within 60 days of the arbitrators' decision. If this demand is not made, the amount of damages agreed to by the arbitrators will be binding.

### Employment practices liability coverage
If Employment practices liability coverage is shown in the Coverage Summary, we provide coverage for Employment practices liability and Reputational injury.

This coverage applies only if on the effective date of any policy period, the number of residential staff does not exceed 5. However, if after the effective date of any policy period you or a family member employs more than 5 residential staff, we will cover, through the remainder of the policy period, only those 5 residential staff with the longest period of uninterrupted employment in chronological order of hiring at the time of the Employment practices liability coverage occurrence. This condition does not apply to your or a family member's employment of a temporary worker to substitute for any residential staff on leave, performing the same duties for the same or fewer number of hours. It is your duty to advise us as soon as reasonably possible if you or a family member employs more than 5 residential staff at any time during the policy period in order to reduce the possibility of being underinsured.

© Copyright 1985 by Chubb & Son Inc. Form no. 5400008 5/85                 1/04/05 12:36:25

*Excess Liability*
*Coverage*

---

## *Excess Liability Coverage*
(continued)

**Employment practices liability.** We cover damages you or a family member is legally obligated to pay any residential staff for a wrongful employment act caused by an occurrence when the claim is made or the suit is brought in the United States of America, its territories or possessions, or Puerto Rico, unless stated otherwise or an exclusion applies.

**Amount of coverage for Employment practices liability.** The maximum amount of coverage for Employment practices liability available for any one occurrence is the amount of coverage for Employment practices liability shown in the Coverage Summary. We will not pay more than this amount in any one occurrence for covered damages regardless of how many claims or people are involved in the occurrence.

The maximum annual amount of coverage for Employment practices liability shown in the Coverage Summary is the most we will pay for the sum of all covered damages during the policy period regardless of the number of claims, people, or occurrences.

**Deductible.** A deductible is that amount we will subtract from the amount of covered damages we pay. The deductible shown in the Coverage Summary for Employment practices liability applies to each Employment practices liability occurrence, unless stated otherwise.

**Reputational injury.** We cover the reasonable and necessary fees or expenses that you incur for services provided by a reputation management firm to minimize potential injury to the reputation of you or a family member solely as a result of an employment practices crisis caused by an occurrence if:
- the employment practices crisis is reported to us as soon as reasonably possible but not later than 30 days after the employment practices crisis begins; and
- you obtain approval of the reputation management firm from us before incurring any fees or expenses,
unless stated otherwise or an exclusion applies. There is no deductible for this coverage.

**Amount of coverage for Reputational injury.** The maximum amount of coverage for Reputational injury available for any one occurrence is the amount of coverage for Reputational injury shown in the Coverage Summary. We will not pay more than this amount in any one occurrence for covered damages regardless of how many claims or people are involved in the occurrence.

The maximum annual amount of coverage for Reputational injury shown in the Coverage Summary is the most we will pay for the sum of all covered damages during the policy period regardless of the number of claims, people, or occurrences.

**Condition for Employment practices liability coverage.** The following condition applicable to Employment practices liability coverage is in addition to the General Conditions, Liability Conditions, and Special Conditions described under Policy Terms.

If on the effective date of any policy period the number of residential staff exceeds 5, your eligibility for Employment practices liability coverage will cease as of that date. If Employment practices liability coverage has been provided, it will be cancelled or nonrenewed at the earliest date allowed by law and an appropriate notice of cancellation or nonrenewal will be issued.

*Excess Liability*
*Coverage*



CHUBB

## Excess Liability Coverage
(continued)

### Defense coverages

We will defend a covered person against any suit seeking covered damages for personal injury or property damage or for covered damages under Employment practices liability, if Employment practices liability coverage is shown in the Coverage Summary, that are either:
- not covered by any underlying insurance; or
- covered by an underlying policy as each Defense coverage has been exhausted by payment of claims.

We provide this defense at our expense, with counsel of our choice, even if the suit is groundless, false, or fraudulent. We may investigate, negotiate, and settle any such claim or suit at our discretion.

As part of our investigation, defense, negotiation, or settlement, we will pay:
- all premiums on appeal bonds required in any suit we defend;
- all premiums on bonds to release attachments for any amount up to the amount of coverage (but we are not obligated to apply for or furnish any bond);
- all expenses incurred by us;
- all costs taxed against a covered person;
- all interest accruing after a judgement is entered in a suit we defend on only that part of the judgement we are responsible for paying. We will not pay interest accruing after we have paid the judgement up to the amount of coverage;
- all prejudgement interest awarded against a covered person on that part of the judgement we pay or offer to pay. We will not pay any prejudgement interest based on that period of time after we make an offer to pay the amount of coverage;
- all earnings lost by each covered person at our request, up to $250 a day, to a total of $10,000;
- other reasonable expenses incurred by a covered person at our request; and
- the cost of bail bonds required of a covered person because of a covered loss.

These Defense coverages are limited for Employment practices liability as follows:
Our duty to defend you or a family member and our obligation to pay defense expenses ends when we have exhausted the amount of coverage per occurrence for Employment practices liability shown in the Coverage Summary by paying for covered damages from any one occurrence, or exhausted the maximum annual amount of coverage for Employment practices liability shown in the Coverage Summary by paying for covered damages, whichever occurs sooner.

In jurisdictions where we may be prevented by local law from carrying out these Defense Coverages, we will pay only those defense expenses that we agree in writing to pay and that are incurred by you.

# Jaeger Affidavit
# Exhibit A
# (part 4)

*Excess Liability
Coverage*

## Exclusions

These exclusions apply to this part of your Masterpiece Policy, unless stated otherwise.

**Owned motorcycles and owned motor homes.** We do not cover any damages arising out of the ownership, maintenance, use, loading or unloading of any owned motorcycle or owned motor home unless shown in the Coverage Summary. The coverage for owned motorcycles and owned motor homes is on a follow form basis.

**Aircraft.** We do not cover any damages arising out of the ownership, maintenance, use, loading, unloading, or towing of any aircraft, except a chartered aircraft operated and piloted by a professional crew. We do not cover any property damages to aircraft rented to, owned by, or in the care, custody or control of a covered person.

**Large watercraft.** We do not cover any damages arising out of the ownership, maintenance, use, loading, unloading or towing of any watercraft 26 feet or longer or with more than 50 engine rated horsepower owned by a covered person, or furnished or rented to a covered person for longer than 30 days. But we do cover watercraft being stored, unless another exclusion applies. Coverage is provided on a following form basis if the watercraft is listed in the Coverage Summary.

Coverage is also provided on a following form basis when notice is given to us within 30 days after you acquire a watercraft. If we agree to insure it, you must pay the additional premium from the date acquired.

**Motorized land vehicle, watercraft and aircraft racing.** We do not cover any damages arising out of the participation in or practice for competitive racing of any motorized land vehicle, watercraft or aircraft. This exclusion does not apply to sailboat racing even if the sailboat is equipped with an auxiliary motor.

**Motorized land vehicle and watercraft-related jobs.** We do not cover any person other than you while employed or otherwise engaged in the business of selling, repairing, servicing, storing, parking, docking, mooring, testing, or delivering motorized land vehicles or watercraft.

**Motorized land vehicle and watercraft loading.** We do not cover any person or organization, other than you or your employees, with respect to the loading or unloading of motorized land vehicles or watercraft.

**Workers' compensation or disability.** We do not cover any damages a covered person is legally obligated to provide under any workers' compensation, disability benefits, unemployment compensation or similar laws. But we do provide coverage in excess over any other insurance for damages a covered person is legally obligated to pay for bodily injury to a domestic employee of a residence shown in the Coverage Summary which are not compensable under workers' compensation, unless another exclusion applies.

**Director's liability.** We do not cover any damages for any covered person's actions or failure to act as an officer or member of a board of directors of any corporation or organization. This exclusion does not apply to a not-for-profit corporation or organization, or to a condominium or cooperative association.

**Damage to covered person's property.** We do not cover any person for property damage to property owned by any covered person.

© Copyright 1985 by Chubb & Son Inc. Form no. 5400008 5/85    1/04/05 12:36:25
638

*Excess Liability*
*Coverage*



## Exclusions
(continued)

**Damage to property in your care.** We do not cover any person for property damage to property rented to, occupied by, used by, or in the care of any covered person, to the extent that the covered person is required by contract to provide insurance. But we do cover such damages for loss caused by fire, smoke, or explosion unless another exclusion applies.

**Wrongful employment act.** We do not cover any damages arising out of a wrongful employment act. This exclusion does not apply to Employment practices liability coverage if Employment practices liability coverage is shown in the Coverage Summary.

**Discrimination.** We do not cover any damages arising out of discrimination due to age, race, color, sex, creed, national origin, or any other discrimination. This exclusion does not apply to Employment practices liability coverage.

**Intentional acts.** We do not cover any damages arising out of an act intended by any covered person to cause personal injury or property damage, even if the injury or damage is of a different degree or type than actually intended or expected. An intentional act is one whose consequences could have been foreseen by a reasonable person. But we do cover such damages if the act was intended to protect people or property unless another exclusion applies. This exclusion does not apply to Employment practices liability coverage.

**Molestation, misconduct or abuse.** We do not cover any damages arising out of any actual, alleged or threatened:
- sexual molestation;
- sexual misconduct or harassment; or
- abuse.
This exclusion does not apply to Employment practices liability coverage.

**Nonpermissive use.** We do not cover any person who uses a motorized land vehicle or watercraft without permission from you or a family member.

**Business pursuits.** We do not cover any damages arising out of a covered person's business pursuits, investment or other for-profit activities, for the account of a covered person or others, or business property except on a follow form basis.

But we do cover damages arising out of volunteer work for an organized charitable, religious or community group, an incidental business away from home, incidental business at home, incidental business property, incidental farming, or residence premises conditional business liability unless another exclusion applies. We also cover damages arising out of your ownership, maintenance, or use of a private passenger motor vehicle in business activities other than selling, repairing, servicing, storing, parking, testing, or delivering motorized land vehicles.

"Incidental business away from home" is a self-employed sales activity, or a self-employed business activity normally undertaken by persons under the age of 18 such as newspaper delivery, babysitting, caddying, and lawn care. Either of these activities must:
- not yield gross revenues in excess of $5,000 in any year;
- have no employees subject to worker's compensation or other similar disability laws;
- conform to local, state, and federal laws.

*Excess Liability*
*Coverage*

## Exclusions
(continued)

"Incidental business at home" is a business activity, other than farming, conducted on your residence premises which must:
- not yield gross revenues in excess of $5,000 in any year, except for the business activity of managing one's own personal investments;
- have no employees subject to workers' compensation or other similar disability laws;
- conform to local, state, and federal laws.

"Incidental business property" is limited to the rental or holding for rental, to be used as a residence, of a condominium or cooperative unit owned by you, an apartment unit rented to you, a one or two family dwelling owned by you, or a three or four family dwelling owned and occupied by you. We provide this coverage only for premises listed in the Coverage Summary unless the rental or holding for rental is for:
- a residence of yours that is occasionally rented and that is used exclusively as a residence; or
- part of a residence of yours by one or two roomers or boarders; or
- part of a residence of yours as an office, school, studio, or private garage.

"Incidental farming" is a farming activity which meets all of the following requirements:
- is incidental to your use of the premises as your residence;
- does not involve employment of others for more than 1,000 hours of farm work during the policy period;
- does not produce more than $2,500 in gross annual revenue from agricultural operations;
- and with respect to the raising or care of animals:
  - does not produce more than $25,000 in gross annual revenues;
  - does not involve more than 10 sales transactions during the policy period;
  - does not involve the sale of more than 25 animals during the policy period.

"Residence premises conditional business liability" is limited to business or professional activities when legally conducted by you or a family member at your residence shown in the Coverage Summary. We provide coverage only for personal injury or property damage arising out of the physical condition of that residence if:
- you do not have any employees involved in your business or professional activities who are subject to workers' compensation or other similar disability laws; or, if you are a doctor or dentist, you do not have more than two employees subject to such laws;
- you do not earn annual gross revenues in excess of $5,000, if you are a home day care provider;
- there is no other valid and collectible insurance.

We do not cover damages or consequences resulting from business or professional care or services performed or not performed.

**Financial guarantees.** We do not cover any damages for any covered person's financial guarantee of the financial performance of any covered person, other individual or organization.

**Professional services.** We do not cover any damages for any covered person's performing or failure to perform professional services, or for professional services for which any covered person is legally responsible or licensed.

© Copyright 1985 by Chubb & Son Inc. Form no. 5400008 5/85
1/04/05 12:36:25

*Excess Liability*
*Coverage*



---

## Exclusions
(continued)

**Acts of war.** We do not cover any damages caused directly or indirectly by war, undeclared war, civil war, insurrection, rebellion, revolution, warlike acts by military forces or personnel, the destruction or seizure of property for a military purpose, or the consequences of any of these actions.

**Contractual liability.** We do not cover any assessments charged against a covered person as a member of a condominium or cooperative association. We also do not cover any damages arising from contracts or agreements made in connection with any covered person's business. Nor do we cover any liability for unwritten contracts, or contracts in which the liability of others is assumed after a covered loss.

**Covered person's or dependent's personal injury.** We do not cover any damages for personal injury for any covered person or their dependents where the ultimate beneficiary is the offending party or defendant. We also do not cover any damages for personal injury for which you can be held legally liable, in any way, to a family member or your spouse or for which a family member or your spouse can be held legally liable, in any way, to you.

However, we do cover damages for bodily injury arising out of the use of a motorized land vehicle for which you can be held legally liable to a family member or your spouse or for which a family member or your spouse can be held legally liable to you to the extent that coverage is provided under this part of your Masterpiece policy. This coverage applies only to the extent such damages are covered by primary underlying insurance and exceed the limits of insurance required for that motorized land vehicle under the required primary underlying insurance provisions of this part of your Masterpiece policy.

**Liability for dependent care.** We do not cover any damages for personal injury for which a covered person's only legal liability is by virtue of a contract or other responsibility for a dependent's care.

**Illness.** We do not cover personal injury or property damage resulting from any illness, sickness or disease transmitted intentionally or unintentionally by a covered person to anyone, or any consequence resulting from that illness, sickness or disease. We also do not cover any damages for personal injury resulting from the fear of contracting any illness, sickness or disease, or any consequence resulting from the fear of contracting any illness, sickness or disease.

**Fungi and mold.** We do not cover any actual or alleged damages arising out of mold, the fear of mold, or any consequences resulting from mold or the fear of mold. "Mold" means fungi, mold, mold spores, mycotoxins, and the scents and other byproducts of any of these.

**Parental liability.** We do not cover any damages arising from parental liability for the acts of a minor using a motorized land vehicle, watercraft 26 feet or longer or with more than 50 engine rated horsepower, or aircraft. But we do cover parental liability for the acts of a minor using a motorized land vehicle or watercraft on a follow form basis for the type of motorized land vehicle or watercraft involved, unless another exclusion applies. This exclusion does not apply to any other coverage provided under an exclusion in this part of your policy.

---

© Copyright 1985 by Chubb & Son Inc. Form no. 5400008 5/85          1/04/05 12:36:25

*Excess Liability*
*Coverage*

## Exclusions
(continued)

**Entrustment.** We do not cover any damages arising from the entrustment by any covered person of a motorized land vehicle, watercraft 26 feet or longer or with more than 50 engine rated horsepower, or aircraft to any person. But we do cover entrustment by any covered person of a motorized land vehicle or watercraft on a follow form basis for the type of motorized land vehicle or watercraft involved, unless another exclusion applies. This exclusion does not apply to any other coverage provided under an exclusion in this part of your policy.

**Nuclear or radiation hazard.** We do not cover any damages caused directly or indirectly by nuclear reaction, radiation, or radioactive contamination, regardless of how it was caused.

**The following additional exclusions apply solely to Employment practices liability coverage.**

**Malicious or criminal acts.** We do not cover any damages arising out of a willful, malicious, or criminal act or omission by any person whether or not the injuries or damages are actually intended, expected, or foreseeable by a reasonable person. But we do cover such damages if the act was intended to protect people, unless another exclusion applies.

**Special exclusions.** We do not cover the following:
- matters which may be deemed uninsurable according to any federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico under which the policy is construed;
- occurrences arising out of the breach of an actual or implied written or oral agreement related to employment;
- costs incurred to comply with any order, grant, or agreement to provide non-monetary relief; or
- occurrences arising out of any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by the Consolidated Omnibus Budget Reconciliation Act, Employment Retirement Income Security Act of 1974, Fair Labor Standards Act (except the Equal Pay Act), state wage payment and collection laws, Federal Insurance Contributions Act, Immigration Reform and Control Act of 1986, National Labor Relations Act, Occupational Safety and Health Act, Social Security Act, Workers' Adjustment and Retraining Notification Act, including any amendments to these laws, promulgated rules, or regulations or any provisions of any similar federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico.

© Copyright 1985 by Chubb & Son Inc. Form no. 5400008 5/85
1/04/05 12:36:25



**Policy Information Notice**



You have the right to review and correct or amend information we have. If you want to know more about this and how information may be disclosed without your prior authorization, please write to:

Chubb Personal Insurance
Attention: Policy Information
202 Halls Mill Road
P.O. Box 1600
Whitehouse Station, N.J. 08889-1600

Please include your policy number, policy period and the name and address of your agent or broker.

If you need to report a claim and have been unable to contact your agent, broker or local Chubb Office, you can call this telephone number for further assistance:

1-800-252-4670

# *Masterpiece*®   **Policy Terms**   

This part of your Masterpiece Policy explains the conditions that apply to your policy.

## *General Conditions*

These conditions apply to your policy in general, and to each coverage in it.

### Policy period
The effective dates of your policy are shown in the Coverage Summary. Those dates begin at 12:01 a.m. standard time at the mailing address shown. Each renewal period shall be for a similar term.

All coverages on this policy apply only to occurrences that take place while this policy is in effect.

### Renewals
We or our agent may offer to renew this policy, at the premiums and under the policy provisions in effect at the date of renewal. We can do this by mailing you a bill for the premium to the address shown in the Coverage Summary, along with any changes in the policy provisions or amounts of coverage. If you do not accept our offer, this policy will automatically terminate at the end of the current policy period. Failure to pay the required renewal premium when due shall mean that you have not accepted our offer.

### Transfer of rights
If we make a payment under this policy, we will assume any recovery rights a covered person has in connection with that loss, to the extent we have paid for the loss.

All of your rights of recovery will become our rights to the extent of any payment we make under this policy. A covered person will do everything necessary to secure such rights; and do nothing after a loss to prejudice such rights. However, you may waive any rights of recovery from another person or organization for a covered loss in writing before the loss occurs.

### Concealment or fraud
This policy is void if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss.

### Application of coverage
Coverage applies separately to each covered person. However, this provision does not increase the amount of coverage for any one occurrence.

### Duplicate coverages
If a loss is covered under more than one part of this policy, we will pay you under the part giving you the most coverage, but not under more than one part. However, when both Valuable Articles Coverage and contents coverage are shown in the Coverage Summary, and a loss is covered under both parts, your amount of coverage will equal the combined total of both contents and Valuable Articles Coverage subject to the Contents Special limits and policy provisions. In no event will we make duplicate payments.

### Assignment
You cannot transfer your interest in this policy to anyone else unless we agree in writing to the transfer.

© Copyright 1985 by Chubb & Son Inc. Form no. 7000008 5/85     10/02/03 9:26:26

*Policy*
*Terms*

## General Conditions
(continued)

### Policy changes
This policy can be changed only by a written amendment we issue.

### Vehicle premium
If you have vehicle coverage, the premium for the vehicle coverage is based on information we have received from you, your agent, or other sources. If the information is incorrect or incomplete, or changes during the policy period, you must inform us or your agent of any changes as soon as possible regarding:
- your vehicle, including its use;
- the covered persons who regularly use your vehicle, including newly licensed family members; or
- the location where your vehicle is principally garaged.

We may decrease or increase your premium during the policy period based on the corrected, completed, or changed information and we reserve our rights to cancel or to decline to renew.

### Bankruptcy or insolvency
We will meet all our obligations under this policy regardless of whether you, your estate, or anyone else or their estate becomes bankrupt or insolvent.

### In case of death
In the event of your death, we cover your legal representative or any person having proper temporary custody of your property until a legal representative is appointed and qualified, but only with respect to your premises and other property covered under the policy at the time of death. We will also cover any member of your household who is a covered person at the time of death.

### Liberalization
We may extend or broaden the coverage provided by this policy. If we do this during the policy period or within 60 days before it begins, without increasing the premium, then the extended or broadened coverage will apply to occurrences after the effective date of the extended or broadened coverage.

### Conforming to state law
If any provision of this policy conflicts with the laws of the state you live in, this policy is amended to conform to those laws.

## Liability Conditions

These conditions apply to all liability coverages in this policy.

### Other insurance
**Vehicles:** When other liability insurance applies to covered damages, we will pay our share. Our share is the proportion that the amount of coverage under this policy bears to the total of all applicable amounts of coverage. However, for non-owned motorized land vehicles, this insurance is excess over any other insurance, except that written specifically to cover excess over the amount of coverage in this policy.

© Copyright 1985 by Chubb & Son Inc. Form no. 7000008 5/85    10/02/03 9:26:26

*Policy*
*Terms*

CHUBB

## Liability Conditions
(continued)

**Personal and Excess:** This insurance is excess over any other insurance except that written specifically to cover excess over the amount of coverage that applies in this policy.

**Additional liability protection.** If you have Masterpiece Personal Liability Coverage, you are eligible to apply for excess liability protection. The additional protection covers your house, vehicle(s) and other personal exposures under our Masterpiece Excess Liability Coverage. Acceptance is subject to our approval.

If your Masterpiece Personal Liability Coverage is cancelled or nonrenewed, your eligibility for Masterpiece Excess Liability Coverage will cease as of the cancellation or nonrenewal date. If Masterpiece Excess Liability Coverage has been provided, it will be cancelled or nonrenewed at the earliest date allowed by law and an appropriate notice of cancellation or nonrenewal will be issued.

If you do not have Masterpiece Personal Liability Coverage, your eligibility for Masterpiece Excess Liability Coverage will cease as of the earliest nonrenewal date allowed by law, and an appropriate notice of nonrenewal will be issued.

### Your duties after a loss
In case of an accident or occurrence, the covered person shall perform the following duties that apply:

**Notification.** You must notify us or your agent as soon as possible.

**Assistance.** You must provide us with all available information. This includes any suit papers or other documents which help us in the event that we defend you.

**Cooperation.** You must cooperate with us fully in any legal defense. This may include any association by us with the covered person in defense of a claim reasonably likely to involve us.

**Examination.** A person making a claim under any liability or vehicle coverages in this policy must:
- submit as often as we reasonably require;
  - to physical exams by physicians we select, which we will pay for; and
  - to examination under oath and subscribe the same; and
- authorize us to obtain;
  - medical reports; and
  - other pertinent records.

### Appeals
If a covered person, or any primary insurer, does not appeal a judgement for covered damages, we may choose to do so. We will then become responsible for all expenses, taxable costs, and interest arising out of the appeal. However, the amount of coverage for damages will not be increased.

## Property Conditions

These conditions apply to all coverages for damage to property and all coverages for damage to vehicles in this policy.

*12/15/03*
© Copyright 1985 by Chubb & Son Inc. Form no. 7000008 5/85

**District of Columbia** Policy Terms
10/02/03 9:26:26

*Page Y-3*

587

*Policy*
*Terms*

---

## *Property Conditions*
(continued)

### Other insurance

When other property insurance applies to a covered loss, we will pay only the portion of the loss that the amount of coverage under this policy bears to the total amount of insurance covering the loss, except as follows:

**Lease gap coverage:** If Lease gap coverage applies to a covered loss, that coverage is excess over any other insurance.

**Condominiums and Cooperatives:** If there is other insurance in the name of the condominium or cooperative association covering the same property covered by us, our coverage shall be in excess of the other insurance.

### Your duties after a loss

If you have a loss this policy may cover, you must perform these duties:

**Notification.** You must immediately notify us or your agent of your loss. In case of theft or accident, you must also notify the police or similar competent authority.

**Protect property.** You must take all reasonable means that are necessary to protect property from further damage.

**Prepare an inventory.** You must prepare an inventory of damaged personal property, describing the property in full. It should show in detail the amount insured under this policy and actual amount of the loss. Attach bills, receipts, and other documents to support your inventory.

**Display property.** You must show us the damaged property when we ask.

**Proof of loss.** At our request you must submit to us your signed sworn proof of loss on a form we have sent to you.

**Examination under oath.** We have the right to examine under oath as often as we may reasonably require you, family members and other members of your household and have them subscribe the same. We may also ask you to give us a signed description of the circumstances surrounding a loss and your interest in it, and to produce all records and documents we request and permit us to make copies.

### Insurable interest

We will not pay for any loss to property in which you or a family member does not have an insurable interest at the time of the loss.

If more than one person has an insurable interest in covered property, we will not pay for an amount greater than your interest, up to the amount of coverage that applies.

### Abandoning property

You cannot abandon any property to us unless we agree to accept it, or to a third party unless we agree.

© Copyright 1985 by Chubb & Son Inc. Form no. 7000008 5/85                10/02/03 9:26:26
588

*Policy*
*Terms*



---

## Property Conditions
(continued)

### Carrier and bailees
We will not make any payments under this policy to the benefit of any carrier or other bailee of damaged property.

---

## Special Conditions

In the event of conflict with any other conditions of your policy, these conditions supersede.

### Legal action against us
You agree not to bring legal action against us unless you have first complied with all conditions of this policy. You also agree to bring any action against us within one year after a loss occurs, but not until 30 days after proof of loss has been filed and the amount of loss has been determined.

If you have a loss under liability coverage, you agree not to bring any action against us until the amount of damages you are legally obligated to pay has been finally determined after an actual trial or appeal, if any, or by a written agreement between you, us and the claimant. No person or organization has any right under this policy to bring us into any action to determine the liability of a covered person.

### Appraisals
If you and we fail to agree on the amount of loss, you and we may select an independent appraiser in order to reach a mutual agreement. You and we will share the expenses incurred equally and every effort will be made to reach an agreement within a reasonable time. However, we do not waive our rights under this policy by agreeing to an appraisal.

### Mortgagee or loss payee
The word "mortgagee" includes a trustee. If a mortgagee or loss payee is named in this policy, any loss payable will be paid to the mortgagee or loss payee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgagees. We cover the interests of the loss payee unless the loss results from fraudulent acts or omissions on your part.

If we deny your claim, that denial will not apply to a valid claim of the mortgagee or loss payee, provided that the mortgagee or loss payee:
- notifies us of any change in ownership, occupancy, or substantial change in risk of which the mortgagee or loss payee is aware;
- pays any premium due under this policy on demand if you have neglected to pay the premium; and
- submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so.

© Copyright 1985 by Chubb & Son Inc. Form no. 7000008 5/85                    10/02/03 9:26:26

*Policy*
*Terms*

---

## *Special Conditions*
(continued)

Policy conditions relating to appraisals and legal action against us, apply to the mortgagee and loss payee. If the policy is cancelled or not renewed by us, the mortgagee or loss payee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

If we pay the mortgagee or loss payee for any loss and deny payment to you, then:
- our rights are subrogated to all rights of the mortgagee or loss payee granted under the mortgage on the property; or
- at our option, we may pay to the mortgagee or loss payee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer from the mortgagee or loss payee and all securities held as collateral to the debt.

Subrogation will not impair the right of the mortgagee or loss payee to recover the full amount of the mortgagee's or loss payee's claim.

### Nonrenewal
If we decline to renew all or part of this policy, we will mail such nonrenewal to the mailing address shown in the Coverage Summary at least 35 days before the policy ends and we will obtain a certificate of mailing. A copy of the notice will also be sent to the last known mortgagee or lienholder named in this policy.

Our right not to renew applies to each coverage or limit in this policy.

### Your cancellation
You may cancel this policy or any part of it at any time by returning it to us or notifying us in writing of the future date that the cancellation is to take effect.

### Our cancellation
We may cancel this policy or any part of it, subject to the following conditions. Our right to cancel applies to each coverage or limit in this policy.

**Within 30 days.** When this policy or any part of it, except vehicle coverage, has been in effect for less than 30 days we may cancel with 35 days notice for any reason.

**Within 60 days.** When vehicle coverage has been in effect for less than 60 days, we may cancel with 35 days notice for any reason.

**Nonpayment of premium.** We may cancel this policy or any part of it with 35 days notice if you fail to pay the premium by the due date, regardless of whether the premium is payable to us, or to our agent.

**Misrepresentation.** We may cancel this policy or any part of it with 35 days notice if the coverage was obtained through misrepresentation, fraudulent statements, or omissions or concealment of a fact that is relevant to the acceptance of the risk or to the hazard we assumed.

*12/15/03*
© Copyright 1985 by Chubb & Son Inc. Form no. 7000008 5/85
599

**District of Columbia** Policy Terms

*Page Y-6*
10/02/03 9:26:26

*Policy*
*Terms*

CHUBB

## *Special Conditions*
(continued)

**Increase in hazard.** We may cancel this policy or any part of it with 35 days notice if there has been a substantial change in the risk which increases the chance of loss after insurance coverage has been issued or renewed, including but not limited to an increase in exposure due to rules, legislation or court decision.

**Vehicle coverage only:**
**Driver's license suspension.** We may cancel any vehicle coverage in this policy with 35 days notice if your driver's license or that of any other driver who lives with you, or customarily uses your car, has been suspended or revoked during the policy period.

**Motor vehicle registration.** We may cancel any vehicle coverage in this policy with 35 days notice if the motor vehicle registration certificate of the covered person has been suspended or revoked during the policy period.

## Procedure
To cancel this policy or any part of it, we must notify you in writing. This notice will be mailed to you at the mailing address shown in the Coverage Summary and we will obtain a certificate of mailing. This notice will include the date the cancellation is to take effect and the reason for cancellation.

## Refund
In the event of cancellation by you or by us, we will refund any unearned premium on the effective date of cancellation, or as soon as possible afterwards. The unearned premium will be computed pro rata for the unexpired term for each part of the policy.

*Signatures*



In Witness Whereof, the company issuing this policy has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless also signed by a duly authorized representative of the company.

CHUBB INDEMNITY INSURANCE COMPANY
CHUBB INSURANCE COMPANY OF NEW JERSEY
CHUBB NATIONAL INSURANCE COMPANY
FEDERAL INSURANCE COMPANY
GREAT NORTHERN INSURANCE COMPANY
VIGILANT INSURANCE COMPANY

President

Secretary

NORTHWESTERN PACIFIC INDEMNITY COMPANY

President

Secretary

PACIFIC INDEMNITY COMPANY

President

Secretary

© Copyright 1985 by Chubb & Son Inc. Form no. 7200008 5/85

**District of Columbia** Signatures
10/02/03 9:26:26

 *Masterpiece*® **Policy Information Notice** 

You have the right to review and correct or amend information we have. If you want to know more about this and how information may be disclosed without your prior authorization, please write to:

Chubb Personal Insurance
Attention: Policy Information
202 Halls Mill Road
P.O. Box 1600
Whitehouse Station, N.J. 08889-1600

Please include your policy number, policy period and the name and address of your agent or broker.

If you need to report a claim and have been unable to contact your agent, broker or local Chubb Office, you can call this telephone number for further assistance:

1-800-252-4670

 

**Additional Interests Update**

**Name and address of Insured**

JOEL HIRSCH
3115 CLEVELAND AVENUE N.W.
WASHINGTON, DC 20008-3534

**Page** 1
**Effective Date** 6/21/06
**Policy no.** 11833276-02
**Issued by** Great Northern Insurance Company
a stock insurance company
incorporated in Minnesota
**Policy period** 6/21/06 to 6/21/07

**If you have any questions, please contact**
AON PRIVATE RISK MANAGEMENT (GNY)
1000 N MILWAUKEE AVENUE
GLENVIEW, IL  60025
866-225-5266

As requested, we have revised your Additional Interests as shown below. To keep your records up to date, please attach this update to your existing policy.

We notify each Additional Interest separately when they are added to your policy. Regardless of the number of Additional Interests shown on your policy, the amount of coverage for any one occurrence does not increase.

Your premium will not change for this revision.

## Mortgagee

This section shows the changes in your Mortgagee information.

HOUSE AT
3115 CLEVELAND AVENUE NW
WASHINGTON, DC

| **OLD MORTGAGEE** | **NEW MORTGAGEE** |
|---|---|
| **Changed** BRANCH BANKING AND TRUST COMPANY OF VA ISAOA ATIMA P.O. BOX 2088 GREENVILLE, SC  29602-2088 | BRANCH BANKING AND TRUST COMPANY OF VA ISAOA ATIMA P.O. BOX 7933 SPRINGFIELD, OH  45501-7933 |
| Loan Number 606112317 | Loan Number 6990189844 |

© Copyright 1984 by Chubb & Son Inc.    Form no.  Q6110000 10/89

INSURED 07/16/07 23.31.49

673

# *Masterpiece*®

**Additional Interests Update**



---

**Name and address of Insured**

JOEL HIRSCH
3115 CLEVELAND AVENUE N.W.
WASHINGTON, DC 20008-3534

**Page** 1
**Effective Date** 6/21/06
**Policy no.** 11833276-02
**Issued by** Great Northern Insurance Company
a stock insurance company
incorporated in Minnesota
**Policy period** 6/21/06 to 6/21/07

**If you have any questions, please contact**
AON PRIVATE RISK MANAGEMENT (GNY)
1000 N MILWAUKEE AVENUE
GLENVIEW, IL  60025
866-225-5266

As requested, we have revised your Additional Interests as shown below. To keep your records up to date, please attach this update to your existing policy.

We notify each Additional Interest separately when they are added to your policy. Regardless of the number of Additional Interests shown on your policy, the amount of coverage for any one occurrence does not increase.

Your premium will not change for this revision.

## *Mortgagee*

This section shows the changes in your Mortgagee information.

HOUSE AT
3115 CLEVELAND AVENUE NW
WASHINGTON, DC

**Mortgagee**

**Added** FIDELITY AND TRUST MORTGAGE, INC
ISAOA \ ATIMA
7000 WISCONSIN AVENUE
CHEVY CHASE, MD  20815

© Copyright 1984 by Chubb & Son Inc.    Form no.  Q6110000 10/89

INSURED 07/16/07 23.31.49

# *Masterpiece*®    **Coverage Update**    

---

**Name and address of Insured**

JOEL HIRSCH
3115 CLEVELAND AVENUE N.W.
WASHINGTON, DC 20008-3534

**Page** 1
**Effective Date** 3/1/07
**Policy no.** 11833276-02
**Issued by** Great Northern Insurance Company
a stock insurance company
incorporated in Minnesota
**Policy period** 6/21/06 to 6/21/07

**If you have any questions, please contact**
AON PRIVATE RISK MANAGEMENT (GNY)
1000 N MILWAUKEE AVENUE
GLENVIEW, IL  60025
866-225-5266

Your policy has been cancelled pro rata at the insured's request.

You will receive a separate statement showing the premium adjustment.

As the duly authorized representative of the company my signature validates this policy.

_____
Authorized representative

© Copyright 1984 by Chubb & Son Inc.    Form no.  Q0806000 05/85
677

INSURED  07/16/07 23.31.49

*Client's Copy*



JOEL HIRSCH
3115 CLEVELAND AVENUE N.W.
WASHINGTON, DC 20008-3534

# Jaeger Affidavit
# Exhibit B

Page 1

1    In Re: Hirsch Coverage Investigation

2    Our File No.: 50209.017

3    Tape Recorded Interview of Joel Hirsch

4    Taken On December 11, 2006

5    Interviewer: Dan Jaeger

6

7

8        Q        This is Dan Jaeger, I'm interviewing Joel Hirsch.  Today's date is December 11, 2006,

9    the time is approximatly 2:30 p.m.  This is in regard to policy number 1183327602 issued

10   by the Great Northern Insurance Company to Joel and Carol Hirsch.  We are here today to

11   talk about a loss that occured at their property in Washington, D.C. on or about June 25,

12   2006.

13       Mr. Hirsch, do you understand that this is being recorded today?

14   A    Yes.

15       Q        And this recording is being made with your full knowledge and consent?

16   A    Yes.

17       Q        Have you ever had a recorded interview taken in person like this?

18   A    No.

19       Q        Okay.  Have you ever been deposed in the context of your job?

20   A    Yes.

21       Q        Okay.  So you understand that in a deposition, somebody asks you questions and you

22   respond, this is similar to that. Although you are not under oath, I would still ask that you

23   be truthfull and honest in your responses.  Everything that you say is being taken down

24   by this tape recorder, so you do need to keep your voice up so that everything is taken

25   down accuratley.  All of your answers to my questions need to be in a verbal form, you

Page 2

1    can't nod your head, go uh-hmm or uh-huh, it won't be taken down by the recorder.

2        If you don't understand one of my questions for any reason whatsoever, let me know that you don't

3    understand it and I will rephrase it so you do.  If you answer the question, I will assume that

4    you understood it and that your answer is truthfull and honest.  Okay?

5    A    Okay.

6        Q    It's very important that you don't guess or make up anything.  If you don't know the

7    answer to one of my questions, it's perfectly acceptable to say I don't know or I don't

8    recall.  However, as you are aware, we are here today to talk about substantial damage to

9    your home and your property, so I would ask you to just try to recollect to the best of

10   your ability the answers to my questions.  Okay?

11   A    Okay.

12       Q    You are allowed to estimate or approximate if you can do that for me, just let me

13   know that your answer is an estimation or an approximation.  Okay?

14   A    Okay.

15       Q    Do you have any questions before we begin?

16   A    No.

17       Q    Are you on any type of drugs or medications that would hinder your ability to

18   recollect the events of June 25, 2006?

19   A    No.

20       Q    Could you please state your full name and spell your last name for me?

21   A    Joel Hirsch, H-I-R-S-C-H.  I should tell you, I think you are aware that I have sort

22   of a window of time.  So, if it's 2:30 we have about thirty to forty minutes and then I

23   have a conference call coming in.

24       Q    Well, Mr. Hirsch, I will do everthing in my power to accomodate your schedule.

25   A    So I will try to be concise.

Page 3

1      Q       Okay.  What is your home address?

2    A     3115 Cleveland Avenue Northwest, Washington, D.C.

3      Q       Zip code?

4    A     20008.

5      Q       And your date of birth?

6    A     7/26/42.

7      Q       And how long have you lived here?

8    A     6 1/2 years.

9      Q       And you live here with who?

10    A    My wife.

11      Q       Is that Carol?

12    A    That's Carol.

13      Q       Anyone else?

14    A    No.

15      Q       Okay.  Are you employed?

16    A    Yes.

17      Q       Where do you work?

18    A    A company called Arrowhead.

19      Q       Arrowhead what?

20    A    Arrowhead Public Risk.

21      Q       Public Risk.  Is that an insurance brokerage?

22    A    It's a police professional, public official, liability manager.

23      Q       Where are they based out of?

24    A    Richmond, Virginia.

25      Q       Is that where you work?

Page 4

1   A    Yes.

2        Q    And what do you do for them?

3   A    I run that division.

4        Q    Would it be considered president?

5   A    Yes.

6        Q    And do you have a daytime telephone number that is best to reach you at?

7   A    With the technology that I use, the best number is (202) 625-6170 because I forward

8   that to where ever I'm going to be.

9        Q    Okay.  And what number is that?  Office, is that home?

10  A    Right here in this room.

11       Q    Home office?

12  A    That's right, home office.

13       Q    Okay.  As you are aware, we are here today to talk about damage that your property

14  sustained as a water event on June 25, 2006, you understand that.  And we are here today to go

15  over certain issues.  I understand that there has been substantial work at the home since

16  this loss occured, and I also understand that there is a significant amount of work that

17  still needs to take place.  You have been kind enough to show myself the property, the

18  damage that was sustained and the repairs that were made.  Is that correct?

19  A    Yes.

20       Q    And Christopher Havens of Mintkoff and Company was here with me initially and we

21  inspected some doors that you had indicated to us were in your crawl space at the time that the

22  water loss occured?

23  A    Correct.

24       Q    Those doors weren't installed in any way in your house.  Correct?

25  A    No.

Page 5

1    Q    Okay. And they were never installed in the house to your knowledge since the time

2  you purchased the home 6 1/2 years ago.

3  A    Correct.

4    Q    Okay. Had you seen those doors prior to looking in the crawl space at the damaged

5  property?

6  A    Had I seen them before they were damaged?

7    Q    Yes.

8  A    Yes.

9    Q    So the damage that I observed out in your garage, that was not there prior to June 25,

10  2006?

11  A    I would say not. They weren't in perfect shape because they're old and they were

12  dirty, but they were not in the shape that they're in now.

13    Q    Okay. And those were actually doors that you inherited, for lack of better words,

14  when you purchased the house?

15  A    Correct.

16    Q    Okay. So they were here when you bought the home?

17  A    Yes.

18    Q    The previous owner left them?

19  A    Yes.

20    Q    You didn't pay for them in any way?

21  A    As part of what we paid for the house.

22    Q    Okay. But there was no specific line item that said in addition to the purchase

23  price of the home for X amount of dollars, you get the doors in the crawl space?

24  A    Right.

25    Q    Okay. You had presented as part of your water damage claim, an invoice from Steven

Page 6

1   Frischling Incorporated for the doors, and this was a invoice dated September 25th - - you can have a

2   copy - - dated September 25th, from Steven Frischling Incorporated Restoration and Fabrication

3   of the World's Finest Furniture, and I believe that this was forwarded to Lawrence

4   Babinski of our Pittsburgh claims office on October 23rd via email by you.  Is that correct?

5   A      Yes.

6        Q      When did Mr. Frischling inspect the doors?

7   A      He didn't inspect the doors.

8        Q      Okay.  How was he made aware of the damage?

9   A      I talked to him about it.

10        Q      So, I assume from what you're telling me is that you discovered that the doors were

11   damaged around when?

12   A      In late June or early July.

13        Q      And when did you first consult with Mr. Frischling regarding the doors?

14   A      I don't remember.

15        Q      How did you communicate with him the condition of the doors?

16   A      I don't remember whether I talked to him and sent him photos or I talked to him, but

17   I know that there were photos of the doors.

18        Q      Okay.  So it's your recollection that in some manner you communicated with Mr.

19   Frischling that you had these four doors that were damaged by water as a result of the June 25,

20   2006 loss?

21   A      I think you're sort of reconstituting what I'm saying.

22        Q      No.  I'm trying to understand what happened, so you can explain it to me.

23   A      Okay.  We knew the doors were damaged.

24        Q      Okay.

25   A      I think I reported that to Mr. Babinski at the begining in early July or late June, but

Page 7

1    probably in early July.

2         Q        And just to be clear for the record, you've told me that off the record and I advised

3    you that I did not have any knowledge of that.  But I wil go back and look for that

4    communication.

5    A      Okay.  And later when he had a spread sheet or whatever of the list of things that we

6    were discussing - -

7         Q        Mr. Babinski?

8    A      Yes.

9         Q        Okay.

10   A      He did not include the doors.  He said that he needed more information about the doors,

11   and so I asked him what does he need and he said he just needed more information, he

12   couldn't just accept my statement about the doors.

13        Q        And I think that at the time you were saying that you believe the doors were worth

14   more than $6,000 but you would accept $6,000?

15   A      I know that I estimated about a $6,000 number for the four doors.

16        Q        Was that prior to speaking wih Mr. Frischling or afterwards?

17   A      Before.

18        Q        Okay.  How did you come to the conclusion that those doors were worth $6,000, what

19   research did you do?

20   A      I didn't do any research.

21        Q        That was your best guess?

22   A      That was my best estimate.

23        Q        Okay.  And you eventually discussed the doors with Mr. Frischling, correct?

24   A      Yes.

25        Q        Okay.  And in the discussion with Mr. Frischling did you tell him that the doors were

Page 8

1    damaged by water?

2    A    Yes.

3        Q        And you have already stated that Mr. Frischling never came to your home to inspect

4    the doors, correct?

5    A    Correct.

6        Q        So, if Mr. Frischling observed the doors, it would have been through a photograph that

7    you sent him?

8    A    Yes.  But what he said was he didn't want to - - he doesn't travel I guess.  I don't

9    really know.  I got his name from the dealer in New York that had provided - - whom we had

10   bought some of the antiques in the house, I've never dealt with the guy before.  And he was

11   reccomended as somebody who could deal with the fixing of the pieces that were damaged.

12       Q        And in fact, he actually did some repairs to some other furniture of yours, correct?

13   A    Yes.

14       Q        As a result of this?

15   A    Yes.

16       Q        And you had sent that to him in Baltimore?

17   A    Yes.  We sent it to him and then he fixed it.

18       Q        And then sent it back?

19   A    And then we had it brought back, correct.

20       Q        And why couldn't you do that with the doors?

21   A    I didn't include the doors at that time.

22       Q        I know that.

23   A    And frankly, it didn't dawn on me to do that with the doors.  So, he said to me that

24   he didn't really want to mess with the doors and so I wrote this letter.

25       Q        You wrote this letter?

1    A    I wrote this letter.

2        Q    On Mr. Frischling's letterhead?

3    A    I wrote this letter, yes.

4        Q    Mr. Hirsch, why would you write a letter on Steven Frischling's letterhead proporting

5    to be Steven Frischling and submit it to the company as if it was something from Mr.

6    Frischling?

7    A    Babinski, Larry Babinski was saying I have to have something, I have to have

8    something.  I called four or five diffrent people about coming to take look at it.  They didn't,

9    they wouldn't, nobody felt that it was important enough.  So, I wrote this letter,

10   Steven knows that I wrote the letter.

11       Q    When did Mr. Frischling first become aware of the fact that you wrote this letter on

12   his letterhead?

13   A    I don't know.

14       Q    Did he give you authorization to write a letter on his letterhead and submit it

15   under his name?

16   A    Not exactly.

17       Q    Well, did you do it without his authority in order to get paid for these doors?

18   A    I did it to satisfy the demand that I was getting for information that I couldn't

19   otherwise supply.

20       Q    Did you ever contact Mr. Babinski and say Larry, I'm having a hard time reaching

21   anyone or getting anyone to inspect these doors, could you give me a reccomendation or could

22   you have someone contact me that might be able to assist me in facilitating the inspection?

23   A    I didn't ask it to him that way.  No.  I told him that I was having a hard time

24   getting him what he wanted.

25       Q    Okay.  So, this letter that Chubb & Son believed to be from Mr. Frischling was

Page 10

1   actually authored by you?

2   A    Yes.

3       Q    He never provided this to you?

4   A    Who?

5       Q    Mr. Frsichling.

6   A    No.

7       Q    Okay.  How did you get his letterhead?

8   A    I don't know.

9       Q    Well, this clearly is a document that proports to be on his letterhead and if you

10  created it, how did you do it?  You don't have access to his stationary, do you?

11  A    No.

12      Q    Is this a document that you scanned and some how replicated in a blank word document

13  or something?

14  A    I don't know.

15      Q    Okay.  So this description of the doors that's in here, this is your description of

16  the doors?

17  A    Yes.

18      Q    Okay.  So nothing in here was based on your conversations with Mr. Frischling and his

19  expert opinion as to what these doors where and what the cost to repair them would be

20  and what the cost to replace them would be?

21  A    Yes.

22      Q    So none of that is from him?

23  A    No.

24      Q    This is all from you?

25  A    Yes.

1    Q      Okay.  So, if you notice in the first paragraph you indicate the doors measure 3.5

2    inches by 68 inches, is that supposed to be 38 inches wide by 68 inches tall, not 3.5?

3    Because you would agree they are not 3.5 inches wide?

4    A      I would agree with that.  Yes.

5    Q      Okay.  You also put in here Mr. Hirsch, that you have paid him $250 for his fee to

6    evaluate these doors.  Where did that come from?

7    A      What do you mean where did it come from?

8    Q      Well, you told me that you created this document proportedly from Mr. Frischling and

9    that you did it because Mr. Babinski was asking you for documentation and you were having a

10   difficult time getting someone to provide you that documentation.  That being said, you

11   created a document that lists a description of the doors as well as replacement and

12   restoration costs and then you go on to say, "as agreed our charge for this evaluation is $250".

13   What was the purpose of putting that in there, Mr. Hirsch?

14   A      The purpose of that was that's what I was going to pay Steven for the letter.

15   Q      Did you ever ask Mr. Frischling to write you a letter wherein he responded give me

16   $250?

17   A      No.

18   Q      Mr. Hirsch, would it suprise you to learn that Mr. Frischling had no idea about these

19   doors?

20   A      Yes.

21   Q      Do you believe that his recollection would be incorrect if he indicated that he was

22   never made aware of the doors and had never seen the doors and has no idea where this letter

23   was generated or how it came about?

24   A      What are you asking?

25   Q      Well, you said that you spoke with Mr. Frischling and he knew about the letter?

Page 12

1   A    Uh-huh.

2        Q    Did he learn about the letter after it was already submitted to Chubb?

3   A    I don't know.

4        Q    Okay. Well, did you contact him and say Mr. Frischling, I've sent a letter on your

5   letterhead to Chubb in support of a claim, do you have a problem with that?

6   A    We didn't have the conversation about it. But I did tell him that I wrote the letter.

7        Q    Okay. And was that subsequent to my initial contact with you?

8   A    I don't believe so, no.

9        Q    And you say the $250 was for what you planned to pay him to write the letter?

10  A    Yes.

11       Q    Was that fee ever discussed with him?

12  A    I don't remember.

13       Q    Okay. All right. If you turn to the second page, which is your email, it says that

14  the sender is Joel Hirsch and the note was created on 10/16/05 (Sic), and in this you indicate

15  to Larry that you've been terribly remissed for not sending these to you and you're

16  refering to the Frischling letter, correct?

17  A    Uh-huh.

18       Q    And are you also refering to a proposal or contract with Wentworth?

19  A    I don't remember.

20       Q    Well, if you look at the second paragraph of your email it says - -

21  A    Oh, architect engagement letter, yeah.

22       Q    Okay. So, would you agree with me that this email was sent by you to Larry Babinski

23  on 10/16/2006 with a copy to Ronnie Tibbie (Phonetic). Who's Ronnie Tibbie?

24  A    My broker.

25       Q    Okay. Is that (AON)?

1    A    Yes.

2    Q    Okay.  So this email was sent to Mr. Babinski with a copy to Ronnie Tibbie attaching

3    the Frischling letter, which you've told me that you authored, not Mr. Frischling, as well

4    as an acrchitect engagement letter?

5    A    Yes.

6    Q    What is the architect engagement letter?

7    A    What is the architect - -

8    Q    What was the purpose - - and I'm going to hand you a copy of this, take a look at

9    that.  I've handed you a copy of a letter from Bruce Wentworth of Wentworth Incorporated

10   dated August 2, 2006, which you reference in your October 16th email to Larry.  And this is

11   an engagement letter for a fee of $10,000.

12   Why don't you tell me, if you don't mind, what you retained Mr. Wentworth to do at your home?

13   A    We retained Wentworth to help us manage our way through the rubble and to help us

14   figure out how to do things in order so that they made sense and to help us figure out what

15   to about some of the problems that we had here and what to do with the master bath.

16   Q    Okay.  Let me ask you this, when did you first consult with Bruce Wentworth regarding

17   his assistance in the repairs to your home?

18   A    I don't remember.

19   Q    Was it prior to August 2, 2006?

20   A    I think so, but I'm not sure.

21   Q    Well, you would agree that he wouldn't have consulted with you and on the same day

22   authored this letter?

23   A    I would say that's probably right.

24   Q    Okay.  And would you agree with me that this letter from Bruce Wentworth, addressed

25   to Carol and Joel Hirsch at 3115 Cleveland Ave Northwest, Washington, D.C., dated August

Page 14

1   2, 2006 was an attachment that you forwarded to Mr. Babinski on October 16, 2006?

2   A     That's what it appears to say, yes.

3       Q      Okay.  And this was in response to Mr. Babinski's inquiries as to what the architect

4   was retained for, correct?

5   A     I'm pausing because I don't think at the point he had asked me that.

6       Q      Have you ever used Bruce Wentworth at any period prior to your engagement for the

7   overseeing of the water damage restoration?

8   A     Yes.

9       Q      Okay.  When did you use Mr. Wentworth prior to that?

10  A     We had talked to him before then, and I don't remember the timing exactley, but we

11  had talked to him about doing some work in the master bedroom, bathroom area.

12      Q      So, Mr. Wentworth if I understand it, is a architect who also will oversee the

13  project if you continue to move foward with the plans, correct?

14  A     Correct.

15      Q      In this letter it indicates that Mr. Wentworth will assist you for the fee of $10,000,

16  and what I assume you mean assist or he means assist, it's overseeing the major

17  restoration that was needed as a result of the water damage claim, correct?

18  A     That was what his fee was.

19      Q      Okay.  And Mr. Wentworth actually came out to the house here in Washington, D.C. and

20  looked at all the damage and told you that he could help you out by overseeing the repairs?

21  A     He told us he could definitly help us, yes.

22      Q      Okay.  And it was your understanding that the purpose of Mr. Wentowrth being involved

23  was to assist your work through the rubble, as you stated, and deal with the many facets

24  of the repiars that needed to be undertaken to restore your home?

25  A     I think Wentworth's understanding and our understanding didn't end up being the same.

Page 15

1      Q      Okay. This says that $10,000 is due upon receipt.

2    A    Uh-huh.

3      Q      Did you pay Mr. Wentworth $10,00 for the oversight of the restoration to your home?

4    A    We paid him $10,000, yes.

5      Q      Okay. The question was did you pay him $10,000 for the oversight of the restoration

6    to your home as a result of the 6/25/06 water loss?

7    A    I know we paid him $10,000.

8      Q      I don't think that - - answer the question, Mr. Hirsch. I understand that $10,000 was

9    paid, but was it for the oversight of the restoration to your home as a result of the

10   water damage claim that you presented to Chubb and Son or was it for something else?

11   A    I think it was.

12     Q      You think it was for the oversight of the restoration?

13   A    That part of the - - we ended up having a disagreement with them about what they were

14   supposed to do and how to do it and what have you. But I think that was part of the

15   disagreement, is that we understood they were going to do - - they wanted to focus on the master

16   bath and we wanted to focus the other stuff.

17     Q      So you say that there is a disagreement between Wentworth and you and your wife over

18   what the scope of their envolvment would be?

19   A    Yes, correct.

20     Q      This letter is dated August 2, 2006, did you -- - how did you recieve this from Mr.

21   Wentworth?

22   A    By mail I think.

23     Q      Did he mail it to you, did he email it to you, did he fax it to you?

24   A    I don't remember whether he mailed it or whether he stuck it through the slot when he

25   delivered it.

Page 16

1     Q     But it wasn't hand delivered to you?

2    A    I don't think so.

3     Q     How many times was Mr. Wentworth out at the house?

4    A    That's hard to remember.  Three, four maybe.

5     Q     So he was here three to four times?  How was he only here so infrequently given the

6  fact that he was here to oversee all the restoration work?

7    A    That's one of my issues.

8     Q     Okay.  This also mentions in this August 2, 2006 letter from Bruce Wentworth that

9  there was a tortion crack which had appeared in the walls of the 1972 addition?

10    A    Yes.

11     Q     And if necessary, he would prepare plans to address the structural issues in which

12  case a design fee will be negotiated based on the scope of that work?

13    A    Yes.

14     Q     Did he ever do that?

15    A    No.

16     Q     Did he ever provide you with any other documentation other than this August 2, 2006

17  letter?

18    A    With respect to this, no.

19     Q     Yes.  With respect to his work at your home?

20    A    No.  There was another letter he wrote for the master bath, but that was for the

21  master bath.

22     Q     Would you agree with me that this letter from Bruce Wentworth was submitted to Larry

23  Babinski in effort to be reimbursed the $10,000 you paid to Wentworth?

24    A    Yes.

25     Q     Mr. Hirsch, did you author this letter?

Page 17

1    A    Did I author - - you're asking me whether - -

2        Q    Did you create this letter?  I'm asking you whether or not this letter is from Bruce

3    Wentorth of Wentworth Incororated or is this another letter like the Frischling letter that you

4    actually authored and sent to us proportadly from Bruce Wentworth?

5    A    I don't remember creating this letter.

6        Q    Is it possible?

7    A    I don't know.

8        Q    If Mr. Wentworth admitly denies ever being involved whatsoever with the oversight of

9    the restoration and fixing of your home as a result of the water damage, how would you

10    explain this letter?

11    A    Has he?

12        Q    Yes.  In fact, he says this isn't his letter.  In light of the Frischling letter,

13    that's why I'm asking you, is this something that you authored and sent to us to recover

14    $10,000 or is this really from Bruce Wentworth?

15    A    I don't know how to answer you.

16        Q    Well, isn't it true, Mr. Hirsch, that in July you and your wife entered into a

17    contract with Wentworth for design plans for your master bath, and the fee for that was $10,000?

18    A    I don't think it was - - well, I don't remember.  I thought it was earlier than that.

19        Q    Okay.  If, and I can show you the document, but if it was July 25, 2006 that you

20    entered into a contract with Bruce Wentworth of Wentworth Incorporated to do a design plan for

21    your master bath and the fee was $10,000, does that seem consistent with your

22    recollection of what Wentworth was really there to do?

23    A    There were two things Wentworth was to do.

24        Q    Okay.

25    A    One was on the master bath and this was the other.

Page 18

1      Q      Okay. Well, what I guess I'm trying to understand that is if Bruce Wentworth

2 indicates that his scope of his involvement at your house dealt soley with the renovation of the

3 master bathroom and also to do with some repairs to windows in the home and had nothing

4 to do with the oversight of the repairs resulting from the water damage, how do you

5 explain that letter from Mr. Wentworth?

6      A      Well, I can't explain what Mr. Wentworth is saying.

7      Q      So, is your statement here today that on or about August 2, 2006, Bruce Wentworth,

8 who I believe is president of Wentworth Incoporated, I'm not sure about that, provided you

9 with this letter outlining what he planned to as far as the oversight of the

10 restoration from the water damage.

11      A      Yes. This was our understanding of what he was going to do.

12      Q      Okay. And you don't believe that you authored this letter?

13      A      I don't recall, no.

14      Q      Okay. Well, would it be something that you would recall Mr. Hirsch? I mean wouldn't

15 you recall sending a letter to Chubb in support of a claim that was allegedly authored

16 by someone else, but in actuality authored by you? I mean you recalled it on the

17 Frischling letter.

18      A      Yes.

19      Q      You don't recall it on this?

20      A      No.

21      Q      How are we on time? I know that you - -

22      A      It's three o'clock.

23      Q      Can you give me five or ten more minutes and then we could - -

24      A      I can give you five or ten more minutes.

25      Q      Okay.

Page 19

1    A    Am I incorrect in remembering that Babinski said that he didn't think this was

2    something that he should pay?

3        Q    No. I don't believe that Babinski ever said that. I believe what Babinski said was

4    that he needed more ellaboration regarding what the architect was actually engaged to do.

5    There was questions to why an architect would be needed, so he was asking for further

6    clarification and that is both on the doors and the architect. I don't believe you had indicated

7    that you hadn't responded to Mr. Babinski when he twice rejected the doors. I've gone back

8    to Mr. Babinski about that and I've talked to him about it and he doesn't recall ever

9    rejecting the doors and the file doesn't reflect that. But in any event, I want to show you a

10   document which is also from Bruce Wentworth dated July 19, 2006, and this is a contract that you

11   had signed on July 25th and it looks like your wife signed it on July 26th and Mr.

12   Wentworth signed it on July 19th. Can you tell me what this is?

13   A    This is about the bath.

14       Q    Okay. And I believe that contract states that if you choose not to move forward

15   using Wentworth to actually do the construction, then that there would be a $10,000 fee for

16   the design phase.

17   A    It says that the design fee of $10,000 is payable now.

18       Q    Right. And that that would be the fee if you chose not move forward with the

19   constructin phase. So is it true that for the design that Wentworth did for the master bath you

20   paid $10,000?

21   A    Yes.

22       Q    Okay. And you did not retain Wentworth to do the construction of the master bath?

23   A    Right. We didn't have him finish.

24       Q    Right. So your understanding was that for the fee of $10,000 he provides you with

25   the design?

Page 20

1    A    (Inaudible)

2    Q    Okay. If Mr. Wentworth says that this contract dated July 25, 2006 is his only

3    involvement with Joel and Carol Hirsch, outlined the scope of what he planned to do and has

4    nothing to do with the oversight of the restoration to the home from the water damage claim,

5    are you saying that he is lying or being untruthfull?

6    A    I can't answer that question.

7    Q    How do you think it is that the August 2nd letter proportadly from Bruce Wentworth

8    and the design phase contract had the same dollar amout of $10,000?

9    A    I don't know why that - -

10    Q    Do you think that's just coincidence?

11    A    Yes.

12    Q    Okay. If Mr. Wentworth signed an affadavit under penalties of purgery indicating

13    that he never authored that August 2, 2006 letter, had no idea how it was created, and in

14    fact under close examination he can tell that it is not his letterhead, how would you

15    explain that you got it and were able to send it to Chubb?

16    A    I'm not sure I would or could.

17    Q    Okay. Knowing what I just told you, is it still your statement that you didn't

18    create that letter of August 2, 2006?

19    A    I do not recall creating that letter.

20    Q    Is it possible you did and just don't remember?

21    A    I'm not sure that I want to even answer that question.

22    Q    Okay. You don't have to answer it. Okay. I want to move on. You had provided us

23    with a faxed copy of Eight Brothers proposal for the plaster work at your house and I

24    believe that this document that I have given you is dated July 10, 2006. Is that correct?

25    A    I don't see the date. Oh, yeah - -

Page 21

1    Q    On the first page?

2    A    Yes, I do.

3    Q    July 10, 2006?

4    A    Right.

5    Q    And Eight Brothers provided you with a copy of this?

6    A    Yes.

7    Q    And you in turn faxed a copy of it to Larry Babinski?

8    A    Yes.

9    Q    That's your cover page?

10   A    Yes.

11   Q    Okay.  And if you look at this proposal, on page one of the proposal, it says that

12   the contract amount is $102,974?

13   A    Yes.

14   Q    And this proposal was done after Eight Brothers inspected the property?

15   A    Right.

16   Q    And were able to go back to their office and compile a detailed proposal as to the

17   scope of the work?

18   A    Yes.

19   Q    Okay.

20   A    They didn't do it here.

21   Q    Okay.  Has Eight Brothers been working at the house prior to July 10, 2006?

22   A    No.

23   Q    Okay.  When Mr. Havens was here, I think he was here on July 11th, he had indiacted

24   that there were people here working, stripping down walls and working on a window.  Who

25   were they?

Page 22

1    A    Probably Junamin (Phonetic).

2        Q    That was Junamin?

3    A    Uh-huh.

4        Q    So, you had engaged Junamin before July 10th?

5    A    I don't remember the date, but it probably was Junamin.

6        Q    Okay.  It couldn't have been Eight Brothers though?

7    A    I don't think so.

8        Q    Okay.  All right.  If you could do me a favor and look at page one of the proposal,

9    the last line item, it should be scaffolding and protection, but it says scaffling and

10   protection, it says $2,460?

11   A    Uh-huh.

12       Q    I'm going to give you a copy of a fax from you dated July 14th, which includes a

13   second proposal from Eight Brothers also dated July 14, 2006.  Is that a fax that was sent by

14   you, Joel Hirsch to Larry Babinski of Chubb Insurance?

15   A    It appears to be.

16       Q    And also on this, it's titled Revised Plaster Repair Proposal, on your cover page, it

17   should say - -

18   A    Oh, yes.

19       Q    And if you look at page one of the proposal and you look at the line item, the last

20   line item, scaffolding and protection it has a number of $24,000?

21   A    Uh-huh.

22       Q    Do you have any explanation or was any explanation given to you by Oscaar Emilio or

23   Eight Brothers as to why the line item for scaffolding and protection would go from $2,460

24   to $24,000?

25   A    Yes.

Page 23

1       Q       What was that explanation?

2    A    They said they made a mistake.

3       Q       Okay.  Eight Brothers said they made a mistake?

4    A    Yes.

5       Q       And what was their mistake?

6    A    That they had typed it wrong.

7       Q       How did they type it wrong?

8    A    In the first one, which you took back, they had a much lower number.

9       Q       What type of mistake did they make though?  I mean was it transition of a number, was

10   it a loss of a zero?

11   A    I think they lost a digit.

12      Q       Okay.

13   A    I gave you back the sheet.

14      Q       I can give it back to you.

15   A    But my recollection was that the person who transcribed his notes didn't read them

16   properly and that the $2,400 number should have been $24,000.

17      Q       Okay.  So, the number actually should have been a rounded number 24,000 instead of

18   2,460?

19   A    That's the number he gave me in this proposal.

20      Q       And that's his explanation to you?

21   A    Yes.

22      Q       When did he provide you that explanation?

23   A    When he gave me this revised proposal, because it took in some additional areas that

24   he didn't estimate the first time.

25      Q       It wasn't after I had contacted him that he contacted you and told you that I was

Page 24

1    inquiring about that?

2    A    I don't understand your question.

3       Q    You're telling me that Oscar explained that when he presented you with that proposal

4    on or about July 14th - -

5    A    Yes.

6       Q    And had Oscar contacted you since I initially contacted you and told you that I was

7    inquiring about that?

8    A    No.  Oscar contacted me and told me that somebody had asked him for a copy of the

9    contract.

10      Q    Okay.

11    A    And I had not heard from you at that time, I don't believe.  And I said, well, I didn't

12    have any objection to his furnishing a copy of the contract.

13      Q    Okay.  So he said it was just a clerical error?

14    A    That is what he said.

15      Q    All right.  Would you agree that the proposal of July 14th encompasses the total

16    scope of what Eight Brothers did aside from a change order that we're going to talk about

17    real quick?

18    A    I think so.

19      Q    Okay.  And did you pay Eight Brothers for their work?

20    A    Yes, I did.

21      Q    Okay.  Have you paid them in full?

22    A    I've paid them for the work they have done, yes.

23      Q    And you've paid them by check?

24    A    By checks, yes.

25      Q    So that would be a personal check, right?

Page 25

1    A    Yes. Are they telling you I didn't pay them?

2        Q    No. They're not, I'm just asking. There was also - - I'm going to give you a copy - - you

3    can hold onto that. This is a change order?

4    A    Yes.

5        Q    From Eight Brothers?

6    A    Yes.

7        Q    And it's dated 8/25/06 and it looks like it's for some additional things that were

8    not included in the revised proposal of 7/14?

9    A    Yes.

10        Q    And did you receive a copy of this?

11    A    Yes.

12        Q    Okay. And did you forward this to Larry Babinski at Chubb?

13    A    I would guess I did.

14        Q    Okay. Well, you were the one who was acting as the conduit between Eight Brothers and

15    Chubb?

16    A    Correct.

17        Q    Everything was passing through you?

18    A    Yes.

19        Q    So nothing was going directly from Eight Brothers to Chubb?

20    A    Not to my knowledge.

21        Q    Okay. Was this something that you have paid Eight Brothers for?

22    A    Yes.

23        Q    So you've paid them $13,960?

24    A    Yes. I've paid them for what they've done.

25        Q    And this has been completed?

Page 26

1    A    The work has all been completed.  They didn't end up doing all of this work.

2        Q    They didn't?  Well, who did?

3    A    Well, I could guess this baseboard they didn't put in.  I had to have somebody else

4    put in.

5        Q    Who did it?

6    A    I don't remember whether it was done by a carpenter by the name of Atkison or whether

7    it was done by Juniman.

8        Q    Why wouldn't you use Eight Brothers?

9    A    They just didn't do it.

10       Q    Do you have any documentation from Atkinson or Juniman indicating that they billed

11   you for this?

12   A    I probably do.

13       Q    Was there any diffrence in the bill between what Eight Brothers was going to charge

14   and what Atkinson and or Juniman charged?

15   A    I don't know.

16       Q    Well, this was a change order that you had sent to Chubb requesting reimbursment or

17   payment, correct?

18   A    Yes.

19       Q    Do you know if this was an accurate estimate of what you paid?

20   A    I think it's an accurate estimate of what Eight Brothers gave me as their change

21   order.  But whether it was what we paid Eight Brothers at the end or not, because Eight

22   Brothers didn't do everything.

23       Q    Okay.

24   A    As you can see, they only finished some of the work and some of the work they didn't

25   do at all.

Page 27

1    Q      My understanding, Mr. Hirsch, was that this was submitted to us because this was

2   additional work that Eight Brothers was going to be completeing at your home.

3   A    Right.

4    Q      And that this was the cost or the amount that they were charging you.

5   A    Yes.

6    Q      As a result of your submission of this document to Chubb, we issued the payment to

7   you for this amount.

8   A    Okay.

9    Q      Are you telling me now that - - well, I believe you're telling me, correct me if I'm wrong,

10   that Eight Brothers didn't complete all this work, correct?

11   A    I know they didn't put that baseboard in.

12    Q      Okay.

13   A    Because that became a big issue for us.

14    Q      Okay.

15   A    I had to get it done.

16    Q      Well, when that - - do you know whether or not the cost for the installation of the

17   baseboard by either Atkinson or Juniman was diffrent from what's listed here by Eight Brothers?

18   A    I don't know.

19    Q      Okay.  So that would be something - -

20   A    This is what Eight Brothers quoted at the time to do the work.

21    Q      Okay.

22   A    And that is what I gave to Babinski as their quote to me to do the work.

23    Q      I had contacted Eight Brothers and I had spoken with Oscar Emilio on a few occasions,

24   and one of the purposes of me contacting him was for me to get his original copies or

25   copies of his original documents, pertaining to the work that he had done at your house.  And

1    when I asked him to provide me copies of what he had, he sent me copies of the July 14,

2    2006 revised proposal.  I had asked him for a copy of the original proposal, he said he

3    didn't have it.  I asked him whether or not there was any other documents that he would have

4    relating to work he completed due to the water damage at your home, and he said there isn't

5    any.  And I said, did you provide Mr. Hirsch with any other documentation and he said yes,

6    I provided him with a change order, but the change order has nothing to do with the

7    water damage claim.

8    A    Oscar is wrong.

9    Q    The change order had to do with work to the front steps which Mr. Hirsch decided not

10    to proceed with.

11    A    That was a diffrent change order, it was a diffrent order, a diffrent work.  Oscar

12    didn't do it.  I also asked him to give me a change order as to what needed to be done in that

13    first floor bathroom upstairs, which he never did give to me.  Oscar's not real good with

14    paper work and he did provide this change order for this work.

15    Q    When I asked him for a copy of the change order that he said he had provided to you

16    in the amount that he recalled around $3,800 or $3,900.

17    A    That was for the stairs.

18    Q    He said that I would need to go to you to get it.  Do you have it?

19    A    I'm sure I do somewhere.

20    Q    So, your recollection is that he issued two change orders, one for the stairs, not

21    related to the water damage claim, which you never submitted to Chubb, and one for this

22    13,960 which was related to work that needed to be done as a result of the water damage, but

23    Eight Brothers didn't actually do all of it?

24    A    Correct.

25    Q    Okay.  Was there any other work in the proposals by Eight Brothers or in the change

Page 29

1    order that Eight Brothers didn't do and that you used another contractor?

2    A    Yes.

3        Q    What else didn't they do that you used another contractor?

4    A    I showed you that ceiling upstairs that's dimpled and not painted well, or right or

5    painted to soon or whatever.  So, we stopped using them to do the painting.

6        Q    So, you stopped using them for painting because of issues you had with them?

7    A    Uh-huh.

8        Q    Okay.  Anything else?  Well, let me ask you this, what did they paint and what didn't

9    they paint?

10    A    I couldn't tell you off hand now.  I would have to go back and try to figure out what

11    they did and what they didn't paint.

12        Q    And I believe a lot of the painting was in the revised estimate on the second page,

13    right?  Is that where he deatils the painting?

14    A    Some of it.

15        Q    Some of it?

16    A    Some of it. Some of it's on the first page.

17        Q    On the first page, okay. So other than the painting that's listed in the proposal from

18    Eight Brothers, you believe that they pretty much did everything else in the proposal?

19    A    No.  They didn't do everything.

20        Q    Well, except for the stuff that you haven't done yet.  Did you use another company to

21    remove plaster and replace  - -

22    A    No.

23        Q    They did that?

24    A    They did - -the plaster work that has been done, they did.

25        Q    Okay.

Page 30

1    A    I've not used anyone else and I'm not sure whether I would use them to finish or not.

2    Q    Okay.  There appears to be - - and I'm not really sure what Juniman did, but there

3    appears to be some overlap of the Juniman invoice, of 7/25/06 and some of the work that Eight

4    Brothers proposed to do.

5    Is it your statement here that Juniman ended up doing the work and Eight Brothers didn't do it?

6    A    I'm sure.  It's possible, yes.  Oh yes.  I had a big argument with Oscar about this.

7    Q    Well, Mr. Hirsch, would you agree with me that Eight Brothers, in their proposal,

8    billed or put in there to do this work?

9    A    Uh-huh.

10    Q    Yes?

11    A    Yes.

12    Q    Okay. And would you agree with me that Juniman actually did the work that's listed

13    here instead of Eight Brothers?

14    A    Yes.

15    Q    And then you submitted to Chubb this Juniman invoice dated 7/25/06?

16    A    Right.

17    Q    After you had already been paid to have Eight Brothers do the work, correct?

18    A    And I talked to Eight Brothers and said I can't pay you to the work that I am paying

19    somebody else to do, and he said well, they didn't take the glue off adequately so most of the

20    charge I have to make to you is to remove the glue.  They took the canvas off, but they

21    didn't get the glue off, so I have to charge you anyway.  Because I had to take the glue off

22    the wall and so I was - - they did some things very well.  But some things I don't think

23    they handled very well at all.

24    Q    Well, would you agree with me, Mr. Hirsch, that in the proposal from Eight Brothers, you

25    were paid to have certain things done by them, correct?

1    A    Yes.

2        Q    And you ended up having them done by Juniman because you weren't pleased with Eight

3    Brothers?

4    A    Partially, yes.

5        Q    Okay.  And then you submitted an invoice to us from Juniman for the work that they

6    did?

7    A    Right.

8        Q    Which is the same work that you were paid for to have completed by Eight Brothers?

9    A    Some of which Eight Brothers said they were entitled to get paid for anyway.

10       Q    Okay.  Did you ever point that out to Larry Babinski, that you were billing Chubb for

11   something that you've already been paid for, or did you submit this to us as something entirely

12   seperate and apart from work that you had already submitted an invoice for?

13   A    I never connected it.  No.

14       Q    Okay.  So - -

15   A    I never thought about it that way either because - - you have to deal with Oscar you

16   know?

17       Q    Well, you would agree with me that you chose Eight Brothers, correct?

18   A    Yes.

19       Q    And you selected Eight Brothers to put together a proposal for the work to be done at

20   your house?

21   A    Yeah.

22       Q    And Chubb paid you based on that proposal, correct?

23   A    Yes.

24       Q    And any dspute you would have with Eight Brothers regarding the quality of the work

25   or what they billed you for was really between you and Eight Brothers?

Page 32

1   A    Right.

2       Q    And the fact that you had Juniman come in and redo the work or do it in it's entirety

3   because Eight Brothers didn't do it to your satisfaction, or they didn't do it really

4   wasn't an expense that should have been submitted to Chubb, correct?

5   A    I'm not sure I woud agree with that, but go ahead.

6       Q    Okay.  I know that we're short on time, I just have a couple more questions.  This is

7   a Linen Limited, this is one of the more recent ones that you sent to me?

8   A    Yes.

9       Q    What was that for?

10  A    The stuff that was on the bed in the master bedroom.

11      Q    And that looks like for the purchase of new linens?

12  A    No.  It's not. This is for the laundering of the linens that were on the bed.

13      Q    And you had to launder in Milwalkee?

14  A    Yes.

15      Q    Not here in D.C.?

16  A    Not here in D.C.

17      Q    Why in Milwalkee?

18  A    Because we send our bedroom linen to Milwaukee to this place that does it by hand and

19  have for years.

20      Q    Okay.  So this is actually for laundering?

21  A    Yes.

22      Q    Not for replacement?

23  A    No.

24      Q    All right.  I know we're short on time and you need to take a conference call, just a

25  couple quick questions just to recap where we are.

Page 33

1   A      I really don't have much time.

2      Q      Give me one minute and we'll end this.  You've acknowledged that the September 25,

3   2006 letter from Steven Frischling was not actually from him and was authored by you?

4   A      Yes.

5      Q      The August 2, 2006 letter, although Mr. Wentworth denies authoring it, you don't

6   acknowledge authoring that letter?

7   A      Right.

8      Q      Okay.  And you believe that there was a disagreement between you and Mr. Wentworth as

9   to the scope of his involvement at your home.  That you believe it was to design a new

10  master bath but also to oversee the restoration?

11  A      Yes.  He said he would help us with that.  That's what he - -

12     Q      What was the primary purpose of engaging Mr. Wentworth, was it for the design of the

13  master bath or the oversight of the restoration?

14  A      Both.

15     Q      Okay.  And you would agree that the design phase fee for the master bath as well as

16  the August 2, 2006 letter that was submitted to Chubb for his fee for his services of

17  oversight of the restoration were both $10,000?

18  A      Uh-huh.

19     Q      And would you - - let me ask you this, did you pay him $20,000 or did you just pay

20  him ten?

21  A      I don't remember.

22     Q      Well, based on the 7/25 contract for the design phase for the master bath and based on

23  the August 2, 2006 letter regarding the oversight of the restoration, it would appear

24  that $20,000 was due to Mr. Wentworth based on the two documents.

25  A      Right.  But I don't remember whether he got paid ten and I owed him ten or whether I

1    paid twenty.

2         Q      So you can't say for certain whether you owe him $10,000?

3    A    Well, I don't think I owe him anything because he didn't do it.

4         Q      Okay.  The August 2nd letter says due upon receipt, did you pay him when you received

5    that letter?

6    A    I don't remember.

7         Q      Okay. Well, did you pay him upon the signing of the contract for the design phase fee

8    for the master bath?

9    A    I don't remember that either.

10   BREAK IN RECORDING

11        Q      Okay.  This is side two of my recorded interview with Joel Hirsch.  So just to recap

12   very quickly, you believe you paid Wentworth $10,000, you don't know at the time if you

13   owed him another ten, but as we stand today, you don't believe you owe him anymore money?

14   A    Correct.

15        Q      Whether it be that you paid him 10,000 or 20,000, you're not sure.

16   A    Right.

17        Q      But you have the ability to obtain documentation as to how much you paid him?

18   A    I assume so.

19        Q      You paid him by check, right?

20   A    Yeah.

21        Q      Okay.  All right, Mr. Hirsch, I know that you are tight on time so we're going to end

22   the statement here today.  Have the statements you made been the truth to the best of your

23   knowledge?

24   A    Yes.

25        Q      And again, you do understand that we recorded this today?

Page 35

1    A      Yes.

2         Q      And the recording was made with your full knowledge and consent?

3    A      Yes.

4         Q      This concludes my recorded interview of Joel Hirsch.  Today is December 11, 2006 the

5    time is approximatley 3:30.  Thank you very much.

Page 36

1

2                              C E R T I F I C A T E

3          I, NICHOLAS GIBERNA, Certified

4     Shorthand Reporter and Notary Public for the

5     State of New Jersey, certify that the

6     foregong is a true and accurate transcript

7     of the taped interview of Joel Hirsch.

8

9

10         I further certify that I am neither

11    attorney or counsel for, nor related to or

12    employed by, any of the parties to the

13    action in which the interview is taken, and

14    further that I am not a relative or employee

15    of any attorney or counsel employed in this

16    case, nor am I financially interested in the

17    action.

18

19

20

21        CERTIFIED SHORTHAND REPORTER

22        NOTARY PUBLIC OF NEW JERSEY

23        CERTIFICATE NO. XI00990

24

25

**A**

ability 2:10,17
34:17
able 9:22 20:15
21:16
accept 7:12,14
acceptable 2:7
access 10:10
accomodate 2:24
accurate 26:19,20
36:6
accuratley 1:25
acknowledge 33:6
acknowledged 33:2
arrchitect 13:4
acting 25:14
action 36:13,17
actuality 18:16
addition 5:22 16:9
additional 23:23
25:7 27:2
address 3:1 16:11
addressed 13:24
adequatly 30:19
admitly 17:8
advised 7:2
affadavit 20:12
ago 5:2
agree 11:3,4 12:22
13:21,24 16:22
24:15 30:7,12,24
31:17 32:5 33:15
agreed 11:12
ahead 32:5
allegedly 18:15
allowed 2:12
amount 4:16 5:23
21:12 27:4,7
28:16
amout 20:8
answer 2:3,4,7,13
15:8 17:15 20:6
20:21,22
answers 1:25 2:10
antiques 8:10
anymore 34:13
anyway 30:21 31:9
AON 12:25
apart 31:12
appear 33:23
appeared 16:9
appears 14:2 22:15
30:2,3
approximate 2:12
approximation
2:13
approximatley 35:5
approximatly 1:9
architect 12:21
13:6,7 14:3,12
19:4,5,6

**B**

area 14:11
areas 23:23
argument 30:6
Arrowhead 3:18,19
3:20
aside 24:16
asked 7:11 14:5
24:8 28:1,2,3,12
28:15
asking 11:9,24 17:1
17:2,13 19:5 25:2
asks 1:21
assist 9:22 14:15,16
14:16,23
assistance 13:17
assume 2:3 6:10
14:16 34:18
Atkinson 26:10,14
27:17
Atkison 26:6
attaching 13:2
attachment 14:1
attorney 36:11,15
August 13:10,19,25
15:20 16:8,16
18:7 20:7,13,18
33:5,16,23 34:4
author 16:25 17:1
authored 10:1 13:3
13:22 17:4,13
18:12,15,16
20:13 33:3
authoring 33:5,6
authority 9:17
authorization 9:14
Ave 13:25
Avenue 3:2
aware 2:8,21 4:13
6:8 9:11 11:22

**B**

Babinski 6:4,25 7:7
9:7,7,20 11:9
12:22 13:2 14:1
16:23 19:1,3,3,7
19:8 21:7 22:14
25:12 27:22
31:10
Babinski's 14:3
back 7:3 8:18,19
19:7 21:16 23:8
23:13,14 29:10
Baltimore 8:16
baseboard 26:3
27:11,17
based 3:23 10:18
16:12 31:22
33:22,22,24
bath 13:15 15:16
16:20,21 17:17
17:21,25 19:13

19:19,22 33:10
33:13,15,22 34:8
bathroom 14:11
18:3 28:13
bed 32:10,12
bedroom 14:11
32:10,18
begining 6:25
believe 6:3 7:13
11:21 12:8 18:8
18:12 19:3,3,6,14
20:24 24:11 27:9
29:12,18 33:8,9
34:12,13
believed 9:25
best 2:9 4:6,7 7:21
7:22 34:22
better 5:13
big 27:13 30:6
bill 26:13
billed 26:10 30:8
31:25
billing 31:10
birth 3:5
blank 10:12
bought 5:16 8:10
BREAK 34:10
broker 12:24
brokerage 3:21
Brothers 20:23
21:5,14,21 22:6
22:13,23 23:3
24:16,19 25:5,14
25:19,21 26:8,13
26:20,21,22 27:2
27:10,17,20,23
28:23,25 29:1,18
30:4,5,7,13,17,18
30:24 31:3,8,9,17
31:19,24,25 32:3
brought 8:19
Bruce 13:9,16,24
14:6 16:8,22 17:2
17:4,14,20 18:1,7
19:10 20:7

**C**

C 36:1,1
call 2:23 32:24
called 3:18 9:8
canvas 30:20
Carol 1:10 3:11,12
13:25 20:3
carpenter 26:6
case 16:12 36:16
ceiling 29:4
certain 4:15 30:25
34:2
CERTIFICATE
36:23
Certified 36:3,21

19:15,22 33:10
certify 36:5,10
change 4:16 25:3
26:16,20 28:6,6,9
28:11,12,14,15
28:20,25
charge 11:12 26:13
30:20,21
charged 26:14
charging 27:4
check 24:23,25
34:19
checks 24:24
choose 19:14
chose 19:18 31:17
Christopher 4:20
Chubb 9:25 12:2,5
15:10 18:15
20:15 22:14
25:12,15,19
26:16 27:6 28:21
30:15 31:10,22
32:4 33:16
claim 5:25 12:5
14:17 15:10
18:15 20:4 28:7
28:21
claims 6:4
clarification 19:6
clear 7:2
clearly 10:9
clerical 24:13
Cleveland 3:2
13:25
close 20:14
code 3:3
coincidence 20:10
come 7:18 11:6,7
32:2
coming 2:23 9:8
communicate 6:15
communicated 6:18
communication 7:4
company 1:10 3:18
4:20 9:5 29:20
compile 21:16
complete 27:10
completed 25:25
26:1 28:4 31:8
completeing 27:2
concise 2:25
concludes 35:4
conclusion 7:18
condition 6:15
conduit 25:14
conference 2:23
32:24
connected 31:13
consent 1:15 35:2
considered 4:4
consistent 17:21
constructin 19:19

construction 19:15
19:22
consult 6:13 13:16
consulted 13:21
contact 9:20,22
12:4,7
contacted 23:25,25
24:6,6,8 27:23
contacting 27:24
context 1:19
continue 14:13
contract 12:18
17:17,20 19:10
19:14 20:2,8
21:12 24:9,12
33:22 34:7
contractor 29:1,3
conversation 12:6
conversations
10:18
copies 27:24,25
28:1,1
copy 6:2 12:23 13:2
13:8,9 20:23 21:5
21:7 22:12 24:8
24:12 25:2,10
28:2,15
correct 4:18,23,24
5:3,15 6:4 7:23
8:4,5,12,19 12:16
14:4,13,14,17
15:19 20:24
25:16 26:17 27:9
27:10 28:24
30:17,25 31:17
31:22 32:4 34:14
cost 10:19,20 27:4
27:16
costs 11:12
counsel 36:11,15
couple 32:6,25
cover 21:9 22:16
Coverage 1:1
crack 16:9
crawl 4:21 5:4,23
create 17:2 20:18
created 10:10 11:8
11:11 12:14
20:13
creating 17:5 20:19

**D**

damage 2:8 4:13,18
5:9,25 6:8 14:7
14:17,20 15:10
17:9 18:4,10 20:4
28:4,7,21,22
damaged 5:4,6 6:11
6:19,23 8:1,11
Dan 1:5,8
date 1:8 3:5 20:25

22:5
dated 6:1,2 13:10
  13:25 15:20
  19:10 20:2,24
  22:12,13 25:7
  30:15
dawn 8:23
day 13:21
daytime 4:6
deal 8:11 14:23
  31:15
dealer 8:9
dealt 8:10 18:2
deatils 29:13
December 1:4,8
  35:4
decided 28:9
definitly 14:21
delivered 15:25
  16:1
demand 9:18
denies 17:8 33:5
deposed 1:19
deposition 1:21
description 10:15
  10:15 11:11
design 16:12 17:17
  17:20 19:16,17
  19:19,25 20:8
  33:9,12,15,22
  34:7
detailed 21:16
difficult 11:10
diffrence 26:13
diffrent 9:8 27:17
  28:11,11,11
digit 23:11
dimpled 29:4
directly 25:19
dirty 5:12
disagreement 15:13
  15:15,17 33:8
discovered 6:10
discussed 7:23
  12:11
discussing 7:6
discussion 7:25
division 4:3
document 10:9,12
  10:12 11:8,11
  17:19 19:10
  20:24 27:6
documentation
  11:9,10 16:16
  26:10 28:5 34:17
documents 27:25
  28:3 33:24
doing 14:11 26:1
  30:5
dollar 20:8
dollars 5:23

doors 4:21,24 5:4
  5:13,23 6:1,6,7
  6:10,13,15,17,19
  6:23 7:10,10,12
  7:13,15,18,23,25
  8:4,6,20,21,23,24
  9:17,21 10:15,16
  10:19 11:1,6,11
  11:19,22,22 19:6
  19:7,9
drugs 2:17
dspute 31:24
due 15:1 28:4 33:24
  34:4
D.C 1:11 3:2 13:25
  14:19 32:15,16
_____
E
E 36:1,1
earlier 17:18
early 6:12,25 7:1
effort 16:23
Eight 20:23 21:5,14
  21:21 22:6,13,23
  23:3 24:16,19
  25:5,14,19,21
  26:8,13,20,21,21
  27:2,10,17,20,23
  28:23,25 29:1,18
  30:3,5,7,13,17,18
  30:24 31:2,8,9,17
  31:19,24,25 32:3
  either 27:17 31:15
  34:9
ellaboration 19:4
email 6:4 12:13,20
  12:22 13:2,10
  15:23
Emilio 22:22 27:23
employed 3:15
  36:12,15
employee 36:14
encompasses 24:15
ended 15:13 30:5
  31:2
engaged 19:4 22:4
engagement 12:21
  13:4,6,11 14:6
engaging 33:12
entered 17:16,20
entirely 31:11
entirety 32:2
entitled 31:9
envolvment 15:18
error 24:13
estimate 2:12 7:22
  23:24 26:19,20
  29:12
estimated 7:15
estimation 2:13
evaluate 11:6

evaluation 11:12
event 4:14 19:9
events 2:18
eventually 7:23
everthing 2:24
exactley 14:10
exactly 9:16
examination 20:14
expense 32:4
expert 10:19
explain 6:22 17:10
  18:5,6 20:15
explained 24:3
explanation 22:22
  22:22 23:1,20,22
_____
F
F 36:1
Fabrication 6:2
facets 14:23
facilitating 9:22
fact 8:12 9:11 16:6
  17:12 20:14 32:2
far 18:9
favor 22:8
fax 15:23 22:12,13
faxed 20:23 21:7
fee 11:5 12:11
  13:11 14:15,18
  16:12 17:17,21
  19:15,17,18,24
  33:15,16 34:7
felt 9:9
figure 13:14,14
  29:10
file 1:2 19:9
financially 36:16
Finest 6:3
finish 19:23 30:1
finished 26:24
first 6:13 9:11 11:1
  13:16 21:1 23:8
  23:24 28:13
  29:16,17
five 9:8 18:23,24
fixed 8:17
fixing 8:11 17:9
floor 28:13
focus 15:15,16
foregong 36:6
form 1:25
forty 2:22
forward 4:7 19:14
  19:18 25:12
forwarded 6:3 14:1
four 6:19 7:15 9:8
  16:4,5
foward 14:13
frankly 8:23
Frischling 6:1,2,6
  6:13,19 7:16,23

7:25 8:3,6 9:5,6
  9:11,25 10:18
  11:8,15,18,25
  12:4,16 13:3,3
  17:3,12 18:17
  33:3
Frischling's 9:2,4
front 28:9
Frsichling 10:5
full 1:15 2:20 24:21
  35:2
furnishing 24:12
furniture 6:3 8:12
further 19:5 36:10
  36:14
_____
G
garage 5:9
generated 11:23
getting 9:18,21,24
  11:10
GIBERNA 36:3
give 9:14,21 11:15
  18:23,24 22:12
  23:14 25:2 28:12
  28:13 33:2
given 16:5 20:24
  22:22
glue 30:19,20,21,21
go 2:1 4:14 7:3
  11:12 21:16
  22:23 28:18
  29:10 32:5
going 4:8 11:14
  13:8 15:15 18:11
  22:12 24:16 25:2
  25:19 26:13 27:2
  34:21
good 28:13
Great 1:10
guess 2:6 7:21 8:8
  18:1 25:13 26:3
guy 8:10
_____
H
hand 13:8 16:1
  29:10 32:18
handed 13:9
handled 30:23
happened 6:22
hard 9:20,23 16:4
Havens 4:20 21:23
head 2:1
heard 24:11
help 13:13,13,14
  14:20,21 33:11
hinder 2:17
Hirsch 1:1,3,8,10
  1:13 2:21,24 9:4
  11:5,13,18 12:14
  13:25 15:8 16:25

17:16 18:14 20:3
  22:14 27:1 28:5,9
  30:7,24 34:11,21
  35:4 36:7
hold 25:3
home 2:9 3:1 4:9,11
  4:12,15 5:2,16,23
  8:3 13:12,17
  14:24 15:3,6,9
  16:19 17:9 18:3
  20:4 27:2 28:4
  33:9
honest 1:23 2:4
house 4:24 5:1,14
  5:21 8:10 14:19
  16:3 18:2 20:23
  21:21 27:25
  31:20
H-I-R-S-C-H 2:21
_____
I
idea 11:18,22 20:13
important 2:6 9:9
Inaudible 20:1
inches 11:2,2,2,2,3
include 7:10 8:21
included 25:8
includes 22:12
Incoporated 18:8
Incororated 17:4
Incorporated 6:1,2
  13:9 17:20
incorrect 11:21
  19:1
indiacted 21:23
indicate 11:1 12:14
indicated 4:21
  11:21 19:6
indicates 14:15
  18:2
indicating 20:12
  26:10
information 7:10
  7:11 9:18
infrequently 16:5
inherited 5:13
initial 12:7
initially 4:20 24:6
inquiries 14:3
inquiring 24:1,7
inspect 6:6,7 8:3
  9:21
inspected 4:21
  21:14
inspection 9:22
installation 27:16
installed 4:24 5:1
insurance 1:10 3:21
  22:14
interested 36:16
interview 1:3,17

34:11 35:4 36:7
  36:13
Interviewer 1:5
interviewing 1:8
Investigation 1:1
invoice 5:25 6:1
  30:3,15 31:5,12
involved 14:22 17:8
involvement 18:2
  20:3 33:9
issue 27:13
issued 1:9 27:6
  28:20
issues 4:15 16:7,11
  29:6
item 5:22 22:9,19
  22:20,23

_____ J _____
Jaeger 1:5,8
Jersey 36:5,22
job 1:19
Joel 1:3,8,10 2:21
  12:14 13:25 20:3
  22:14 34:11 35:4
  36:7
July 6:12,25 7:1
  17:16,19 19:10
  19:11,11,12 20:2
  20:24 21:3,21,23
  22:4,12,13 24:4
  24:15 28:1
Junamin 22:1,2,4,5
June 1:11 2:18 4:14
  5:9 6:12,19,25
Juniman 26:7,10
  26:14 27:17 30:2
  30:3,5,12,15 31:2
  31:5 32:2

_____ K _____
keep 1:24
kind 4:17
knew 6:23 11:25
know 2:2,6,7,13
  6:17 7:15 8:9,22
  9:13 10:8,14 12:3
  15:7 17:7,15
  18:21 20:9 26:15
  26:19 27:11,16
  27:18 31:16 32:6
  32:24 34:12,21
Knowing 20:17
knowledge 1:15 5:1
  7:3 25:20 34:23
  35:2
knows 9:10

_____ L _____
lack 5:13
Larry 9:7,20 12:15

12:22 13:10
  16:22 21:7 22:14
  25:12 31:10
late 6:12,25
launder 32:13
laundering 32:12
  32:20
Lawrence 6:3
learn 11:18 12:2
left 5:18
letter 8:24,25 9:1,3
  9:4,9,10,11,14,25
  11:14,15,22,25
  12:2,4,6,9,16,21
  13:3,4,6,9,11,22
  13:24 14:15
  15:20 16:8,17,20
  16:22,25 17:2,2,3
  17:3,5,10,12,12
  18:5,9,12,15,17
  20:7,13,18,19
  33:3,5,6,16,23
  34:4,5
letterhead 9:2,4,12
  9:14 10:7,9 12:5
  20:14
liability 3:22
light 17:12
Limited 32:7
line 1:24 22:9,19,20
  22:23
linen 32:7,18
linens 32:11,12
list 7:5
listed 27:17 29:17
  30:12
lists 11:11
live 3:9
lived 3:7
long 3:7
look 7:3 9:8 12:20
  13:8 21:11 22:8
  22:19,19
looked 14:20
looking 5:4
looks 19:11 25:7
  32:11
loss 1:11 4:16,22
  6:20 15:6 23:10
lost 23:11
lot 29:12
lower 23:8
lying 20:5

_____ M _____
mail 15:22,23
mailed 15:24
major 14:16
manage 13:13
manager 3:22
manner 6:18

master 13:15 14:11
  15:15 16:20,21
  17:17,21,25 18:3
  19:19,22 32:10
  33:10,13,15,22
  34:8
mean 11:7 14:16
  18:14,16 23:9
means 14:16
measure 11:1
medications 2:17
mentions 16:8
mess 8:24
Milwaukee 32:13,17
  32:18
mind 13:12
Mintkoff 4:20
minute 33:2
minutes 2:22 18:23
  18:24
mistake 23:2,3,5,9
money 34:13
move 14:13 19:14
  19:18 20:22

_____ N _____
name 2:20,20 8:9
  9:15 26:6
necessary 16:11
need 1:24,25 7:11
  28:18 32:24
needed 7:10,11
  14:17,24 19:4,5
  28:12,22
needs 4:17
negotiated 16:12
neither 36:10
never 5:1 8:3,10
  10:3 11:22,22
  20:13 28:13,21
  31:13,15
new 8:9 32:11 33:9
  36:5,22
NICHOLAS 36:3
nod 2:1
Northern 1:10
Northwest 3:2
  13:25
Notary 36:4,22
note 12:14
notes 23:15
notice 11:1
number 1:9 4:6,7,9
  7:15 22:20 23:8,9
  23:16,17,17,19

_____ O _____
oath 1:22
objection 24:12
observed 5:9 8:6
obtain 34:17

occasions 27:23
occured 1:11 4:16
  4:22
October 6:4 13:10
  14:1
office 4:9,11,12 6:4
  21:16
official 3:22
Oh 12:21 20:25
  22:18 30:6
okay 1:19,21 2:4,5
  2:10,11,13,14 3:1
  3:15 4:9,13 5:1,4
  5:13,16,22,25 6:8
  6:18,23,24 7:5,9
  7:18,23,25 9:25
  10:7,15,18 11:1,5
  12:4,7,13,22,25
  13:2,16,24 14:3,9
  14:19,22 15:1,5
  16:8 17:19,24
  18:1,12,14,25
  19:14,22 20:2,12
  20:17,22,22
  21:11,19,21,23
  22:6,8 23:3,12,17
  24:10,13,19,21
  25:12,14,21
  26:23 27:8,12,14
  27:19,21 28:25
  29:8,17,25 30:2
  30:12 31:5,10,14
  32:6,20 33:8,15
  34:4,7,11,21
old 5:11
ones 32:7
opinion 10:19
order 9:17 13:14
  24:16 25:3 26:16
  26:21 28:6,6,9,11
  28:11,12,14,15
  29:1
orders 28:20
original 27:24,25
  28:2
Oscar 22:22
Oscar 24:3,6,8
  27:23 28:8,11
  30:6 31:15
Oscar's 28:13
outlined 20:3
outlining 18:9
overlap 30:3
oversee 14:12 16:6
  33:10
overseeing 14:7,16
  14:20
oversight 15:3,5,9
  15:12 17:8 18:4,9
  20:4 33:13,17,23
owe 34:2,3,13

owed 33:25 34:13
owner 5:18
o'clock 18:22

_____ P _____
page 12:13 21:1,9
  21:11 22:8,16,19
  29:12,16,17
paid 5:21 9:17 11:5
  15:4,7,9 16:23
  19:20 24:21,22
  24:23 25:21,23
  25:24 26:19,21
  30:17,25 31:8,9
  31:11,22 33:25
  34:1,12,15,17,19
paint 29:8,9,11
painted 29:4,5
painting 29:5,6,12
  29:13,17
paper 28:14
paragraph 11:1
  12:20
part 5:21,25 15:13
  15:14
Partially 31:4
parties 36:12
passing 25:17
pausing 14:5
pay 5:20 11:14 12:9
  15:3,5 19:2 24:19
  25:1 30:18 33:19
  33:19 34:4,7
payable 19:17
paying 30:18
payment 26:17
  27:6
penalties 20:12
people 9:8 21:24
perfect 5:11
perfectly 2:7
period 14:6
person 1:17 23:15
personal 24:25
pertaining 27:25
phase 19:16,19
  20:8 33:15,22
  34:7
Phonetic 12:23
  22:1
photograph 8:6
photos 6:16,17
pieces 8:11
Pittsburgh 6:4
place 4:17 32:18
plan 17:20
planned 12:9 18:9
  20:3
plans 14:13 16:11
  17:17
plaster 20:23 22:16

29:21,24
**please** 2:20
**pleased** 31:2
**point** 14:5 31:10
**police** 3:22
**policy** 1:9
**possible** 17:6 20:20
20:6
**power** 2:24
**prepare** 16:11
**presented** 5:25
15:10 24:3
**president** 4:4 18:8
**pretty** 29:18
**previous** 5:18
**price** 5:23
**primary** 33:12
**prior** 5:4,9 7:16
13:19 14:6,9
21:21
**probably** 7:1 13:23
22:1,5 26:12
**problem** 12:5
**problems** 13:15
**proceed** 28:10
**professional** 3:22
**project** 14:13
**properly** 23:16
**property** 1:11 2:9
4:13,17 5:5 21:14
**proportadly** 17:4
20:7
**proportedly** 11:8
**proporting** 9:4
**proports** 10:9
**proposal** 12:18
20:23 21:11,11
21:14,16 22:8,13
22:16,19 23:19
23:23 24:3,15
25:8 28:2,2 29:17
29:18 30:7,24
31:19,22
**proposals** 28:25
**proposed** 30:4
**protection** 22:9,10
22:20,23
**provide** 11:10
16:16 23:22 28:1
28:5,14
**provided** 8:9 10:3
18:8 20:22 21:5
28:6,15
**provides** 19:24
**public** 3:20,21,22
36:4,22
**purchase** 5:22
32:11
**purchased** 5:2,14
**purgery** 20:12
**purpose** 11:13,14

13:8 14:22 33:12
**purposes** 27:24
**put** 11:5 26:3,4
27:11 30:8 31:19
**putting** 11:13
**p.m** 1:9
_____

**Q**

**quality** 31:24
**question** 2:3 15:5,8
20:6,21 24:2
**questions** 1:21,25
2:2,7,10,15 19:5
32:6,25
**quick** 24:17 32:25
**quickly** 34:17
**quote** 27:22
**quoted** 27:20
_____

**R**

**R** 36:1
**reach** 4:6
**reaching** 9:20
**read** 23:15
**real** 24:17 28:13
**really** 8:9,24 17:14
17:22 30:2 31:25
32:3 33:1
**reason** 2:2
**recall** 2:8 18:13,14
18:15,19 19:8
20:19
**recalled** 18:16
28:16
**recap** 32:25 34:11
**reccomendation**
9:21
**reccomended** 8:11
**receipt** 15:1 34:4
**receive** 25:10
**received** 34:4
**recieve** 15:20
**recollect** 2:9,18
**recollection** 6:18
11:21 17:22
23:15 28:20
**reconstituting** 6:21
**record** 7:2,2
**recorded** 1:3,13,17
34:11,25 35:4
**recorder** 1:24 2:1
**recording** 1:15
34:10 35:2
**recover** 17:13
**redo** 32:2
**reference** 13:10
**refering** 12:16,18
22:13 13:23
**reflect** 19:9
**regard** 1:9
**regarding** 6:13
13:16 19:4 31:24

33:23
**reimbursed** 16:23
**reimbursment**
26:16
**rejected** 19:7
**rejecting** 19:9
**related** 28:21,22
36:11
**relating** 28:4
**relative** 36:14
**remember** 6:14,16
12:12,19 13:18
14:10 15:24 16:4
17:5,18 20:20
22:5 26:6 33:21
33:25 34:6,9
**remembering** 19:1
**remissed** 12:15
**remove** 29:21 30:20
**renovation** 18:2
**repair** 10:19 22:16
**repairs** 4:18 8:12
13:17 14:20 18:3
18:4
**rephrase** 2:3
**repiars** 14:24
**replace** 10:20 29:21
**replacement** 11:11
32:22
**replicated** 11:2
**reported** 6:25
**Reporter** 36:4,21
**requesting** 26:16
**research** 7:19,20
**respect** 16:18,19
**respond** 1:22
**responded** 11:15
19:7
**response** 14:3
**responses** 1:23
**restoration** 6:2
11:12 14:7,17
15:3,5,9,12 16:6
17:9 18:10 20:4
33:10,13,17,23
**restore** 14:24
**result** 6:19 8:14
14:17 15:6,9 17:9
27:6 28:22
**resulting** 18:4
**retain** 19:22
**retained** 13:12,13
14:4
**revised** 22:16 23:23
25:8 28:2 29:12
**Richmond** 3:24
**right** 4:10,12 5:24
12:13 13:23
19:18,23,24 21:4
21:15 22:8 24:15
24:25 27:3 29:4

29:13 30:16 31:7
32:1,24 33:7,25
34:16,19,21
**Risk** 3:20,21
**Ronnie** 12:23,23
13:2
**room** 4:10
**rounded** 23:17
**rubble** 13:13 14:23
**run** 4:3
_____

**S**

**satisfaction** 32:3
**satisfy** 9:18
**saying** 6:21 7:13
9:7 18:6 20:5
**says** 12:13,20 15:1
17:12 19:17 20:2
21:11 22:9,10
34:4
**scaffling** 22:9
**scaffolding** 22:9,20
22:23
**scanned** 10:12
**schedule** 2:24
**scope** 15:18 16:12
18:2 20:3 21:17
24:16 33:9
**second** 12:13,20
22:13 29:12
**see** 20:25 26:24
**seen** 5:4,6 11:22
**selected** 31:19
**send** 20:15 32:18
**sender** 12:14
**sending** 12:15
18:15
**sense** 13:14
**sent** 6:16 8:7,16,17
8:18 12:4,22 13:2
17:4,13 22:13
26:16 28:1 32:7
**seperate** 31:12
**September** 6:1,2
33:2
**services** 33:16
**shape** 5:11,12
**sheet** 7:5 23:13
**short** 32:6,24
**Shorthand** 36:4,21
**show** 4:17 17:19
19:9
**showed** 29:4
**Sic** 12:14
**side** 34:11
**signed** 19:11,11,12
20:12
**significant** 4:16
**signing** 34:7
**similar** 1:22
**slot** 15:24

**soley** 18:2
**somebody** 1:21
8:11 24:8 26:3
30:19
**Son** 9:25 15:10
**soon** 29:5
**sort** 2:21 6:21
**space** 4:21 5:4,23
**speaking** 7:16
**specific** 5:22
**spell** 2:20
**spoke** 11:25
**spoken** 27:23
**spread** 7:5
**stairs** 28:17,20
**stand** 34:13
**state** 2:20 36:5
**stated** 8:3 14:23
**statement** 7:12 18:7
20:17 30:5 34:22
**statements** 34:22
**states** 19:14
**stationary** 10:10
**steps** 28:9
**Steven** 5:25 6:2 9:4
9:5,10 11:14 33:3
**stopped** 29:5,6
**stripping** 21:24
**structural** 16:11
**stuck** 15:24
**stuff** 15:16 29:20
32:10
**submission** 27:6
**submit** 9:5,14 31:11
**submitted** 12:2
16:22 27:1 28:21
30:15 31:5,12
32:4 33:16
**subsequent** 12:7
**substantial** 2:8 4:15
**supply** 9:19
**support** 12:5 18:15
**supposed** 11:2
15:14
**suprise** 11:14
**sure** 13:20 18:8
20:16,21 28:19
30:1,2,6 32:5
34:15
**sustained** 4:14,18
_____

**T**

**T** 36:1,1
**take** 4:17 9:8 13:8
30:19,21 32:24
**taken** 1:4,17,23,24
2:1 36:13
**talk** 1:11 2:8 4:13
24:16
**talked** 6:9,16,16
14:10,11 19:8

30:18
tall 11:2
tape 1:3,24
taped 36:7
technology 4:7
telephone 4:6
tell 2:21 7:25 12:6
  13:12 19:12
  20:14 29:10
telling 6:10 24:3
  25:1 27:9,9
ten 18:23,24 33:20
  33:25,25 34:13
terribly 12:15
Thank 35:5
things 7:5 13:14
  17:23 25:7 30:22
  30:22,25
think 2:21 6:21,25
  7:13 13:20 14:5
  14:25 15:8,11,12
  15:14,22 16:2
  17:18 19:1 20:7
  20:10 21:23 22:7
  23:11 24:18
  26:20 30:22 34:3
thirty 2:22
thought 17:18
  31:15
three 16:4,5 18:22
Tibbie 12:23,23
  13:2
tight 34:21
time 1:9 2:22 4:21
  5:1 7:13 8:21
  9:20,23 11:10
  18:21 23:24
  24:11 27:20 32:6
  32:24 33:1 34:12
  34:21 35:5
times 16:3,5
timing 14:10
titled 22:16
today 1:10,13 2:8
  4:13,14 18:7
  34:13,22,25 35:4
Today's 1:8
told 7:2 9:23 11:8
  13:3 14:20,21
  20:17 23:25 24:6
  24:8
tortion 16:9
total 24:15
transcribed 23:15
transcript 36:6
transition 23:9
travel 8:8
true 17:16 19:19
  36:6
truth 34:22
truthfull 1:23 2:4

try 2:9,25 29:10
trying 6:22 18:1
turn 12:13 21:7
twenty 34:1
twice 19:7
two 17:23 28:20
  33:24 34:11
type 2:17 23:7,9
typed 23:6

**U**

uh-hmm 2:1
uh-huh 2:1 12:1,17
  15:2 22:3,11,21
  29:7 30:9 33:18
understand 1:13,21
  2:2,3 4:14,15,16
  6:22 14:12 15:8
  18:1 24:2 34:25
understanding
  14:22,25,25
  18:11 19:24 27:1
understood 2:4
  15:15
undertaken 14:24
untruthfull 20:5
upstairs 28:13 29:4
use 4:7 14:9 26:8
  29:20 30:1

**V**

verbal 1:25
Virginia 3:24
voice 1:24

**W**

wall 30:22
walls 16:9 21:24
want 8:8,24 19:9
  20:21,22
wanted 9:24 15:15
  15:16
Washington 1:11
  3:2 13:25 14:19
wasn't 16:1 23:25
  32:4
water 4:14,22 5:25
  6:19 8:1 14:7,17
  15:6,10 17:9 18:4
  18:10 20:4 28:4,7
  28:21,22
way 4:24 5:20 9:23
  13:13 31:15
Wentorth 17:3
Wentowrth 14:22
Wentworth 12:18
  13:9,9,12,13,16
  13:24 14:6,9,12
  14:15,19 15:3,17
  15:21 16:3,8,22
  16:23 17:3,4,8,14

17:17,20,20,22
  17:23 18:1,5,6,7
  18:8 19:10,12,15
  19:19,22 20:2,7
  20:12 33:5,8,12
  33:24 34:12
Wentworth's 14:25
weren't 4:24 5:11
  31:2
we'll 33:2
we're 24:16 32:6,24
  34:21
whatsoever 2:2
  17:8
wide 11:2,3
wife 3:10 15:17
  17:16 19:11
wih 7:16
wil 7:3
window 2:22 21:24
windows 18:3
word 10:12
words 5:13
work 3:17,25 4:15
  4:16 14:11,23
  16:6,12,19 20:23
  21:17 24:19,22
  26:1,1,24,24 27:2
  27:10,20,22,25
  28:4,9,11,14,14
  28:22,25 29:24
  30:3,5,8,12,17,18
  31:5,8,12,19,24
  32:2
working 21:21,24
  21:24
World's 6:3
worth 16:9 21:24
woud 32:5
wouldn't 9:9 13:21
  18:14 26:8
write 9:4,14 11:15
  12:9
wrong 23:6,7 27:9
  28:8
wrote 8:24,25 9:1,3
  9:9,10,11 12:6
  16:20

**X**

X 5:23
XI00990 36:23

**Y**

yeah 12:21 20:25
  31:21 34:20
years 3:8 5:2 32:19
York 8:9

**Z**

zero 23:10

Zip 3:3

**$**

$10,00 15:3
$10,000 13:11
  14:15 15:1,4,5,7
  15:8 16:23 17:14
  17:17,21 19:11
  19:17,20,24 20:8
  33:17 34:2,12
$102,974 21:12
$13,960 25:23
$2,400 23:16
$2,460 22:10,23
$20,000 33:19,24
$24,000 22:20,24
  23:16
$250 11:5,12,16
  12:9
$3,800 28:16
$3,900 28:16
$6,000 7:14,14,15
  7:18

**1**

1/2 3:8 5:2
10 20:24 21:3,21
10th 22:4
10,000 34:15
10/16/05 12:14
10/16/2006 12:23
11 1:4,8 35:4
11th 21:23
1183327602 1:9
13,960 28:22
14 22:13 28:1
14th 22:12 24:4,15
16 14:1
16th 13:10
19 19:10
19th 19:12
1972 16:9

**2**

2 13:10,19 14:1
  15:20 16:8,16
  18:7 20:13,18
  33:5,16,23
2nd 20:7 34:4
2,460 23:18
2:30 1:9 2:22
20,000 34:15
20008 3:4
2006 1:4,8,12 2:18
  4:14 5:10 6:20
  13:10,19 14:1,1
  15:20 16:8,16
  17:19 18:7 19:10
  20:2,13,18,24
  21:3,21 22:13
  28:2 33:3,5,16,23

35:4
202 4:7
23rd 6:4
24,000 23:17
25 1:11 2:18 4:14
  5:9 6:19 17:19
  20:2 33:2
25th 6:1,2 19:11
26th 19:11

**3**

3.5 11:1,2,3
3:30 35:5
3115 3:2 13:25
38 11:2

**5**

50209.017 1:2

**6**

6 3:8 5:2
6/25/06 15:6
625-6170 4:7
68 11:2,2

**7**

7/14 25:8
7/25 33:22
7/25/06 30:3,15
7/26/42 3:6

**8**

8/25/06 25:7