UNITED STATES DISTRICT COURT
THE DISTRICT OF COLUMBIA
-------------------------------------------------------------X
GREAT NORTHERN INSURANCE COMPANY, :
                                 :
                                 :
         Plaintiff and Counter-Defendant, :
                                 :         Case No: 1:07-cv-01804-EGS
        -against-                     :
                                 :
JOEL HIRSCH and CAROL HIRSCH, :
                                 :
       Defendants and Counter-Plaintiffs. :
-------------------------------------------------------------X

## REPLY MEMORANDUM IN SUPPORT OF GREAT NORTHERN INSURANCE COMPANY'S MOTION TO DISMISS THE COUNTERCLAIM

## Table of Contents

**Page(s)**

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I     THE FIRST COUNTERCLAIM SHOULD BE DISMISSED AS A
MATTER OF LAW BECAUSE DEFENDANTS FAIL TO ESTABLISH
A FIDUCIARY RELATIONSHIP BETWEEN THE PARTIES OR,
ASSUMING SUCH A DUTY, ANY BREACH THEREOF . . . . . . . . . . . . . . . 2

II    THE GOOD FAITH AND FAIR DEALING COUNTERCLAIM
SHOULD BE DISMISSED BECAUSE NEITHER PERTINENT
FACTS NOR COGNIZABLE DAMAGES HAVE BEEN
ALLEGED TO SUPPORT SUCH A CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III   DEFENDANTS DO NOT ALLEGED OUTRAGEOUS CONDUCT
BY GREAT NORTHERN, THUS, THE INTENTIONAL INFLICTION
OF EMOTIONAL DISTRESS COUNTERCLAIM SHOULD
BE DISMISSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV   NO SPECIFIC CONTRACTUAL BREACH HAS BEEN
ALLEGED THUS, THE CONTRACT COUNTERCLAIM
SHOULD BE DISMISSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

V    THE UNFAIR TRADE PRACTICES COUNTERCLAIM
SHOULD BE DISMISSED BECAUSE NO ACTIONABLE
MISSTATEMENTS OR MONETARY DAMAGES HAVE
BEEN ALLEGED BY DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI   THE COUNTERCLAIM IS DEVOID OF ANY ALLEGATIONS
OF MALICIOUS CONDUCT, THUS, THE CLAIM FOR
PUNITIVE DAMAGES SHOULD BE DISMISSED . . . . . . . . . . . . . . . . . . . 23

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## Table of Authorities

**Page(s)**

## Cases

*Allworth v. Howard Univ.*,
    890 A.2d 194 (D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Am. Nat'l Red Cross v. Travelers Indem. Co. of R.I.*,
    924 F. Supp. 304 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ames v. HSBC Bank*,
    Civ. Action No. 06-2039 (RMC),
    2007 WL 1404443 (D.D.C. May 11, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Athridge v. Aetna Cas. & Sur. Co.*,
    351 F.3d 1166 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Braesch v. Union Ins. Co.*,
    237 Neb. 44, 464 N.W.2d 769 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Butler v. Fairbanks Capital*,
    No. Civ.A. 04-0367(RMU),
    2005 WL 5108537 (D.D.C. Jan. 2, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Cambridge Holdings Group, Inc. v. Fed. Ins. Co.*,
    357 F. Supp. 2d 89 (D.D.C. 2004),
    *app. dismissed*, 489 F.3d 1356 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Central Armature Works, Inc. v. American Motorists Ins. Co.*,
    520 F. Supp. 283 (D.D.C. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Confederate Memorial Ass'n, Inc. v. Hines*,
    995 F.2d 295 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Continental Ins. Co. v. Lynham*,
    293 A.2d 481 (D.C. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Eddy v. Colonial Life Ins. Co. of Am.*,
    919 F.2d 747 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

*Fireman's Fund Insurance Co. v. CTIA*,
    480 F. Supp. 2d 7 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Page(s)

*Franklin Asaph Ltd. P'ship v. FDIC,*
    794 F. Supp. 402 (D.D.C. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Goldstein v. S&A Rest. Corp.,*
    622 F. Supp. 139 (D.D.C. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Griffith Consumer Co. v. Spinks,*
    608 A.2d 1207 (D.C. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Hais v. Smith,*
    547 A.2d 986 (D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Indep. Mgmt. Co. v. Andersen & Summers, LLC,*
    874 A.2d 862 (D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Johnson v. Long Beach Mort. Loan Trust 2001-4,*
    451 F. Supp. 2d 16 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Kahal v. J.W. Wilson & Assocs., Inc.,*
    673 F.2d 547 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*King & King, Chartered v. Harbert Int'l, Inc.,*
    436 F. Supp. 2d 3 (D.D.C. 2006),
    *aff'd,* 503 F.3d 153 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Kranzush v. Badger State Mut. Casualty Co.,*
    103 Wis.2d 56, 307 N.W.2d 256 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Lattimore v. Nw. Coop. Homes Ass'n,*
    No. 90-0049, 1990 WL 10521534 (D.D.C. Mar. 26, 1990) . . . . . . . . . . . . . . . . . . 15

*Lattimore v. Nw. Coop. Homes Ass'n,*
    No. 90-0049, 1992 WL 118383 (D.D.C. May 19, 1992) . . . . . . . . . . . . . . . . . . 14, 15

*Lipton v. MCI Worldcom, Inc.,*
    135 F. Supp. 2d 182 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Longobardi v. Chubb Ins. Co. of N.J.,*
    582 A.2d 1257 (N.J. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Malacca Corp. v. Travelers Indem. Co.,*
    421 F. Supp. 2d 137 (D.D.C. 2006) (Sullivan, J.) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Page(s)

*Martin v. Washington Metropolitan Area Trans. Auth.*,
    273 F. Supp. 2d 114 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*McCauley v. Suls*,
    123 Md. App. 179, 716 A.2d 1129 (Ct. Spec. App. 1998) . . . . . . . . . . . . . . . . . . . . . 5

*Mesmer v. Md. Auto. Ins. Fund*,
    725 A.2d 1053 (Md. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Messina v. Nationwide Mut. Ins. Co.*,
    998 F.2d 2 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Murawski v. Pataki*,
    514 F. Supp. 2d 577 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Napoleon v. Heard*,
    455 A.2d 901 (D.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Obelisk Corp. v. Riggs Nat'l Bank of Wash., D.C.*,
    668 A.2d 847 (D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Osbourne v. Capital City Mort. Corp.*,
    667 A.2d 1321 (D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Overseas Private Inv. Corp. v. Industria de Pesca, N.A.*,
    920 F. Supp. 207 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Pagan v. Murray*,
    628 A.2d 110 (D.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Prunte v. Universal Music Group*,
    484 F. Supp. 2d 32 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ross v. DynCorp*,
    362 F. Supp. 2d 344 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*,
    323 A.2d 495 (N.J. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Saks & Co. v. Cont'l Ins. Co.*,
    242 N.E.2d 833 (N.Y. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Page(s)

*Sere v. Group Hosp., Inc.*,
  443 A.2d 33 (D.C. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 23

*State Farm Mut. Auto. Ins. Co. v. Hoang*,
  682 A.2d 202 (D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*,
  389 F.3d 1251 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Vanover v. Hantman*,
  77 F. Supp. 2d 91 (D.D.C. 1999),
  *aff'd*, 38 Fed. App'x 4 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wagman v. Lee*,
  457 A.2d 401 (D.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Washington v. Government Employees Ins. Co.*,
  769 F. Supp. 383 (D.D.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Washington v. Group Hospitalization, Inc.*,
  585 F. Supp. 517 (D.D.C. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Wells v. Allstate Ins. Co.*,
  210 F.R.D. 1 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Witherspoon v. Philip Morris, Inc.*,
  964 F. Supp. 455 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20


**Statutes and Other Authorities**

D.C. Code § 12-301 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

D.C. Code § 31-2231.17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 31-2231.02 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code §§ 22-3225.08 - .09 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13

N.Y. Ins. Law § 3404(e) (McKinney's 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Preliminary Statement**

Notwithstanding the hyperbole and conclusory accusations of Defendants-Counter Plaintiffs

Joel Hirsch and Carol Hirsch (the "Hirsches"), this case is about one thing, and one thing only: the

enforcement of the unambiguous terms of defendants' homeowners insurance policy in consequence

of Joel Hirsch's submission of fraudulent documents in support of defendants' insurance claim under

that policy, and the defendants' refusal to fulfill their contractual obligations when making that

claim. As Plaintiff-Counter Defendant Great Northern Insurance Company ("Great Northern")

demonstrated in its moving brief, each of the five counterclaims asserted by defendants is meritless.

While defendants' brief in opposition to Great Northern's motion to dismiss is long on repetitive

rhetoric and misleading arguments, it is short on citations to germane case law and well-pleaded

factual allegations that make out claims.

For example, defendants rely upon *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750

(D.C. Cir. 1990), for the proposition that insurance carriers have a fiduciary "'duty to disclose

material information,' and to advise its policyholders of 'circumstances that threaten interests

relevant to the relationship.'" (Opp. at 10-11). What defendants fail to note is that the carrier in *Eddy*

was a statutory fiduciary under the ERISA statute. Defendants also fail to point to any factual

allegations of purported outrageous behavior by Great Northern to support their conclusory claim

that Great Northern's claim fraud investigation inflicted intentional emotional distress upon them.

Similarly, defendants offer no response to the substantial body of case law cited by Great Northern

holding that advertising puffery is not actionable, and, thus, their statutory claim fails. Nor do

defendants counter Great Northern's demonstration that the absence of any alleged damages

proximately caused by Great Northern is fatal to the Counterclaim. In short, defendants' brief in

response to Great Northern's arguments is devoid of relevant case law and factual allegations based

on the pleadings which could support a finding that even one of the counterclaims alleges a valid claim for relief.  As such, the Court should grant the pending motion and dismiss defendants' Counterclaim *en toto*.

## ARGUMENT

I

### THE FIRST COUNTERCLAIM SHOULD BE DISMISSED AS A MATTER OF LAW BECAUSE DEFENDANTS FAIL TO ESTABLISH A FIDUCIARY RELATIONSHIP BETWEEN THE PARTIES OR, ASSUMING SUCH A DUTY, ANY BREACH THEREOF

The case law of the District of Columbia and Maryland makes clear that an insurance carrier does not owe a policyholder a fiduciary duty in the context of a first-party property damage claim. In a failed effort to avoid this body of law, defendants overstate and misstate the case law that they cite.  That, however, cannot change the fact that defendants' cases do not support the existence of the purported fiduciary duty that underlies the first counterclaim.  Moreover, even if such a duty existed, nothing alleged in the counterclaim establishes for pleading purposes that Great Northern breached any such duty.

Defendants attempt to craft an argument that a fiduciary duty exists in this action based upon a series of cases flowing from an unwarranted interpretation of *dicta* in *Continental Ins. Co. v. Lynham*, 293 A.2d 481 (D.C. 1972).  The issue in that case was whether a grant of attorneys' fees as taxable cost was proper.  The *Lynham* court did not address whether there was a tort basis to award attorneys' fees.  Rather, the case turned on the application of the fee-shifting exception to the American Rule.  *Id.*  The court concluded that no exception had been established, and further held that it was an abuse of discretion to award fees.  In reaching that conclusion, the court also said:

2

> It is true that the insurer has a duty to process and pay claims expeditiously and in good faith, and that evidence as to the reasonableness or good faith of the insurer in refusing to pay is admissible in an action for attorney's fee based on vexatious refusal to pay.

*Id.* at 483. Thus, the *Lynham* court did not find that the contract of insurance created a fiduciary duty, nor did it hold that a tort of bad faith refusal to pay a claim existed under District law.

*Central Armature Works, Inc. v. American Motorists Ins. Co.*, 520 F. Supp. 283, 292 (D.D.C. 1981), upon which defendants principally rely, cited the *dicta* in *Lynham*, without further analysis, for the proposition that a carrier has an "additional obligation" to its policyholder. *Washington v. Group Hospitalization, Inc.*, 585 F. Supp. 517, 520 (D.D.C. 1984), took the error a step further, holding, on the basis of *Lynham*, that District of Columbia law recognizes a tort for bad faith refusal to pay an insurance claim. From these cases, defendants contend that a fiduciary duty is created by the contractual relationship between a carrier and policyholder insofar as the bad faith tort arises only from a breach of the duty.

To reinforce this view, defendants next point to *Messina v. Nationwide Mut. Ins. Co.*, 998 F.2d 2, 5 (D.C. Cir. 1993), for the proposition that "the fiduciary relationship between the insurer and the insured" arises because "insurance contracts have special characteristics that warrant heightened liability for breach of that covenant." (Opp. at 10). This is a dishonest account of what the court said.[*] *Messina* did not find that any such fiduciary duty existed under the District's law,

---

[*] The words in bold are what the *Messina* court actually wrote and that defendants misuse:

> The bad faith tort is grounded on the covenant of good faith and fair dealing that is implicit in all contracts, supplemented by the idea that **insurance contracts have special characteristics that warrant heightened liability for breach of that covenant**. *See Braesch v. Union Ins. Co.*, 237 Neb. 44, 464 N.W.2d 769, 774-75 (1991) . . . *see also Kranzush v. Badger State Mut. Casualty Co.*, 103 Wis.2d 56, 307

3

nor did it "cite" what defendants have concocted. Rather, *Messina* pointed out that the Court of Appeals had not addressed whether a bad faith tort for denying payment of an insurance claim exists under local law. It further found *Washington v. Group Hospital* was in direct conflict with *Washington v. Government Employees Ins. Co.*, 769 F. Supp. 383, 387 (D.D.C. 1991) (noting that "District of Columbia law does not recognize the tort of bad faith denial of an insurance claim"). Thus, the linchpin of defendants' argument fails.

The balance of defendants' cases also fails to provide any support regarding the existence of a fiduciary duty under the District's law. *Eddy*, as pointed out, involved a statutory fiduciary duty imposed on a carrier which required it to provide continuation of coverage information to an AIDS patient. *Eddy*, 919 F.2d at 750. *Wagman v. Lee*, 457 A.2d 401, 404 (D.C. 1983), involved an alleged breach of a fiduciary duty by an escrow agent. In discussing the nature of fiduciary duties, the court cited *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 323 A.2d 495, 511 (N.J. 1974). However, that case involved the agency, hence fiduciary, relationship under New Jersey law between a carrier and policyholder when the carrier controls settlement of a third party claim.

None of the defendants' cases support their argument that a tort for bad faith refusal to pay an insured's first party property claim exists under the District's law. Without such a tort, defendants have no basis to argue that a fiduciary duty exists between carrier and policyholder. As such, defendants' jerry-rigged argument does not establish that Great Northern owed them a fiduciary duty

---

N.W.2d 256, 261 (1981) ("The heart of the [bad faith] tort ... is **the fiduciary relationship between the insurer and the insured** and the insurer's breach of the duty of good faith and fair dealing implicit in every contract.").

*Messina*, 998 F.2d at 5 (emphasis added).

4

regarding the adjustment and settlement of their storm damage claim, or with respect to any investigation of suspected claim fraud.

In contrast, defendants in their brief give the back of their hand to *Fireman's Fund Insurance Co. v. CTIA*, 480 F. Supp. 2d 7, 11 (D.D.C. 2007), which held:

> The result reached in [*Washington v. Government Employees* that no bad faith tort exists] is also consistent with Maryland law, which is the basis for the District of Columbia's common law and therefore is "an especially persuasive authority when the District's common law is silent," *Napoleon v. Heard*, 455 A.2d 901, 903 (D.C. 1983). Courts in Maryland "ha[ve] not recognized a bad faith claim against an insurer in a first-party context, that is, holding an insurer liable in tort for failing to pay [a] ... claim." *McCauley v. Suls*, 123 Md. App. 179, 716 A.2d 1129, 1133 (Ct. Spec. App. 1998).

*Fireman's Fund*, moreover, was decided in the context of a third-party duty to defend claim in which the insured, arguably, is more in more peril than when the claim is for damage to personal property.[*]

Assuming *arguendo* that Great Northern owed defendants a fiduciary duty under District law, defendants do not identify any purported facts alleged in the counterclaim which make out a breach by Great Northern. Defendants also do not dispute that Great Northern made payments on their claim under the policy that Great Northern issued them (the "Policy"). Indeed, Great Northern is suing for the return of $280,000 that defendants admit that they were paid. Thus, the first counterclaim is not built upon an alleged refusal to pay. Rather, the counterclaim is premised upon an investigation that Great Northern undertook of potential claim fraud, and the alleged failure to

---

[*] The Maryland Court of Appeals articulated the distinction between first-party and third-party contractual obligations to indemnify and defend and the fiduciary obligation that attaches to the right to control the defense of a third party claim in *Mesmer v. Md. Auto. Ins. Fund*, 725 A.2d 1053, 1061-63 (Md. 1999). A fiduciary relationship arises in the context of litigation and settlement control of third-party claims because of the concerns that a conflict of interest might arise between the insurer's interest and the insured's interest regarding the resolution of the claim.

5

warn the defendants that a material misrepresentation <u>already</u> made in conjunction with their claim would, as the Policy expressly states, void any coverage that they might have had for their claim. Common sense, as well as the law, holds that such conduct cannot constitute a breach of a fiduciary duty. Repeatedly saying otherwise, as defendants do, does not change common sense or the law.

Defendants contend that examining "the entire course of dealings between the parties" can support a conclusion that a relationship is fiduciary in nature and, without any citation to the Counterclaim, assert that such dealings are "detailed in the Hirsches' Counterclaim." (Opp. at 11). But no such facts are even remotely alleged. Further, the allegations in the Counterclaim make evident that the relationship between Great Northern and defendants was purely contractual: In return for premium payments, Great Northern agreed to pay defendants for covered loss up to the Policy limits, subject to the terms, conditions and exclusions in the Policy, including defendants' satisfaction of the express conditions concerning the making of a claim. (Counterclaim ¶¶ 9-11 & Jaeger Ex. A). *See also Mesmer*, 725 A.2d at 1061 ("Since the source of the duties to defend and to indemnify are entirely contractual, a liability insurer breaches no tort duty when, upon learning of a claim, it erroneously denies coverage and refuses to undertake any defense against the claim.").

Great Northern's contractual agreement to pay covered claims up to the Policy limits did not impose upon it a "duty" to ignore possible claim fraud, and to take no action when it suspected such. Moreover, the District's law requires such investigations and the reporting of insurance fraud to the appropriate authorities. D.C. Code §§ 22-3225.08 - .09 (2001). Defendants baldly contend that Great Northern waited to deny coverage until they allegedly had spent the funds that Great Northern had advanced toward their claim to repair their residence and replace damaged property. However, the counterclaim is devoid of any factual allegations which either make out intentional delay or from

6

which such delay could be inferred. Indeed, defendants allege that Great Northern had paid them hundreds of thousands of dollars in claim payments within weeks of the notice of claim, and that the documents as to which Great Northern raised initial questions had been submitted by the Hirsches after the first of these payments had already been made. (Counterclaim ¶¶ 25, 30-32, 36-39).

Moreover, the timing of the fraud investigation cannot result in a breach of any duty. Great Northern has the unfettered right to investigate suspected claim fraud by a policyholder, and to sue when it determines that the insured's wrongful conduct has voided the contract of insurance. The defendants' argument, taken to its logical conclusion, would mean that a carrier could never seek to recover claim money wrongly obtained by the insured if the insured has spent the funds before his or her fraud has been discovered.

Simply put, defendants have not and cannot establish there was a fiduciary relationship, *i.e.*, "a special relationship of trust and confidence," between them and Great Northern with respect to the adjustment and fraud investigation of their property damage claim. *See, e.g., Prunte v. Universal Music Group*, 484 F. Supp. 2d 32, 43 (D.D.C. 2007).

Further, because the defendants' counterclaim does not allege any facts that constitute a betrayal of trust, defendants have failed to plead a breach of fiduciary duty claim even if the law recognized one in the context of a first party property damage claim. As such, the Court should dismiss the counterclaim concerning the fiduciary claim.

II

## THE GOOD FAITH AND FAIR DEALING COUNTERCLAIM
## SHOULD BE DISMISSED BECAUSE NEITHER PERTINENT FACTS NOR
## COGNIZABLE DAMAGES HAVE BEEN ALLEGED TO SUPPORT SUCH A CLAIM

Despite strident rhetoric, defendants' pleadings fail to allege that Great Northern did anything to destroy their rights to receive any coverage benefits owed them under the Policy. The prolix litany of purported wrongdoing argued in support of the second counterclaim does nothing more than to put a conclusory gloss of adjectives and adverbs on legitimate actions that Great Northern took to investigate suspected claim fraud and then to enforce its contractual rights. Defendants' allegations of wrongdoing fall into two categories:

- Great Northern is wrongly attempting to void defendants' policy; and

- Great Northern has not dealt with defendants promptly, fairly or equitably in an attempt to settle their claim.[*]

Stripped of pejoratives, the alleged facts do not support any inference that Great Northern acted in bad faith. If Joel Hirsch's misconduct has voided defendants' policy, then Great Northern is within its rights to seek such a declaration and to recover its claim payments. Similarly, Great Northern is within its rights to investigate suspected claim fraud, and conclusory allegations of improper conduct does not change this or effect those rights.[**] *See, e.g., Malacca Corp. v. Travelers*

---

[*] District law does not recognize a claim for poor claims-handling practices. *See, e.g., Cambridge Holdings Group, Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d 89, 92 (D.D.C. 2004) (dismissing claim where insurer allegedly "refuse[d] to process, discuss, or pay the plaintiff the loss it suffered"), *app. dismissed*, 489 F.3d 1356 (D.C. Cir. 2007). There also is no private right of action under the District's unfair claims-handling practices statute. *See* D.C. Code § 31-2231.02 (2001). Moreover, a violation of the statute must be based upon a general business practice, D.C. Code § 31-2231.17, which is nowhere alleged in the Counterclaim.

[**] It is telling that defendants repeatedly protest that they withdrew the aspect of their claim concerning the document that Mr. Hirsch admitted forging and the other document whose

*Indem. Co.*, 421 F. Supp. 2d 137, 140 (D.D.C. 2006) (Sullivan, J.) (conclusory allegations unsupported by alleged facts insufficient to make out claim based on breach of good faith covenant).

The District's Courts also have held that to make out a claim based on a breach of the covenant, a plaintiff must show "arbitrary or capricious action." *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006). Further, mere "negligence or lack of diligence" will not constitute a breach of the duty of fair dealing. *Id.* Even construed in the most generous possible light, adjectives and all, the allegations in the second counterclaim merely demonstrate an insurer investigating possible fraud, defendants repeatedly rebuffing the insurer's efforts to obtain relevant information, and the insurer bringing a lawsuit to enforce its rights. (Counterclaim ¶¶ 50-54). Such actions are reasonable, not arbitrary or capricious.

Further, there are no allegations that Great Northern's actions had "the effect of destroying or injuring the right of [the Hirsches] to receive the fruits of the contract." *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988) (citations omitted). To the contrary, there are no allegations even that defendants have suffered any damage caused by Great Northern's actions. Defendants still retain more than $280,000 that was paid them under the Policy toward their claim. If it is established through this lawsuit that they are not entitled to that money, then the return of those claim benefits cannot constitute "damages." Rather, repayment of those funds will flow from a determination in this Court of defendants' liability under one or more of Great Northern's claims against them. For

---

provenance he claimed that he could not remember (Compl. ¶¶ 17-23; Opp. at 6), and that their Counterclaim and Opposition papers completely ignore the forged documents on which Great Northern made claim payments as alleged in Complaint ¶¶ 24-30. Such protests are an implicit concession, and are enough to undercut any conclusory contentions of bad faith.

these reasons, defendants' claim for breach of the implied covenant of good faith should be dismissed.

In addition, Great Northern's efforts to enforce the Policy -- either by invoking the fraud or concealment provision or demanding that defendants adhere to their Policy-based obligations when making a claim -- cannot constitute a breach of the covenant of good faith as a matter of law.[*] Great Northern asserts three policy-based claims: a declaration that Joel Hirsch's wrongful conduct voided the policy, breach of contract based upon the defendants' refusal to comply with claim procedure obligations and unjust enrichment based on the unwarranted claim payments. Seeking to enforce these rights simply is not actionable. *See, e.g., Obelisk Corp. v. Riggs Nat'l Bank of Wash., D.C.*, 668 A.2d 847, 854 n.4 (D.C. 1995) (duty of good faith does not "prohibit[] a party from relying upon rights expressly reserved in a contract"); *Overseas Private Inv. Corp. v. Industria de Pesca, N.A.*, 920 F. Supp. 207, 211 (D.D.C. 1996) (insisting that counterparty adhere to contract terms cannot breach covenant of good faith); *Goldstein v. S&A Rest. Corp.*, 622 F. Supp. 139, 143 (D.D.C. 1985) (no breach of duty of good faith to exercise contract rights where party "was justifiably insecure about its continuing relationship" with counterparty).

To support their second counterclaim for breach of the implied contractual covenant of good faith, defendants cite two inapplicable employment cases. *Martin v. Washington Metropolitan Area*

---

[*] Defendants misconstrue Great Northern's position when they argue that "[a]t the very least, there is a factual dispute as to whether Great Northern's actions in this matter were pursuant to its contractual rights." (Opp. at 16). Great Northern was acting to *enforce* its contractual rights once it became clear that defendants were acting contrary to such rights. This position is wholly consistent with the allegations in the Counterclaim, and there is no factual issue relating to this position. All that matters for purposes of the present motion are whether taking steps to enforce contractual rights can constitute a breach of the implied covenant where there are no allegations suggesting any arbitrary or capricious actions.

*Trans. Auth.*, 273 F. Supp. 2d 114 (D.D.C. 2003), and *Ames v. HSBC Bank*, Civ. Action No. 06-2039

(RMC), 2007 WL 1404443 (D.D.C. May 11, 2007). Those cases involved specific oral and written

assurances regarding employment action -- hiring procedures in the former case and promised

compensation in the latter case -- and are completely unrelated to the instant circumstances, where

there are no alleged oral assurances and, as discussed below, defendants have failed to cite a single

contract provision that was allegedly breached. The holdings in those cases provide no basis for the

Court to sustain defendants's second counterclaim. It, too, should be dismissed.

<div align="center">III</div>

### DEFENDANTS DO NOT ALLEGED OUTRAGEOUS CONDUCT BY GREAT NORTHERN, THUS, THE INTENTIONAL INFLICTION OF <u>EMOTIONAL DISTRESS COUNTERCLAIM SHOULD BE DISMISSED</u>

In an attempt to salvage their baseless claim of intentional infliction of emotional distress

("IIED"), defendants claim that they were in a delicate state when Great Northern began to

investigate the suspected claim fraud -- "Great Northern knew that" they were "vulnerable" since

their "house was in shambles" (Opp. at 8, 18) -- and therefore accusations of their wrongdoing

should be viewed as particularly harsh. None of these allegations, however, are to be found

anywhere in defendants' Counterclaim. Defendants, remarkably, press this vulnerability theory even

though they allege in their Counterclaim that, by the time of Joel Hirsch's December 11, 2006

interview, they "finally were able to begin enjoying the use of their home and its contents again."

(Counterclaim ¶ 45). This alleged harsh treatment, according to defendants, extended to letters Great

Northern subsequently wrote requiring the defendants' compliance with the terms of the Policy, and

for "waiting until *almost a year*" after Joel Hirsch first admitted fabricating the Frischling invoice

<div align="center">11</div>

before filing suit in October 2007.* (Opp. at 17 (emphasis in original)).  Even this newly-revised

theory collapses when exposed to sunlight, and the IIED claim should be dismissed.

The law is clear:  IIED claim "liability has been found only where the conduct has been so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,

and to be regarded as atrocious, and utterly intolerable in civilized community." *Sere v. Group

Hosp., Inc.*, 443 A.2d 33, 37 (D.C. 1982) (citations omitted).  The heart of defendants' claim is the

manner in which Great Northern investigated defendants' insurance fraud, which resulted in

substantial proof of wrongdoing as alleged in the Complaint.  The conduct of that investigation as

alleged in the Counterclaim is far from being "intolerable in civilized community."  Moreover, the

undertaking of that investigation is expressly embraced as a matter of the District's public policy and

---

* The Hirsches are simply wrong when they argue that the Court may not consider Exhibit B to the Jaeger Declaration, the certified transcript of the December 11, 2006 interview of Joel Hirsch.  They allege -- and continue to argue (Opp. at 17, 30) -- that, during that interview, Joel Hirsch was subjected to a rude, condescending and accusatory tone regarding allegations that he had committed fraud, and that such behavior constitutes tortious behavior and, indeed, supports an award of compensatory <u>and</u> punitive damages.  (Counterclaim ¶¶ 45-47, 57, 65, 75, 80, 84).  Having based their claims on what was said during that interview, the Hirsches have incorporated the recorded interview, and, hence, the transcript, into their Counterclaim.  *See, e.g., Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 Fed. App'x 4 (D.C. Cir. 2002); *accord Murawski v. Pataki*, 514 F. Supp. 2d 577, 589 (S.D.N.Y. 2007) (citing cases for proposition that court can consider documented statement whose legal significance is integral to cause of action).  The sole case they cite for their counterargument has no bearing since that court expressly observed that the written document, nowhere mentioned in the relevant complaint, was not "incorporated therein by reference." *Johnson v. Long Beach Mort. Loan Trust 2001-4*, 451 F. Supp. 2d 16, 46-47 (D.D.C. 2006).  The Court's consideration of this transcript is proper.

The Hirsches' contention (Opp. at 9) that they only belatedly received a copy of the transcript after "repeated" requests is without any record support, and, thus, irrelevant to the motion before the Court.  It also is not accurate.  The Hirsches requested a copy of the interview on February 12, 2007.  Great Northern obtained a certified transcript and sent it defendants' counsel the following month.  (Jaeger Reply Aff. ¶ 6 & Ex. E).  Defendants have never questioned the transcript.

is required by law.  D.C. Code §§ 22-3225.08 - .09 (2001).

The letters from Great Northern about which the defendants complain (Counterclaim ¶¶ 50-53, 76), except for the first one, were sent to defendants' counsel.* (Defendants were not represented when the first letter was sent.)  The first and second letters were, in substance, identical in that they asked the defendants to (a) produce documents relevant to Great Norther's claim investigation; (b) appear for examination under oath; (c) sign a proof of loss; and (d) sign consents which would direct their vendors to provide Great Northern with documents relevant to the claim investigation.  The first letter also cited and quoted Policy provisions requiring the defendants to do the aforementioned things in connection with their claim, and the second letter incorporated those Policy provisions by reference.  The other letters were from Great Northern's counsel to defendants' counsel responding to the defendants' refusal to (a) provided the requested documents (some of which ultimately, but untimely, were produced); (b) sit for examination (which defendants refused to do); (c) sign a proof of loss (which defendants also refused); and (d) execute the consent (which defendants also refused).  Nothing in these letters can be deemed threatening or harassing, and defendants' *ipsit dixit* contention to the contrary is simply untrue.

The final allegedly wrongful act supporting the IIED claim is that Great Northern waited almost a year after Joel Hirsch admitted fabricating the Frischling invoice, claimed he did not know from where the Wentworth invoice came, and acknowledged double-billing for the same painting

---

* Copies of these letters dated letters December 28, 2007, January 23, 2007, February 8, 2007, February 23, 2007, April 7, 2007, and May 16, 2007 are annexed as Exhibits A - D, F - G to the Reply Affidavit of Daniel Jaeger, who investigated the Hirsches' claim.  As with the transcript of the December 11, 2006 interview, defendants contend that the language in these written documents constitute actionable torts, and, thus, they are incorporated by reference into the Counterclaim, and can be considered in connection with this Motion.

work before filing suit. This purported delay intentionally inflicted emotional distress in some unexplained manner upon the defendants according to the Counterclaim. Defendants, of course, ignore that, from December 29, 2006 until last summer, Great Northern was still attempting to obtain the defendants' compliance with the obligations imposed on them by the claims provisions in their Policy. Indeed, defendants' counsel did not even agree to produce requested documents until May 2007. (*See* Jaeger Reply Aff. Ex. G). Thus, the defendants' claim that Great Northern waited almost a year is disproved by defendants' own pleaded conduct. (Counterclaim ¶¶ 51-53). At most, there was an eight to ten-week interval between the time defendants refused to comply with their policy obligations became final and the filing of the Complaint on October 5, 2007.

Regardless of whether the interval was ten months or ten weeks, the delay charged to Great Northern was not intentional, as the correspondence between the parties cited in the Counterclaim establishes; nor can the period of time during which Great Northern undertook a claim fraud investigation, and then determined that it could and should file its Complaint in good faith, as required by Rule 11, Federal Rules of Civil Procedure, be viewed as "intolerable in civilized community." This is particularly so when the legislature requires insurance carriers to investigate fraud, and provides a three-year statute of limitations "from the time the right to maintain the action accrues" to bring a lawsuit. *See* D.C. Code § 12-301 (1981).

The most remarkable argument defendants make to sustain the IIED claim is their reliance upon *Lattimore v. Nw. Coop. Homes Ass'n*, No. 90-0049, 1992 WL 118383 (D.D.C. May 19, 1992). The contrast between *Lattimore* and the allegations in the Counterclaim is truly staggering, and renders the use of that case wholly inappropriate.

14

The *Lattimore* plaintiff lived in Section 8, federally-funded housing at 216 R Street, N.W.

Plaintiff and her father had paid rent of "30% of their monthly adjusted gross income (from Mr.

Lattimore's pension and Ms. Lattimore's welfare benefits) which amounted to $261," before the

dispute arose. *Lattimore v. Nw. Coop. Homes Ass'n*, No. 90-0049, 1990 WL 10521534, at *1

(D.D.C. Mar. 26, 1990) (granting injunction prohibiting eviction through a separate Superior Court

action). Defendants live in a multimillion dollar house on Cleveland Avenue, west of Rock Creek

Park. (Counterclaim ¶ 5; Jaeger Aff. Ex. A at 6).

Immediately after the death of plaintiff's father, the *Lattimore* defendants began a campaign

to evict plaintiff and her child from their home, which would render them homeless in "clear

violation of the applicable [HUD] regulations." *Lattimore*, 1992 WL 118383, at *1, *4. The

Hirsches' residence suffered water damage after a rainstorm, and their greatest immediate worry was

a risk of mold, which was promptly addressed. (Counterclaim ¶¶ 23, 26, 48). The *Lattimore*

defendants brought a court action to evict plaintiff, and she was forced to obtain an injunction to

maintain a home for her child and herself. *Lattimore*, 1990 WL 10521534, at *1. The Hirsches were

paid hundreds of thousands of dollars under the Policy toward their claim within weeks after the

rainstorm. (Counterclaim ¶¶ 25, 30).

The *Lattimore* plaintiff alleged that a defendant with a history of violence intended to cause

her harm. *Lattimore*, 1992 WL 118383, at *4. The Hirsches complain that Great Northern's claim

representative was prone to "procrastinating" in handling their claim. (Counterclaim ¶ 34). The

*Lattimore* plaintiff alleged that she was forced to pay "seven months of housing charges [out of her

public assistance funds] before she received the benefit of the insurance policy" that defendants had

taken out for just the sort of situation that she faced after the death of her father. *Lattimore*, 1992

WL 118383, at *3. The Hirsches alleged that an investigator for Great Northern used a "condescending and accusatory tone" toward Joel Hirsch during an interview in which he admitted to fabricating a document that he submitted to Great Northern in support of defendants' claim and double-billing for painting work.[*] (Counterclaim ¶ 47). To say the least, *Lattimore* provides no support to defendants' effort to sustain the third counterclaim. Indeed, that counterclaim borders on the frivolous.

Defendants' wordy complaints about Great Northern "seeking recovery of moneys it knows have been spent to repair the Hirsches' home and its contents after damage to the home that it acknowledged was 'severe'" is utterly beside the point. Whether defendants spent the claim money paid them, or the damage to their residence was severe is irrelevant. If Joel Hirsch's misconduct rendered the Policy void, or if defendants breached obligations that the Policy imposed on them in making a claim, or if defendants were unjustly enriched, then the law requires that they return the claim payments. Moreover, there are no facts alleged to support an inference that Great Northern's beliefs in this respect were driven by malice. Therefore, the allegations of delay and money already spent are for those additional reasons irrelevant to a claim that must be based upon "extreme and outrageous conduct."

Finally, defendants offer no response to Great Northern's argument that they have not pled loss causation. Defendants reiterate that they have suffered sleeplessness and severe stress "'[a]s a result' of Great Northern's conduct," (Opp. at 18), but fail to allege what, in particular, Great Northern allegedly did to cause that purported discomfort. That alone is fatal to any effort to plead

---

[*] The Court should take note of defendants' failure to point to any words in the December 11, 2006 transcript which they allege are actionable in support of the IIED claim. Were there any such words, one would have expected defendants to quote them in their Counterclaim.

an IIED claim. Saying that "all" of Great Northern's conduct subsequent to Joel Hirsch's admission of wrongdoing supports the claim and satisfies loss causation pleading requirements, as defendants do, is insufficient as a matter of law.

Even if the investigation was the cause of defendants' alleged stress and sleeplessness (as opposed to the stress and sleeplessness that comes from being caught red handed committing fraud), an IIED claim cannot be grounded on the investigation alone or the investigative conduct of which the defendants complain. Were the rule otherwise, then any investigation in which documents were sought and the subject of the investigation interviewed to his or her discomfort would give rise to an IIED claim. That is not the law. Moreover, as set forth in Great Northern's moving brief (at 19), defendants' claimed maladies are far too general to support defendants' claim for relief. *E.g., Ross v. DynCorp*, 362 F. Supp. 2d 344, 360 (D.D.C. 2005) (noting that "mere mental anguish and stress" do not support an IIED claim (internal quotations omitted)).

For these reasons, defendants' third counterclaim should be dismissed.

## IV

### NO SPECIFIC CONTRACTUAL BREACH HAS BEEN ALLEGED THUS, THE CONTRACT COUNTERCLAIM SHOULD BE DISMISSED

Great Northern has argued that defendants' breach of contract counterclaim failed for three reasons. There were no citations in the Counterclaim to any contract provision that Great Northern purportedly breached, there were no factual allegations showing of the manner in which Great Northern allegedly breached any contract provision, and there were no allegations of any damage caused by such alleged breach. Nothing in defendants' opposition papers undercuts any of those arguments.

To start, once more, defendants have misused case law. The court in *Butler v. Fairbanks Capital*, No. Civ.A. 04-0367(RMU), 2005 WL 5108537, at *7 (D.D.C. Jan. 2, 2005), cited by defendants (Opp. at 19), recognized that "other courts have dismissed breach of contract allegations for failure to state a claim when the allegation does not identify a specific contractual provision." However, defendants fail to tell this Court that, rather than dismiss the complaint, the *Butler* court "require[d] the plaintiff to amend her complaint to plead with more specificity the contract and provisions thereof that the defendant allegedly breached." *Butler*, 2005 WL 5108537, at *7. Thus, the Hirsches' summary of that case as one in which the court "refus[ed] to dismiss plaintiff's breach of contract claim" for not identifying the provision breached, is misleading.

Further, knowing that the *Butler* case requires specificity as to the alleged breach, defendants in their opposition papers still fail to identify what provision of the Policy Great Northern allegedly breached. Rather, in general and conclusory fashion, they argue that it was a breach of the Policy for Great Northern to seek to void the Policy "for reasons that are not set forth under the terms of the contract and by the other conduct alleged in the Hirsches' Counterclaim." (Opp. at 22). The only basis upon which Great Northern seeks a declaration that the Policy has been voided is Joel Hirsch's breach of the "Concealment or fraud" provision in the Policy. (Compl. ¶¶ 12, 36-38). Therefore, defendants' characterization of Great Northern's actions is simply wrong.[*]

---

[*] *Pagan v. Murray*, 628 A.2d 110 (D.C. 1993) (Opp. at 22), is inapposite. While the wrongful acts in that case consisted, in part, of declaring the policy void, the real breach, as conceded by defendants, was the refusal to perform under the contract. *Id.* at 112; *see also Indep. Mgmt. Co. v. Andersen & Summers, LLC,* 874 A.2d 862, 868 (D.C. 2005) (noting that, in *Pagan*, "the seller, in refusing to perform, was liable for breach of contract"). The only party alleged here to have refused to perform under the Policy is defendants. (Counterclaim ¶¶ 51-53).

The defendants also argue that "Great Northern's attempts to evade its obligation under the contract to pay the Hirsches' claim is therefore a breach of contract." (Opp. at 22). However, defendants have not sued Great Northern to have it pay their claim or any part of the claim which they admit remains open.[*] The long litany of obligations that defendants contend the Policy and law impose on Great Northern adds nothing. The law does not recognize a claim for attempted breach of those alleged contractual obligations.

Defendants finally argue that they have alleged damages with their assertion that they are entitled to be reimbursed for the premiums they paid for the Policy. But the wrongful acts that they attribute to Great Northern -- supposedly poor claims handling and an overly aggressive claim fraud investigation -- have absolutely no causal relationship to the payment of premium. Similarly, the return of premium has nothing to do with an alleged breach of the Policy because Great Northern has brought suit for a declaration that the policy is void under its very terms.[**]

In short, defendants have not alleged any contractual provisions that were breached, they have not alleged any conduct by Great Northern which breached the Policy and they have not alleged any damages suffered by such breaches. This Court, therefore, should dismiss defendants' contract

---

[*] Defendants indulge in sophistry. They assert that there is an inconsistency -- and, indeed, a "frivolous" one at that -- between Great Northern's position that there is no fiduciary duty because of the parties' contractual relationship and Great Northern's position that there is no alleged contract provision that was breached. (Opp. at 19). But while the purely contractual relationship certainly means there is no fiduciary duty as a matter of law, recognizing such a relationship does not also entail a concession that there was a breach of the contractual obligations that define that relationship. This is particularly so when there are no allegations of any such breached obligations.

[**] In a throw-away line, defendants say that Great Northern did not refund their premiums in conjunction with filing suit for a declaration that Joel Hirsch's conduct voided the Policy. (Opp. at 23.) This, of course, has nothing to do with any alleged damages caused by Great Northern alleged breach the Policy.

19

counterclaim. *See, e.g., King & King, Chartered v. Harbert Int'l, Inc.*, 436 F. Supp. 2d 3, 10 (D.D.C. 2006), *aff'd*, 503 F.3d 153 (D.C. Cir. 2007); *Franklin Asaph Ltd. P'ship v. FDIC*, 794 F. Supp. 402, 405 (D.D.C. 1992); *cf. Butler*, 2005 WL 5108537, at *7.[*]

V

### THE UNFAIR TRADE PRACTICES COUNTERCLAIM SHOULD BE DISMISSED BECAUSE NO ACTIONABLE MISSTATEMENTS OR MONETARY DAMAGES HAVE BEEN ALLEGED BY DEFENDANTS

The Hirsches have ignored completely the central arguments in support of Great Northern's motion to dismiss the fifth counterclaim based on a purported violation of D.C. Code §28-3901, *et. seq.* ("CPPA"): they have not pled any alleged misrepresentations with the particularity required by Rule 9(b), the statements set forth in Great Northern's purported promotional materials are simply not actionable as a matter of law, and defendants have not pled damages. What defendants do argue misconstrues case law and the allegations in the Counterclaim, and is irrelevant or lends further support to Great Northern's argument. In all, the CPPA counterclaim should be dismissed.

As set forth in Great Northern's moving brief (at 22), misrepresentation claims under the CPPA "must be pleaded with particularity because they are akin to allegations of fraud." *Witherspoon v. Philip Morris, Inc.*, 964 F. Supp. 455, 464 (D.D.C. 1997). Defendants' CPPA counterclaim, therefore, must contain specific allegations supporting the contention that Great

---

[*] Defendants attempt to introduce an ambiguity argument in footnote 5 of their brief regarding the provision in the Policy stating that it is rendered void where the policyholder "intentionally concealed or misrepresented any material fact relating to their policy either before or after a loss." This is a standard provision found in many insurance policies whose unambiguous meaning is well-settled and applies to precisely the situation at issue in this case. *See, e.g., Longobardi v. Chubb Ins. Co. of N.J.*, 582 A.2d 1257, 1260-61 (N.J. 1990) (citing cases nationwide). Moreover, "concealment or fraud" provisions often are required by statutory law. *Saks & Co. v. Cont'l Ins. Co.*, 242 N.E.2d 833, 834 (N.Y. 1968); N.Y. Ins. Law § 3404(e) (McKinney's 2007).

20

Northern either misrepresented or failed to state a material fact and that defendants relied thereon to their detriment. (Counterclaim ¶ 86). Defendants do not contest the deficiency of their statutory counterclaim, and merely request the opportunity to replead. (Opp. at 25 n.6).* However, the courts in this Circuit do not look favorably upon "a bare request in an opposition to a motion to dismiss -- without any indication of the particular grounds on which amendment is sought." *Confederate Memorial Ass'n, Inc. v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993), *see also U.S. ex rel. Williams v. Martin-Baker Aircraft Co.,* 389 F.3d 1251, 1259 (D.C. Cir. 2004) ("Given Williams's failure to articulate to the district court anything more than a bare request to amend his complaint, we affirm the dismissal of Count I with prejudice."). Defendants' "bare request" to amend should result in the dismissal of the CPPA counterclaim without leave to replead.

Defendants also have ignored Great Northern's arguments that the unspecified promotional statements on which they allegedly relied to their detriment are inactionable puffery as to which reliance is not deemed reasonable as a matter of law. (Moving Br. at 23-24).** The counterclaim should be dismissed for this reason, too. Defendants' argument that they "have pled that Great Northern advertised its claims-handling services without the intent to sell them as advertised or offered" (Opp. at 26), does not change this result. First, they are mistaken: there is no such allegation anywhere in the Counterclaim, and tellingly, defendant fail to provide a citation to where

---

* There is a curious statement in defendants' brief to the effect that the Rule 9(b) argument "fails for the same reasons" but one searches in vain for just what "reasons" that might be. (Opp. at 25 n.6).

** Defendants cite *Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 3 n.3 (D.D.C. 2002), but only disingenuously. The case does not stand for the proposition that a CPPA claim is made by a "policyholder alleging that [its] insurer failed to disclose material facts about its claims-handling processes." (Opp. at 26). *Wells* solely addressed issues of class certification, and expressly stated that it "does not reach the merits of plaintiff's case." *Wells*, 210 F.R.D. at 3.

it might be found in their Counterclaim. But even if there were such an allegation, there is no mention of who at Great Northern made such statements, when such statements were made, or even what they allegedly were told, let alone properly pled with the specificity required by Rule 9(b),

Defendants also fail to rebut Great Northern's argument that the CPPA counterclaim does not allege any monetary damages caused by defendants' alleged reliance on Great Northern's alleged misrepresentations and omissions. Contrary to defendants' contentions, the Court of Appeals in *Athridge* did not reverse or remand the lower court's finding of insufficient damages; it affirmed the dismissal of the CPPA claims. *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1176-77 (D.C. Cir. 2003). Regardless, *Athridge* very much stands for the proposition that "a court action [under the CPPA] requires a showing of damages," *id.* at 1176, and defendants have alleged no such damages.

Defendants also are simply wrong to state that *Osbourne v. Capital City Mort. Corp.*, 667 A.2d 1321 (D.C. 1995), stands for the proposition that attorneys' fees and expenses incurred in this action are compensable damages. The only attorneys' fees potentially compensable in *Osbourne* were the fees the plaintiff expended in legal work necessary to remedy the harm caused by the defendants' wrongdoings. *Id.* at 1327. Significantly, the *Osbourne* court rejected the notion that additional fees that were independent of the defendants' wrongdoings were compensable. *Id.* at 1327 n.6. Any attorneys' fees that defendants incur here are the result of the misrepresentations made by Joel Hirsch and the defendants' other wrongful conduct which resulted in the Complaint. Those fees most certainly are not the natural and proximate cause of any alleged wrongdoing by Great Northern. *See, e.g., Griffith Consumer Co. v. Spinks*, 608 A.2d 1207 (D.C. 1992).

Defendants' argument that they are entitled to a return of premium, and that satisfies the damage element of their claim should be rejected. (Opp. at 25). First, such "damages" are not sought in the fifth counterclaim. (*Compare* Counterclaim ¶ 87 *with* ¶ 83). Second, there is no causal relationship alleged between Great Northern's alleged wrongdoing and the payment of premium. The CPPA counterclaim also should be dismissed.

VI

THE COUNTERCLAIM IS DEVOID OF ANY ALLEGATIONS
OF MALICIOUS CONDUCT, THUS, THE CLAIM FOR
PUNITIVE DAMAGES SHOULD BE DISMISSED

Little more needs be said about defendants' final plea to maintain their claim for punitive damages. Defendants once more throw everything but the kitchen sink into their argument in an effort to marshal evidence to support that claim. (Opp. at 29-30). The simple fact remains: whether viewed individually, or taken as a whole, none of these conclusory allegations support an inference of "malice, wantonness, gross fraud, recklessness, or willful disregard of the [defendants'] rights." *Sere v. Group Hosp., Inc.*, 443 A.2d 33, 37 (D.C. 1982); *see also State Farm Mut. Auto. Ins. Co. v. Hoang*, 682 A.2d 202, 209 (D.C. 1996) (punitive damages not appropriate where denial of insurance claim made without "ill will, recklessness, wantonness, [or] oppressiveness") (internal quotations omitted); *Kahal v. J.W. Wilson & Assocs., Inc.*, 673 F.2d 547, 549 (D.C. Cir. 1982); *Am. Nat'l Red Cross v. Travelers Indem. Co. of R.I.*, 924 F. Supp. 304, 308 (D.D.C. 1996).

Defendants concede (Opp. at 27) that, at a minimum, a fiduciary relationship is a prerequisite to a claim for punitive damages. There is no such relationship between the parties for the reasons set forth above. Thus, this is a separate reason why there is no claim for punitive damages. Still,

23

defendants continue to assert that theirs is a special case because they were "vulnerable," although that is not alleged and nothing in the Counterclaim supports such a conclusion. Even if there were such allegations, they do not satisfy what is necessary to make out a claim for punitive damages. As such, for this and the other reasons set forth above, defendants' claims for punitive damages are insufficiently pled, and should be dismissed.

## Conclusion

For the reasons set forth in Great Northern's moving and reply papers, the Court should dismiss each of defendants' counterclaims with prejudice.

Dated: February 28, 2008
      New York, New York

Respectfully submitted,

KORNSTEIN VEISZ WEXLER & POLLARD, LLP

By: _William B. Pollard, III_

     William B. Pollard, III
     D.C. Bar No. 947275
David T. McTaggart (*pro hac vice*)
757 Third Avenue
New York, NY 10017
(212) 418-8600

-- and --

Karen Ventrell
D.C. Bar No. 466150
ROSS, DIXON & BELL, LLP
2001 K Street, NW
Washington, DC 20006
(202) 662-2000

*Attorneys for Plaintiff/Counter-Defendant,*
*Great Northern Insurance Co.*

24

UNITED STATES DISTRICT COURT
THE DISTRICT OF COLUMBIA
-----------------------------------------------------------------X
GREAT NORTHERN INSURANCE COMPANY,  :
                                                    :
                                                    :
            Plaintiff and Counter-Defendant,  :
                                                    :          Case No: 1:07-cv-01804-EGS
            -against-                             :
                                                    :          REPLY AFFIDAVIT OF
                                                    :          DANIEL I. JAEGER
                                                    :
JOEL HIRSCH and CAROL HIRSCH,           :
                                                    :
            Defendants and Counter-Plaintiffs.  :
-----------------------------------------------------------------X

STATE OF DELAWARE        )
                                      )  ss.:
COUNTY OF NEW CASTLE   )


        DANIEL I. JAEGER, being duly sworn, deposes and says:

        1        I am employed as a Special Investigator by Chubb & Son, a division of Federal

Insurance Company which acts as the claim manager for Plaintiff/Counter-Defendant Great

Northern Insurance Company ("Great Northern"). I was involved in the investigation of the

claim Defendants Joel Hirsch and Carol Hirsch made under a Great Northern homeowners

insurance policy which is the subject of the Complaint and Counterclaim in this action. In the

course of my involvement in the investigation, I received copies of correspondence exchanged

between counsel for Great Northern and counsel for defendants.* Accordingly, I also have

---

\* I received unsigned, electronic copies of the correspondence sent by Great Northern's
counsel to defendants and to their counsel. Some of that correspondence is attached hereto as
Exhibits. It appears that some such correspondence was written utilizing an automatic date
macro that causes a current date to appear on the header of the correspondence whenever the
electronic file containing such correspondence is opened. This means that, although the first
page of all correspondence attached hereto as Exhibits indicates the date on which the letter was

knowledge of the facts set forth herein.  I submit this affidavit in support of Great Northern's

Reply Memorandum in Support of its Motion to Dismiss the Counterclaim.

2.    Attached hereto as Exhibit "A" is a true and correct copy of the December 28,

2006 letter sent by Cozen & O'Connor to defendants as referenced in paragraphs 50, 53 and 76

of the Counterclaim.

3.    Attached hereto as Exhibit "B" is a true and correct copy of the January 23, 2007

letter sent by counsel for Great Northern to counsel for defendants as referenced in paragraphs

52, 53 and 76 of the Counterclaim.

4    Attached hereto as Exhibit "C" is a true and correct copy of the February 8, 2007

letter sent by counsel for Great Northern to counsel for defendants as referenced in paragraphs 53

and 76 of the Counterclaim.

5.    Attached hereto as Exhibit "D" is a true and correct copy of the February 23, 2007

letter sent by counsel for Great Northern to counsel for defendants as referenced in paragraphs 53

and 76 of the Counterclaim.

6.    Based upon my knowledge of this matter and my review of  Great Northern's

claim file, by letter dated February 12, 2007 defendants' counsel requested a copy of the

transcript of my December 11, 2006 interview of Joel Hirsch that was attached as Exhibit B to

my January 18, 2008 Affidavit.  A true and correct copy of that letter is attached hereto as

Exhibit "E."  In response to that letter, I arranged for a  certified court reporter to prepare a

transcript of the recorded interview, and forwarded that transcript to Great Northern's then

---

sent, the header on a number of such Exhibits shows today's date, i.e., the date that the
correspondence was printed.

counsel, who, in turn, sent a copy in mid-March 2007 to defendants' counsel.

7.    Attached hereto as Exhibit "F" is a true and correct copy of a April 9, 2007 letter sent by counsel for Great Northern to counsel for defendants.   Paragraph 53 of the Counterclaim refers to a letter dated April 7, 2007, which is a Saturday, but the only letter that counsel for Great Northern sent to counsel for defendants in April 2007 was the letter attached hereto as Exhibit "F," which was sent on the Monday immediately after April 7.

8.    Attached hereto as Exhibit "G" is a true and correct copy of the May 16, 2007 letter sent by counsel for Great Northern to counsel for defendants as referenced in paragraphs 53 and 76 of the Counterclaim.

_____
DANIEL I. JAEGER


Sworn to before me this
27th day of February, 2008

_____
Notary Public

BARRETT O. BLACKWELDER
NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires March 23, 2008

# Jaeger Reply Affidavit Exhibit A

December 28, 2006

**Eric D. Freed**
Direct Phone 215.665.3724
Direct Fax   215.701.2324
efreed@cozen.com

**VIA CERTIFIED MAIL**
**VIA REGULAR MAIL**

Joel and Carol Hirsch
3115 Cleveland Avenue N.W.
Washington, D.C. 20008-3534

| Re: | **Insured:** | **Joel Hirsch** |
|-----|--------------|-----------------|
|     | **Policy No.:** | 1183327602 |
|     | **Reference No.:** | 40506061991 |
|     | **Dates of Loss:** | **June 25, 2006** |
|     | **Writing Company:** | **Great Northern Insurance Co.** |

Dear Mr. and Mrs. Hirsch:

Please be advised that this firm has been retained by the Great Northern Insurance Company (hereinafter "Great Northern") in order to provide them our legal advice and opinion with respect to various legal issues which may arise during the investigation of the above-referenced claim. The purpose of this letter is to outline for you those steps which must be taken in order for you to fully perfect this claim.

Respectfully, I would first like to advise you and any of your agents or representatives that Great Northern's investigation into the above-referenced loss is ongoing, and that absolutely nothing which has been done, or which will be done by Great Northern or its authorized agents or representatives, is to be construed by you or your agents and representatives to be a waiver of any of Great Northern's rights and/or defenses under and pursuant to the policy of insurance upon which this claim has been made. To the contrary, you are hereby formally advised that Great Northern does hereby reserve each and every right it has under and pursuant to the policy of insurance upon which this claim has been made. Great Northern will continue to conduct its investigations and claim review subject to this reservation of rights. Accordingly, neither you nor anyone acting on your behalf should construe any statements or actions by Great Northern or its representatives to constitute a waiver of any right given to Great Northern by the pertinent policy of insurance unless a specific waiver of rights is communicated to you in writing.

Joel and Carol Hirsch
December 28, 2006
Page 2

_____

 As the named insured on the pertinent policy of insurance, it is your obligation to fulfill specific duties after loss.  These duties include the following, which are set forth in the pertinent insurance policy:

### YOUR DUTIES AFTER A LOSS

If you have a loss this policy may cover, you must perform these duties:

**Notification.**  You must immediately notify us or your agent of your loss.  In case of theft or accident, you must also notify the police or similar competent authority.

**Protect property.**  You must take all reasonable means that are necessary to protect property from further damage.

**Prepare an inventory.**  You must prepare an inventory of damaged personal property, describing the property in full.  It should show in detail the amount insured under this policy and actual amount of the loss.  Attach bills, receipts, and other documents to support your inventory.

**Display property.**  You must show us the damaged property when we ask.

**Proof of loss.** At our request you must submit to us your signed sworn proof of loss on a form we have sent to you.

**Examination under oath.**  We have the right to examine under oath as often as we may reasonably require you, family members and other members of your household and have them subscribe the same.  We may also ask you to give us a signed description of the circumstances surrounding a loss and your interest in it, and to produce all records and documents we request and permit us to make copies.

 It is essential that your claim of loss be presented to Great Northern as precisely as possible.  Please note in the policy conditions quoted above that the insured must, if requested, submit a "Sworn Statement in Proof of Loss."  We have enclosed a blank "Sworn Statement in Proof of Loss" form for your use.  We urge your prompt attention to this document.  Once you have supplied all the information requested on the form, you must read the declaration paragraph carefully and sign the completed documents in the presence of a Notary Public.  After you have fully prepared and executed the "Sworn Statement in Proof of Loss" form, please send the document to me as soon as possible in order to expedite the processing of your claim.  We emphasize that these documents should comply with the above-noted terms and conditions and should reflect the amount of your loss as precisely as possible.

Joel and Carol Hirsch
December 28, 2006
Page 3

_____

It is also your obligation to submit to an examination under oath. This obligation, along with your other duties, is set forth in your insurance policy as noted above. Great Northern wishes to examine both of you regarding the basis of your claim, the circumstances of your reported loss and any other matter relating to this insurance claim. Great Northern is interested in moving forward with these matters as quickly as possible, accordingly, the examinations under oath will be conducted on **January 23, 2007 at the offices of Cozen O'Connor, located at 1627 "I" Street, Suite 1100, Washington, D.C. 20006.** The examination under oath of Joel Hirsch will begin at **10:00 a.m.**, and the examination under oath of Carol Hirsch will begin at **3:00 p.m.** If this date, time, and location are not convenient for you, please contact me and we will arrange a mutually convenient date and time for the examinations.

Pursuant to this and all other relevant portions of the policy, you are required to produce for our inspection the original books and records, as well as any and all other writings and documentation which are relevant to your coverage. Great Northern hereby demands production of the following documents:

1. Any and all documentation that verifies or corroborates your whereabouts on June 25, 2006, including but not limited to credit card receipts, receipts for airline or other travel, toll records, cell phone records, or any other receipts;

2. A complete, itemized list of all property that you alleged was damaged and is the subject of this claim;

3. A complete list of names and last known addresses of all persons you believe to have personal knowledge of the ownership and/or value of the property which is the subject of this claim;

4. A complete list of names and last known addresses of all persons you believe to be witnesses to the circumstances of the reported loss on June 25, 2006;

5. All _original_ purchase receipts, receipts for replacement items, orders, appraisals, correspondence, or other documents relating to or reflecting the purchase and/or current value of _all_ property which is the subject of this claim;

6. All photographs of the property which is the subject of this claim that are in your possession, custody or control;

7. The originals of all policies of insurance upon which your claim has been made and any other policies of insurance existing at the time of the loss and covering the dwelling at 3115 Cleveland Avenue NW, Washington, D.C., personal property or other insurable interests of Joel Hirsch and/or Carol Hirsch, whether such policies are in the name of a business or any other name;

Joel and Carol Hirsch
December 28, 2006
Page 4

8. All documents, records, or other writings relating to insurance claims of any kind or nature whatsoever made by Joel Hirsch and/or Carol Hirsch or any business owned or operated by Joel Hirsch and/or Carol Hirsch, under the above-referenced policy, or any other policy, at any time before or after the reported loss;

9. All documents and other writings relating to any mortgage foreclosure proceeding, judgment of foreclosure and/or sheriff's sale involving any dwelling and/or other structure owned by Joel Hirsch and/or Carol Hirsch, individually, or any businesses owned or operated by Joel Hirsch and/or Carol Hirsch from January 1999 and continuing to the present time;

10. All pleadings and other court documents pertaining to any lawsuit (including criminal proceedings) in litigation at any time during the period beginning January 1, 1996 and continuing to the present time in which Joel Hirsch and/or Carol Hirsch, individually, or any business owned and/or operated by Joel Hirsch and/or Carol Hirsch, were named as a party;

11. True and correct copies, with all schedules and attachments, of the federal, state and local personal income tax returns filed by Joel Hirsch and/or Carol Hirsch for the years 2003, 2004, and 2005;

12. True and correct copies, with all schedules and attachments, of the federal corporate income tax returns filed by any business owned and/or operated by Joel Hirsch and/or Carol Hirsch for the years 2003, 2004 and 2005;

13. True and correct copies, with all schedules and attachments, of every monthly, quarterly and annual corporate financial statement from January 1, 2003 to the present, prepared for any business owned and/or operated by Joel Hirsch and/or Carol Hirsch;

14. All documents, records and other writings relating to the indebtedness of Joel Hirsch and/or Carol Hirsch, or any businesses owned or operated by Joel Hirsch and/or Carol Hirsch, as of June 25, 2006, including without limitation, copies of all loan agreements, financing agreements, contracts, mortgages, home equity lines of credit, tax liens, promissory notes, personal guarantees on loans made to other persons or entities, credit card account statements and any other credit account statements;

15. All documents, records and other writings which may constitute evidence of income received by Joel Hirsch and/or Carol Hirsch from January 1, 2006 to the present time, including without limitation, all records relating to retirement benefits, disability benefits, unemployment compensation or other benefits paid to Joel Hirsch and/or Carol Hirsch, by any federal, state

Joel and Carol Hirsch
December 28, 2006
Page 5

_____

or local government agency, as well as any pay check stubs, pay records, and all other writings;

16.     Credit card records for any and all credit cards maintained by Joel Hirsch and/or Carol Hirsch, or any businesses owned or operated by Joel Hirsch and/or Carol Hirsch, that reflect all purchases made from January 1, 2006 through the present;

17.     Bank statements for all checking and/or savings accounts maintained by Joel Hirsch and/or Carol Hirsch for the months of January 2006 through the present; and

18.     The <u>originals</u> of all estimates, invoices, change orders, permits, receipts, correspondence or other documents relating to the repair or replacement of all or part of the roof of the dwelling located at 3115 Cleveland Avenue NW, Washington, D.C., from January 2000 to the present;

19.     The <u>originals</u> of all estimates, invoices, change orders, permits, receipts, correspondence or other documents relating to any repairs, construction, restoration or cleaning performed at 3115 Cleveland Avenue NW, Washington, D.C. since June 25, 2006;

20.     Copies of all estimates, invoices, change orders, permits, receipts, correspondence or other documents from any architects, contractors, subcontractors, or other individuals contacted by you, or someone on your behalf, to prepare an estimate and/or perform work in reference to damage sustained by the dwelling at 3115 Cleveland Avenue, NW Washington, D.C., or its contents during the loss on June 25, 2006. If such documents are not available, please provide the relevant contact information, including name, address and telephone number(s); and

21.     Copies of any documents relating to payment for any repairs, restoration, cleaning or construction performed in reference to damage sustained by the dwelling at 3115 Cleveland Avenue, NW Washington, D.C., or its contents during the loss on June 25, 2006, including but not limited to canceled checks and receipts.

Great Northern must examine and evaluate all of the available documents and other writings enumerated above in order to make an informed decision regarding its liability, if any, for your claim of loss. Submission to us of the above listed material as soon as possible will serve to expedite the processing of your claim, but, in any event, the deadline to produce these documents is **January 16, 2007**.

You are requested to forward all documents and/or correspondence to my attention. If available, original documents and papers are sought, rather than photocopies. If you cannot obtain any of the above-referenced items, then please so inform. Additionally, it is not our intention to cause you to duplicate and send that material which has already been provided to

Joel and Carol Hirsch
December 28, 2006
Page 6

_____

Great Northern's representatives.  Thus, if any material which is requested above has previously been given to Great Northern or its representatives, then kindly indicate to the undersigned, in writing, what was given, when it was provided and to whom it was given.

As previously noted, your duties and obligations in presenting this insurance claim to Great Northern are set forth in the policy of insurance.  We urge you to read the policy.  In the event that you have lost or misplaced your copy of the policy, you may obtain an additional copy by contacting the undersigned.

I look forward to speaking with you at your examination under oath on January 23.  Until then, if you have any questions concerning this matter, please do not hesitate to contact me at any time.

Waiving none, but in all other respects reserving to the Great Northern Insurance Company all of its rights and defenses under and pursuant to the policy of insurance involved herein and at law, we remain,

Sincerely,

COZEN O'CONNOR

By:     Eric D. Freed

EDF

# Jaeger Reply Affidavit Exhibit B

## O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP
### COUNSELLORS AT LAW

CARMINE J. LIOTTA
RICHARD M. MANDEL
DAVID M. KUPFER
———
RAYMOND D. O'BRIEN
(1928-2000)

LIBERTY HALL CORPORATE CENTER
1085 MORRIS AVENUE
P.O. BOX 3180
UNION, NEW JERSEY 07083-1980
908-354-7530

Fax
908-354-7531

CONSTANTINA DROGARIS
THOMAS J. WHITNEY
JODIE L. DRISCOLL
———
OF COUNSEL
ELIZABETH H. ROHAN

January 23, 2007

**VIA FAX AND REGULAR MAIL**

Lorelie S. Masters, Esq.
Jenner & Block, LLP
601 Thirteenth Street, NW
Suite 1200 South
Washington, DC 20005-3823

> Re:  Insured:  Joel and Carol Hirsch
>        Policy No.: 1183327602
>        Date of Loss:  June 25, 2006
>        Writing Company: Great Northern Insurance Company
>        Our File No.:    50209.017

Dear Ms. Masters:

This firm represents the interests of Great Northern Insurance Company with respect to a certain claim by Joel and Carol Hirsch under the above-referenced policy. It is our understanding that you represent Mr. and Mrs. Hirsch with respect to such claim.

Enclosed you will find a Schedule of Documents to be produced by Mr. and Mrs. Hirsch on or before February 5, 2007. The requested documents are the same as those requested by the December 28, 2006 letter of Eric D. Freed, Esq. of Cozen & O'Connor to Mr. and Mrs. Hirsch. Please forward all of the requested documents to my office.

We have also scheduled the examination of Mr. and Mrs. Hirsch, under oath, for Thursday, February 15, 2007 at your office. The examination of Mr. Hirsch will proceed at 10:00 a.m., and of Mrs. Hirsch as soon thereafter as possible. If Mrs. Hirsch wishes

*O'BRIEN, LIOTTA , MANDEL & KUPFER, LLP*
*COUNSELLORS AT LAW*

Lorelie S. Masters, Esq.
February 27, 2008
Page 2

to remain "on call," able to appear at your office on thirty (30) minutes notice, that will be acceptable.

If February 15th is not convenient for you, please propose two or three other dates soon thereafter on which you and the Hirschs will be available to appear.

Mr. Freed's December 28, 2006 letter to Mr. and Mrs. Hirsch enclosed a blank "Sworn Statement and Proof of Loss" for their completion and signature in the presence of a notary public. Please arrange to have a completed, signed and sworn Statement returned to me by February 5th.

Please refer to Mr. Freed's December 28th letter to Mr. and Mrs. Hirsch which refers to various policy terms and conditions which obligate them to fulfill specific duties after loss. We continue Mr. Freed's advice that none of the rights and defenses of Great Northern under the policy of insurance or at law or in equity are waived, and are expressly reserved.

Please confirm to me that Mr. and Mrs. Hirsch will produce the requested documents, provide a Sworn Statement of Loss, and appear to be examined under oath as provided herein.

Very truly yours,

O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP

BY:_____
            DAVID M. KUPFER

DMK:js
Enclosure
50209017.LET1

## SCHEDULE OF DOCUMENTS

1. Any and all documentation that verifies or corroborates your whereabouts on June 25, 2006, including but not limited to credit card receipts, receipts for airline or other travel, toll records, cell phone records, or any other receipts;

2. A complete, itemized list of all property that you allege was damaged and is the subject of this claim;

3. A complete list of names and last known addresses of all persons you believe to have personal knowledge of the ownership and/or value of the property which is the subject of this claim;

4. A complete list of names and last known addresses of all persons you believe to be witnesses to the circumstances of the reported loss on June 25, 2006;

5. All <u>original</u> purchase receipts, receipts for replacement items, orders, appraisals, correspondence, or other documents relating to or reflecting the purchase and/or current value of <u>all</u> property which is the subject of this claim;

6. All photographs of the property which is the subject of this claim that are in your possession, custody, or control;

7. The originals of all policies of insurance upon which your claim has been made and any other policies of insurance existing at the time of the loss and covering the dwelling at 3115 Cleveland Avenue NW, Washington, D.C., personal property or other insurable interests of Joel Hirsch and/or Carol Hirsch, whether such policies are in the name of a business or any other name;

8. All documents, records, or other writings relating to insurance claims of any kind or nature whatsoever made by Joel Hirsch and/or Carol Hirsch or any business owned or operated by Joel Hirsch and/or Carol Hirsch, under the above-referenced policy, or any other policy, at any time before or after the reported loss;

9. All documents and other writings relating to any mortgage foreclosure proceeding, judgment of foreclosure and/or sheriff's sale involving any dwelling and/or other structure owned by Joel Hirsch and/or Carol Hirsch, individually, or any business owned or operated by Joel Hirsch and/or Carol Hirsch from January 1999 and continuing to the present time;

10. All pleadings and other court documents pertaining to any lawsuit (including criminal proceedings) in litigation at any time during the period beginning January 1, 1996 and continuing to the present time in which Joel Hirsch and/or Carol Hirsch, individually, or any business owned and/or operated by Joel Hirsch and/or Carol Hirsch, were named as a party;

11.  True and correct copies, with all schedules and attachments, of the federal, state and local personal income tax returns filed by Joel Hirsch and/or Carol Hirsch for the years 2003, 2004, and 2005;

12.  True and correct copies, with all schedules and attachments, of the federal corporate income tax returns filed by any business owned and/or operated by Joel Hirsch and/or Carol Hirsch for the years 2003, 2004 and 2005;

13.  True and correct copies, with all schedules and attachments, of every monthly, quarterly and annual corporate financial statement from January 1, 2003 to the present, prepare for any business owned and/or operated by Joel Hirsch and/or Carol Hirsch;

14.  All documents, records and other writings relating to the indebtedness of Joel Hirsch and/or Carol Hirsch, or any business owned or operated by Joel Hirsch and/or Carol Hirsch, as of June 25, 2006, including without limitation, copies of all loan agreements, financing agreements, contracts, mortgages, home equity lines of credit, tax liens, promissory notes, personal guarantees on loans made to other persons or entities, credit card account statements and any other credit account statements;

15.  All documents, records and other writings which may constitute evidence of income received by Joel Hirsch and/or Carol Hirsch from January 1, 2006 to the present time, including without limitation, all records relating to retirement benefits, disability benefits, unemployment compensation or other benefits paid to Joel Hirsch and/or Carol Hirsch, by any federal, state or local government agency, as well as any pay check stubs, pay records, and all other writings;

16.  Credit card records for any and all credit cards maintained by Joel Hirsch and/or Carol Hirsch, or any businesses owned or operated by Joel Hirsch and/or Carol Hirsch, that reflect all purchases made from January 1, 2006 through the present;

17.  Bank statements for all checking and/or savings accounts maintained by Joel Hirsch and/or Carol Hirsch for the months of January 2006 through the present; and

18.  The originals of all estimates, invoices, change orders, permits, receipts, correspondence or other documents relating to the repair or replacement of all or part of the roof of the dwelling located at 3115 Cleveland Avenue NW, Washington, D.C., from January 2000 to the present;

19.  The originals of all estimates, invoices, change orders, permits, receipts, correspondence or other documents relating to any repairs, construction, restoration or cleaning performed at 3115 Cleveland Avenue, NW, Washington, D.C. since June 25, 2006.

2

20.    Copies of all estimates, invoices, change orders, permits, receipts, correspondence or other documents from any architects, contractors, subcontractors, or other individuals contacted by you, or someone on your behalf, to prepare an estimate and/or perform work in reference to damage sustained by the dwelling at 3115 Cleveland Avenue, NW, Washington, D.C., or its contents during the loss on June 25, 2006.  If such documentation are not available, please provide the relevant contact information, including name, address and telephone number(s); and

21.    Copies of any document relating to payment for any repairs, restoration, cleaning or construction performed in reference to damage sustained by the dwelling at 3115 Cleveland Avenue, NW Washington, D.C. or its contents during the loss on June 25, 2006, including but not limited to canceled checks and receipts.

# Jaeger Reply Affidavit Exhibit C

# O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP
### COUNSELLORS AT LAW

CARMINE J. LIOTTA
RICHARD M. MANDEL
DAVID M. KUPFER

———
RAYMOND D. O'BRIEN
(1928-2000)

LIBERTY HALL CORPORATE CENTER
1085 MORRIS AVENUE
P.O. BOX 3180
UNION, NEW JERSEY 07083-1980
908-354-7530
———
Fax
908-354-7531

CONSTANTINA DROGARIS
THOMAS J. WHITNEY
JODIE L. DRISCOLL
BRADLEY E. BISHOP

———
OF COUNSEL
ELIZABETH H. ROHAN

February 8, 2007

**VIA FAX AND REGULAR MAIL**

Lorelie S. Masters, Esq.
Jenner & Block, LLP
601 Thirteenth Street, NW
Suite 1200 South
Washington, DC  20005-3823

> Re:  Insured:  Joel and Carol Hirsch
> Policy No.: 1183327602
> Date of Loss:  June 25, 2006
> Writing Company: Great Northern Insurance Company
> Our File No.:     50209.017

Dear Ms. Masters:

I am in receipt of your February 7, 2007 letter, to which this will respond.

I spoke with you on February 6th regarding your clients' failure to produce for inspection on February 5th the documents identified in my January 23, 2007 letter. As my letter indicated, the requested documents were those requested by the December 28, 2006 letter of Eric D. Freed, Esq. of Cozen & O'Connor to your clients.

When we spoke on February 6th, you informed me that Mr. Hirsch had been traveling, that you had not yet spoken with him regarding my January 30th letter, but that you expected to speak with him on the morning of Wednesday, February 7th. I was therefore surprised by your advice, as of 5:20 p.m. on Wednesday, that you had not yet spoken with Mr. Hirsch.

I am troubled by the implication of your letter that Great Northern is imposing undue time pressure on the Hirsches to produce documents, provide a sworn proof of loss, and be examined under oath ("the time demands set forth in January 30, 2007

*O'BRIEN, LIOTTA , MANDEL & KUPFER, LLP*
        COUNSELLORS AT LAW

Lorelie S. Masters, Esq.
February 27, 2008
Page 2

letter…were not discussed with me or anyone else on behalf of my client, Joel Hirsch";
"feigned urgency"). Counsel for Great Northern first requested that the Hirsches produce documents, execute a sworn proof of loss and be examined under oath on December 28, 2006. The Hirsches should have begun assembling the requested documents then. The Hirsches have not returned the sworn proof of loss; although they have had ample time to do so. My January 23rd letter, scheduling the Hirsches examination under oath for February 15th, 23 days thereafter, informed you that if February 15th was not convenient for you, you should propose two or three dates soon thereafter on which you and the Hirsches would be available to appear. No one has informed us that you or the Hirsches are unavailable on February 15th; indeed, although the Hirsches have known of Great Northern's requests for information for over a month, we have yet to learn whether they intend to comply with their contractual obligations under the Policy to provide the requested information.

My January 30th letter to you, responding to your request for an explanation of the purpose of Great Northern's request for information, was intended to communicate that this is a matter of some seriousness. I will therefore appreciate your advice, by next Monday, February 12th, regarding whether and when the Hirsches will produce the requested documents, complete a sworn proof of loss, execute the authorizations for the release of information, and be examined under oath. We will be prepared to go forward with the Hirsches' examinations under oath on Thursday, February 15th as scheduled; however, since the Hirsches have not produced the documents requested of them, we would reserve our rights to reexamine the Hirsches following Great Northern's and our review of those documents. If, by the close of business Monday, we do not have a proposed schedule for the provision of the requested documents and information, we will understand that to mean that the Hirsches do not intend to cooperate in Great Northern's investigation.

Please let me know how the Hirsches intend to proceed.

Very truly yours,

O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP

BY:_____
                DAVID M. KUPFER

DMK:js
50209017.LET3

# Jaeger Reply Affidavit Exhibit D

## O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP
### COUNSELLORS AT LAW

CARMINE J. LIOTTA
RICHARD M. MANDEL
DAVID M. KUPFER
———
RAYMOND D. O'BRIEN
(1928-2000)

LIBERTY HALL CORPORATE CENTER
1085 MORRIS AVENUE
P.O. BOX 3180
UNION, NEW JERSEY  07083-1980
908-354-7530
Fax
908-354-7531

CONSTANTINA DROGARIS
THOMAS J. WHITNEY
JODIE L. DRISCOLL
BRADLEY E. BISHOP
———
OF COUNSEL
ELIZABETH H. ROHAN

February 23, 2007

**VIA FAX and REGULAR MAIL**

Lorelie S. Masters, Esq.
Jenner & Block, LLP
601 Thirteenth Street, NW
Suite 1200 South
Washington, DC  20005-3823

> Re:   Insured:  Joel and Carol Hirsch
>        Policy No.: 1183327602
>        Date of Loss:  June 25, 2006
>        Writing Company: Great Northern Insurance Company
>        Our File No.:     50209.017

Dear Ms. Masters:

I am in receipt of your February 12, 2007 letter, to which this letter will reply.

I must advise you at the outset that Great Northern and I do not intend to participate in an interminable exchange of letters with you. You have previously requested that I "explain the purpose of" my January 23rd letter, which enclosed a schedule of documents to be produced and proposed dates for examinations under oath. My January 30, 2007 letter informed you—somewhat directly, I had hoped—of the reasons which precipitate Great Northern's investigation of the Hirsches' claims for damage to their residence, specifically, Mr. Hirsch's admission that he fabricated a repair estimate and submitted it to Great Northern for payment, and his having submitted a different invoice for payment which Great Northern is informed is also fraudulent.  Mr. Hirsch's submission of two fraudulent invoices has precipitated an investigation of the legitimacy of other damages which the Hirsches claim to have sustained on June 25, 2006, as well as a 2003 claim by Mr. and Mrs. Hirsch for water damage to their house.

*O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP*
 *COUNSELLORS AT LAW*

Lorelie S. Masters, Esq.
February 23, 2007
Page 2

The categories of documents which we have requested that the Hirsches produce have to do with the repair of the damage which is the subject of their present claim and of their claim in 2003, and with their financial condition and possible motive to commit a fraud. These categories of documents are obviously relevant to Great Northern's investigation.

The Hirsches' cooperation in this investigation is a condition precedent to Great Northern's obligations under the insurance contract.

We would like to learn whether the Hirsches intend to produce any or all of the requested documents; identify a date by which such documents will be produced; and identify a date on which the Hirsches will appear to be examined under oath. So as not to divert our attention from that goal, I wish to move past a debate regarding when "the clock" for the Hirsches' provision of information began to "run"; our respective views on when the Hirsches became obligated to provide information, and what information they are obligated to provide, obviously differ.

Your letter advises that "we believe that waiver and/or estoppel may apply under the facts here; notwithstanding that, we do not understand the basis for many of your requests, especially given the history of this claim." As my January 30, 2007 letter informed you, waiver is not a viable defense to a claim that a policyholder has intentionally misrepresented material facts during the claims process or made fraudulent claims. You further advise that, although the loss occurred in June 2006, and despite "many contacts" between Mr. Hirsch and Great Northern, Great Northern did not request an interview, proof of loss, examination under oath, etc. until December 2006. Until late October 2006, when it was informed that two invoices submitted by the Hirsches for payment were fraudulent, Great Northern had no reason to question the veracity of the Hirsches' claim. Great Northern can hardly be criticized for having assumed that the Hirsches had, in good faith, submitted a legitimate claim.

I also take issue with your statement that Great Northern has requested "blanket authorizations to probe into [your] client's affairs...". The purpose of the authorizations to Eight Brothers, Steven Frischling, Inc., J.S. Wagner Company, Inc., Juneman Painting and Wentworth, Inc. – all companies claimed by the Hirsches to have provided services in connection with the repair of their house as a result of the June 25, 2006 or 2003 claim – is to ascertain what services, if any, were actually provided by those companies for the Hirsches' benefit and the charges incurred or billed for those services. Great Northern's attempt to obtain information from the contractors identified by the Hirsches as having rendered services relevant to the repair of their home is in no respect a "fishing expedition" (your words) or an "invasion" (again, your word) of their

*O'BRIEN, LIOTTA , MANDEL & KUPFER, LLP*
    *COUNSELLORS AT LAW*

Lorelie S. Masters, Esq.
February 23, 2007
Page 3

privacy. It is, however, imperative that the Hirsches sign the authorizations so that Great Northern may communicate with those contractors.  Your letter advises that it is your "impression" that Great Northern "intends to deny coverage for this claim" and asks that I confirm to you whether that "impression is mistaken." When Great Northern completes its coverage investigation—which is being frustrated by the Hirsches' failure to provide information—it will make a coverage determination.

    I note your request for notes or a transcription of the interview of Mr. Hirsch and assertion that such interview constituted an examination under oath. We are having a certified transcript of Mr. Hirsch's interview prepared and will forward a copy of same as soon as it is available. Mr. Hirsch was not placed under oath prior to being interviewed, such that the interview was not an "examination under oath". *See Fineberg v. State Farm Fire and Cas. Co.*, ,438 S.E.2d 754 (N.C. Ct. App., 1994) ("we are not persuaded by plaintiff's arguments that the first recorded investigative interview constituted an examination under oath for purposes of compliance. *See* 5A Appleman, § 3549 (stating that an insured's recorded statements not given under oath are insufficient to meet the examination under oath requirement)"); *Pervis v. State Farm Fire and Cas. Co.*, 901 F. 2d 944, 946 (11th Cir. 1990); *State Farm General Ins. Co. v. Lawlis*, 773 S.W.2d 948 (Tex. App., 1989). Of course, Mrs. Hirsch has never been interviewed, under oath or not, regarding the claims at issue.

    Please provide me with dates by which your clients will sign and return a sworn proof of loss, sign and return the authorizations to their contractors, produce the requested documents and appear to be examined under oath.

    In continuing to correspond with you, and in our efforts to secure the Hirsches' cooperation in the investigation of this claim, we do not waive, and expressly reserve, all of Great Northern's rights and defenses under the Policy and at law.

            Very truly yours,

            O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP

            BY:_____
                   DAVID M. KUPFER

DMK:js
50209017.LET4

Jaeger Reply
Affidavit
Exhibit E

FEB-12-2007  19:52    JENNER BLOCK LLP                202 637 6567    P.02/04

# JENNER&BLOCK

February 12, 2007

Jenner & Block LLP          Chicago
601 Thirteenth Street, NW    Dallas
Suite 1200 South            New York
Washington, DC 20005-3823    Washington, DC
Tel 202 639-6000
www.jenner.com

Lorelie S. Masters
Tel  202 639-6076
Fax  202 661-4924
lmasters@jenner.com

<u>VIA FACSIMILE AND U.S. MAIL</u>

David M. Kupfer, Esquire
O'Brien, Liotta, Mandel & Kupfer, LLP
Liberty Hall Corporate Center
1085 Morris Avenue
P.O. Box 3180
Union, NJ  07083-1980

Re:    Insured:  Joel Hirsch
       Chubb Policy No. 1183327602
       Your Reference No. 50209.017

Dear Mr. Kupfer:

From the tone of your letters, including your most recent letter of February 8, you seem intent on making a "record." This indicates to me that a recitation of the background of this claim may be helpful and will, at the very least, correct assumptions of some kind of misconduct which we believe are without any foundation.

First, I told you in my February 7 letter that I would contact you after I had been able to confer with my client, Mr. Hirsch. Given that you had been advised that the two of us have been traveling and, not surprisingly, have other obligations, the implication that we are not responsive is based on assumptions for which we believe there is no support in fact. For that reason, I will review the matter to clear the record.

Your letter omits the fact that Chubb's first lawyer letter was written on December 28, 2006, and was not received until after, the New Year Holiday from Cozen & O'Connor, a law firm that represented Mr. Hirsch in 2001 in accordance with Mr. Hirsch's Chubb policy. Cozen & O'Connor withdrew from this matter when we communicated our view that the law firm was now adverse to Mr. Hirsch in violation of rules of lawyers' professional ethics. At that time, and for what to us seem like obvious reasons (confirmed in writing), I told Mr. Freed of the Cozen firm that we would not be producing documents or appearing for examination, as demanded, on January 23, 2007.

Second, I clearly advised you by my letter of January 12, that we considered the requests made of my client by Mr. Freed to be "extravagant." Even so, you simply restated them in your letter of January 23. In response, I asked you three days later, on January 26, to explain "the specific relevance to this claim" of each of the requests you had made. Your January 30 letter neglected to address my questions.

Third, there is no basis for any of the typical insurance company assertions about "cooperation." Mr. Hirsch consistently cooperated with Great Northern since the time of the loss on June 25,

FEB 12 2007  15:33    JENNER BLOCK LLP    202 637 6367  P.03/04

David M. Kupfer, Esquire
February 12, 2007
Page 2

2006. Mr. Hirsch also met the demand (first made in early November 2006) by the insurer's claim investigator (Mr. Jaeger) for a meeting, which took place on December 11. At no time up until then or for that matter until your lawyer's letters began to appear was there a request by Great Northern for an interview, examination under oath, proof of loss, etc. Between the time of the damage on June 25 and the recorded interview in December, Mr. Hirsch had many contacts (or attached contacts) with Great Northern, by telephone and email, and there were also contacts with Great Northern by Mr. Hirsch's broker, who interceded in order to spur a response to Mr. Hirsch's inquiries from the claim handler.

The general conditions in Great Northern's policy state that, with regard to the property insurance provided, the policyholder's insurance company may ask its policyholder "to produce all records and documents we request and permit us to make copies." As you know, we believe that waiver and/or estoppel may apply under the facts here; notwithstanding that, we do not understand the basis for many of your requests, especially given the history of this claim. As a general proposition, it appears that, after paying Mr. Hirsch more than $280,000, Great Northern intends to deny coverage for this claim. Is that the case? We assume so from your correspondence. If that impression is mistaken, please confirm that to me. In addition, we do not understand the basis for certain of your specific requests. For example, even though Chubb knows that my client did not own the house on Cleveland Avenue until late June 2000, you demand documents related to the roof that predate purchase of the property.

Fourth, providing Mr. Hirsch with three working days to produce a response to scores of requests imposes an unreasonable and undue burden. We believe it reasonable to consider that a clock (if any) started to run upon receipt of your January 23 letter and not upon receipt of a letter from the Cozen firm, which withdrew.

As to your request for an examination under oath, February 15 is not possible for us. Both Mr. Hirsch and I have long-standing commitments that day. When we receive explanations about your requests, we will endeavor to comply and will consult with you about an appropriate time for an examination. In the meantime, please provide a copy of the notes or any transcription taken of Mr. Hirsch's "interview" which we consider an examination under oath. If you do not believe it does, I would appreciate an explanation.

As to your request for blanket authorizations to probe into my client's affairs, we do not see the relevance of conducting a fishing expedition into matters that invade his, and his wife's, privacy. We also are aware of your contacts with various companies with whom the Hirsches have done business over the years, including some that have had nothing to do with this claim. My client requests an explanation of the relevance of these inquiries and a list of companies you have contacted. I am not aware of policy provisions that impose such a requirement on the policyholder. If I am mistaken, I would appreciate it if you would cite the applicable provisions to us.

FEB-12-2007  19:33        JENNER BLOCK LLP                202 637 6367    P.04/04

David M. Kupfer, Esquire
February 12, 2007
Page 3

My client previously indicated to Great Northern the desire to conclude this claim promptly (and amicably).  Assuming that is also your intention, we look forward to working with you to do so, and, as we discussed this afternoon, I will send you dates for an examination under oath.

Very truly yours,

Lorelie S. Masters

LSM:kag

cc:    Mr. Joel Hirsch

L:\MASTERLS\Hirsch\Letter\kupfer re his 2-8-07 letter v3.doc

TOTAL P.04

# Jaeger Reply Affidavit Exhibit F

## O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP

### COUNSELLORS AT LAW

CARMINE J. LIOTTA
RICHARD M. MANDEL
DAVID M. KUPFER

————

RAYMOND D. O'BRIEN
(1928-2000)

LIBERTY HALL CORPORATE CENTER
1085 MORRIS AVENUE
P.O. BOX 3180
UNION, NEW JERSEY 07083-1980
908-354-7530

Fax
908-354-7531

THOMAS J. WHITNEY
JODIE L. DRISCOLL
BRADLEY E. BISHOP

————

OF COUNSEL
ELIZABETH H. ROHAN

April 9, 2007

**VIA FAX**

Lorelie S. Masters, Esq.
Jenner & Block, LLP
601 Thirteenth Street, NW
Suite 1200 South
Washington, DC 20005-3823

<div style="margin-left:2em">

Re:     Insured:  Joel and Carol Hirsch
Policy No.: 1183327602
Date of Loss:  June 25, 2006
Writing Company: Great Northern Insurance Company
Our File No.:     50209.017

</div>

Dear Ms. Masters:

I am writing regarding the Hirsches' failure to date to produce documents relevant to their claims for damage to their residence, provide a sworn statement of loss, and provide dates on which they will appear to be examined under oath.

Your March 23rd letter advised that you expected to confer with Mr. Hirsch regarding these matters by March 26th and "would get back to [me] then." I called you on March 30th because I had not heard further from you; from our telephone conversation, it was my understanding that I would receive some substantive reply to our information requests by the end of the week of April 2nd. I have not, as of this writing, received any documents or information, or had any further communication, from you.

Former counsel for Great Northern first requested on December 28, 2006 that the Hirsches, by a date certain, produce specified documents, execute a sworn proof of loss and be examined under oath. I renewed Great Northern's requests by my January 23, January 30, February 8, February 23 and March 14 letters. The Hirsches have failed to provide any of the requested information and are in breach of their contractual obligations under the insurance policy at issue.

*O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP*
*COUNSELLORS AT LAW*

Lorelie S. Masters, Esq.
February 27, 2008
Page 2


Great Northern will afford the Hirsches one opportunity to cure their breach of their obligations under the Policy, as follows:

1.  By producing documents responsive to the Schedule and a sworn proof of loss to me on or before April 23, 2007;

2.  By appearing to be examined under oath at your offices at 10:00 a.m. on Wednesday, May 9, 2007.

Upon your receipt of this letter, please let me hear from you regarding how the Hirsches intend to proceed.

Very truly yours,

O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP


BY:_____
                    DAVID M. KUPFER

DMK:js
50209017.LET7

# Jaeger Reply Affidavit Exhibit G

## O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP
### COUNSELLORS AT LAW

CARMINE J. LIOTTA
RICHARD M. MANDEL
DAVID M. KUPFER
———
RAYMOND D. O'BRIEN
(1928-2000)

LIBERTY HALL CORPORATE CENTER
1085 MORRIS AVENUE
P.O. BOX 3180
UNION, NEW JERSEY 07083-1980
908-354-7530
Fax
908-354-7531

THOMAS J. WHITNEY
JODIE L. DRISCOLL
BRADLEY E. BISHOP
MICHAEL J. DONAHUE
———
OF COUNSEL
ELIZABETH H. ROHAN

May 16, 2007

**VIA FAX - (202) 661-4924 and**
**REGULAR MAIL**

Lorelie S. Masters, Esq.
Jenner & Block, LLP
601 Thirteenth Street, NW
Suite 1200 South
Washington, DC  20005-3823

> Re:  Insured:  Joel and Carol Hirsch
> Policy No.: 1183327602
> Date of Loss:  June 25, 2006
> Writing Company: Great Northern Insurance Company
> Our File No.:      50209.017

Dear Ms. Masters:

I am in receipt of your May 11, 2007 letter and documents provided therewith which, with the exception of a few emails to and from Mr. Hirsch and his broker, consist of copies of emails and documents already in the possession of Great Northern.  I look forward to receiving the "signed proof of loss on the form provided first and originally by the Cozen firm before it withdrew" which your letter advises will be "provide[d] early next [this] week."

Please be reminded that the "Sworn Statement and Proof of Loss" forwarded by the Cozen firm is to be signed and sworn to by the Hirsches in the presence of a notary public.

Your letter advises that you possess a "box of documents" for my review.  Please immediately arrange to have the entire contents of the box photocopied and sent to me by overnight mail (you may use our federal express account #1121-1960-4).  Great Northern will pay the reasonable cost of copying these documents.  Your letter does not advise whether the documents in your possession are originals or photocopies.  We will

*O'BRIEN, LIOTTA , MANDEL & KUPFER, LLP*
    *COUNSELLORS AT LAW*

Lorelie S. Masters, Esq.
February 27, 2008
Page 2

wish to examine the originals, and ask for your advice regarding where and when the original documents may be inspected.

The schedule of documents forwarded under cover of the Cozen firm's December 28, 2006 letter, and my January 23, 2007, January 30, 2007, February 8, 2007, February 23, 2007 and March 14, 2007 letters identified 21 categories of documents to be produced. If the "box of documents" does not contain all documents in the Hirsches' possession responsive to these 21 categories, please identify those categories to which the documents to be produced will respond.

Your May 11th letter fails to address whether the Hirsches intend to appear, as is their obligation under the policy, to be examined under oath, or to sign and return the authorizations to Eight Brothers, Steven Frischling, JS Wagner Company, Inc., Jueneman Painting and Wentworth, Inc. (companies which have been identified by Mr. Hirsch as having provided services relevant to damage sustained in the loss) forwarded by my January 30, 2007 letter. (I disagree with your position, that Mr. Hirsch's interview by Dan Jaeger was an examination under oath: Mr. Hirsch was not placed under oath prior to such interview.) Great Northern, through counsel, has requested, in letters dated December 28, 2006, January 23, 2007, January 30, 2007, February 8, 2007, February 23, 2007 and March 14, 2007, that the Hirsches produce specified documents, sign authorizations, execute a sworn proof of loss and be examined under oath. My April 7th letter informed you that the Hirsches had failed to provide any of the requested information and were in breach of their contractual obligations under the insurance policy at issue, and offered the Hirsches the opportunity to cure their breach by producing responsive documents on or before April 23, 2007, and by appearing to be examined under oath at your offices on May 9, 2007. The Hirsches did not produce <u>any</u> documents by April 23rd, nor did they appear to be examined under oath on May 9th. Thus, the Hirsches continue to be in breach of their obligations under the insurance contract.

For the past 4½ months, Great Northern and we have attempted to obtain the Hirsches' compliance with their obligations under the insurance contract to provide information relevant to their claim. We do not intend to continue these efforts indefinitely. Within the next 10 days (i.e., by May 25th), please inform me of the following:

1. Whether the Hirsches will submit to examination under oath;

2. Two or more dates, within the next 30 days, on which the Hirsches are available to be examined under oath at your office;

*O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP*
COUNSELLORS AT LAW

Lorelie S. Masters, Esq.
February 27, 2008
Page 3

2.  Whether the Hirsches will sign the authorizations for the release of information by their construction contractors and consultants, and a firm date by which we will have signed authorizations in hand.

Great Northern respectfully declines your request for a copy of its claim file, as your clients have no right under the Policy or at law to a copy of the claim file. I will not respond to every factual allegation and legal argument advanced by your six page letter (other than to state that I disagree with all such allegations and arguments); Great Northern's investigation of the Hirsches' claim is ongoing, and I think your suggestion that Great Northern has "rushed to judgment" (to borrow a phrase), and factual and legal arguments regarding why such "rush to judgment" is inappropriate, are entirely premature.  In my January 30, 2007 letter, early in Great Northern's investigation, I was candid regarding the purpose of Great Northern's request for information:  to investigate Mr. Hirsch's concealment and misrepresentation of facts relevant to the claim.  During his interview by Mr. Jaeger, Mr. Hirsch stated that he had fabricated an estimate on the letterhead of Steven Frischling, Inc. for the repair of certain interior doors claimed by Mr. Hirsch to have sustained water damage on June 25, 2006, and that he had submitted this fabricated estimate to Great Northern for payment.  I further informed you that Great Northern had been informed that another invoice submitted by Mr. Hirsch for payment (purporting to have been prepared by Wentworth, Inc. for project management services) was also fabricated.  As is its right under the contract of insurance, Great Northern has attempted, through request to your clients for information and interviews of their contractors, to fully investigate this claim prior to making a coverage determination. Your clients' failure to provide information relevant to their claim has frustrated that investigation.  We again request your clients' cooperation in Great Northern's investigation, as is their obligation under the insurance contract, so that Great Northern may make a fully informed coverage determination.  As I informed you when we met on May 9th, your several demands that Great Northern commit to a coverage position, prior to the completion of its investigation, seek to put the cart before the horse.

Please let me hear from you by May 25th regarding how the Hirsches intend to proceed.  This letter is written without prejudice to the rights and defenses of Great Northern under the Policy and at law or in equity, which are expressly reserved.

Very truly yours,

O'BRIEN, LIOTTA, MANDEL & KUPFER, LLP

BY:_____

DAVID M. KUPFER

DMK:js